**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

**ALEXANDER INTERACTIVE, INC.**                                         Case No. 12 cv 6608 (KPC)
                                                                         **ECF CASE**

                                   **Plaintiff,**                        <u>**COMPLAINT**</u>

                  -against-
                                                                         **Plaintiff Demands**
                                                                         <u>**Trial By Jury**</u>

**ADORAMA, INC., ADORAMA ENTERPRISES LLC,**
**EUGENE MENDLOWITS, AND**
**MENDEL MENDLOWITS,**

                                   **Defendants.**
-------------------------------------------------------------------X


        Plaintiff, Alexander Interactive, Inc. ("**AI**"), files this complaint ("**Complaint**") against

Adorama, Inc. ("**Adorama**"), Adorama Enterprises LLC ("**Adorama LLC**"), Eugene

Mendlowits ("**EM**") and Mendel Mendlowits ("**MM**," together with Adorama, Adorama LLC

and EM, the "**Defendants**"), and respectfully sets forth, alleges and represents as follows:

**PARTIES AND JURISDICTION**

1.  Plaintiff, AI, is a Corporation, duly formed and operating under the laws of the State of

    New York. AI maintains its headquarters at, and operates from, 149 Fifth Avenue, 8th

    Floor, New York, New York.

2.  Upon information and belief, Defendant, Adorama, is a Corporation, duly formed and

    operating under the laws of the State of New York.  Adorama maintains its principal

    executive offices at, and operates from, 42 West 18th St., New York, New York 10011

    (the "**Retail Store**").

3. Upon information and belief, Defendant, Adorama LLC, is a Limited Liability Company, duly formed and operating under the laws of the State of New York with its principal place of business at 42 West 18th St., New York, New York, 10011.

4. Upon information and belief, Defendant, MM, is an individual and citizen of the State of New York with his residence at 1574 55th ST., Brooklyn, New York 11219.

5. Upon information and belief, Defendant, EM, is an individual and citizen of the State of New York with his residence at 473 Bedford Avenue, Brooklyn, New York 11211.

6. As set forth more fully hereinbelow, the amount in controversy in this action exceeds $75,000.00, exclusive of costs and interest.

7. As more fully set forth hereinbelow, Plaintiffs seek relief under applicable federal law and the laws of the State of New York.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. Venue is proper in this District pursuant to 28 U.S.C. §1391.

## APPLICABLE FACTS

### 1. The Agreements

9. AI is a web design and engineering firm dedicated to the principle of transactional intelligence ("**TI**"). AI markets TI as a way of thinking about websites that focuses on behavior, commerce, and measurable success.

10. Adorama and Adorama LLC are businesses engaged in the sale of photographic and other electronics equipment both at it Retail Store and online at www.adorama.com.

11. Upon information and belief, EM and MM are principals of Adorama and Adorama LLC.

12. Upon information and belief, EM is a principal of Leisure Pro, Ltd, which sells leisure equipment relating to diving at the Retail Store and at www.leisurepro.com.

13. On June 2, 2010, Adorama and AI executed a Master Services Agreement (the "**MSA**"), with annexed Schedule A ("**MSA Schedule A**"), dated June 2, 2010, pursuant to which AI was retained, in connection with reengineering www.adorama.com, to create and prepare certain Project Deliverables, set forth on MSA Schedule A, delineated as Faceted Feature Analysis, Technical Roadmap, and a Statement of Work (collectively, the "**Schedule A Deliverables**") for a fee of fifty-thousand dollars ($50,000).

14. After completing the Schedule A Deliverables contemplated on MSA Schedule A, or as otherwise agreed to by AI and Adorama, the Schedule A Deliverables were accepted by Adorama pursuant to the express terms of Section 2 of Schedule B to the MSA (with annexed Appendices A through E)(collectively, the "**MSA Schedule B**")), executed by Adorama and AI on December 21, 2010.

15. Concurrent, and in conjunction, with the execution of MSA Schedule B, Adorama and AI executed an Escrow Agreement, dated December 21, 2010 (the "**Escrow Agreement**"), pursuant to which, *inter alia*, Adorama agreed to deposit with an appointed escrow agent (the "**Escrow Agent**") the sum of $50,000 on December 21, 2010 and the sum of $450,000 on April 1, 2011.

16. AI is a commerce partner of Magento Enterprise (a/k/a Magento, Inc.) ("**Magento**"). According to www.magento.com, "Magento [is an] eCommerce platform [that] serves more than 110,000 merchants worldwide and is supported by a global ecosystem of solution partners and third-party developers. Magento is a feature-rich, open-source, enterprise-class platform that offers merchants a high degree of flexibility and control over the user experience, catalog, content and functionality of their online store." www.magento.com/company.

17.  It was anticipated by Adorama, AI and Magento that, upon completion of Adorama's website pursuant to the MSA Schedule B, Adorama's website would operate on a Magento ecommerce platform.

18.  To ensure complete compatibility and functionality of Adorama's website on the Magento platform, on November 10, 2010, AI executed with Magento a Magento Custom Services Agreement, with Schedule A (collectively, the "**CSA**") pursuant to which a Magento development team was employed to provide:

   a)  Consulting services on Magento architecture;

   b)  Consulting services on Magento coding best practices;

   c)  Hands-on development support with [AI's] Magento projects and resolution of production defects, as assigned by [AI];

   d)  Knowledge transfer on any development work completed as part of the services engagement; and

   e)  Code Development

      (i)  Software development extensions as defined by a provided specification document
      (ii)  Delivery of two standalone extensions that function as defined within the specification document on a clean (native) installation of the latest Enterprise Edition release at the time of contract execution, 1.9x.  The stand alone extensions will be delivered as individual archive files consisting of self contained folders including xml, config, and php files.

19.  As a precondition of AI's contract with Adorama, AI was required to attach the Magento CSA to the MSA, and such CSA was, indeed, attached to the MSA.

## 2.  Performance by AI

20.  Upon execution of the MSA Schedule B, AI immediately commenced services.

21. Upon execution of the Magento CSA, Magento provided a developer who interfaced and worked with AI providing the following services (for which AI was invoiced by and paid to Magento the sum of $64,490.00):

    a) Consulting services on Magento architecture (November – December 2010);

    b) Consulting services on Magento coding best practices (November – December 20120);

    c) Catalog migration and Enterprise Service Bus ("ESB") integration (February 2011);

    d) Knowledge transfer on any development work completed as part of the services agreement (February 2011);

    e) Memory optimization in Magento's ESB module (July 21, 2011);

    f) Performance optimization (July 25, 2011); and

    g) Code review (October 25, 2011).

(collectively, the "**Magento Services**").

22. Pursuant to the MSA Schedule B, AI (in conjunction with the Magento Services under the CSA), on the dates set forth below, AI created and delivered to Adorama all of the deliverables (as this term is defined in Section 1.2 of the MSA) set forth on Appendix C to MSA Schedule B:

    a) Integration Design Specification (November 2012);

    b) Project Schedule and Iteration Plan (November 2012);

    c) Functional Requirements Document (March 2011 – June 2011);

    d) Personas (December 2010);

e)   Analytics Reports (December 2010);

f)   Strategy and User Experience Recommendation (December 2012);

g)   Sitemap (December 8, 2010);

h)   Wireframes (February 8, 2011 – May 4, 2011);

i)   Creative Brief (December 9, 2011 – December 13, 2011);

j)   Concept Design (February 17, 2011 – February 23, 2011);

k)   Applied Design (March 1, 2011 – May 12, 2011);

l)   HTML, CSS, and Javascript (March 2011 – March 2012);

m)   Magento Enterprise (March 2011 – March 2012);

n)   Hosting Specification and System Administration (November 29, 2010 and ongoing through engagement);

o)   Launch Plan (June 7, 2011);

p)   QA Test Plan (April 2011 – March 2012);

q)   Website Testing (March 2011 – March 2012);

r)   User Acceptance Testing (July 25, 2011, August 4, 2011, February 24, 2012, and, upon information and belief, among other dates;

s)   Training (May 31, 2011, June 23, 2011); and

t)   Multivariate Testing Engine.

(collectively, the "**Appendix C Deliverables**")

23. Pursuant to Section 1.3 of the MSA, AI (in conjunction with Magento's services under the CSA), on the dates set forth below, AI created and delivered to Adorama the following additional Deliverables (as this term is utilized in the MSA Schedule B) requested and agreed to by Adorama:

    a) Demo for Samsung (December 2011 – January 2012);

    b) Taxonomy (December 2010);

    c) Treejack Survey (December 2010);

    d) Card Sorting (December 2010);

    e) Development, Quality Assurance, and Project Management in January 2012;

    f) Development, Quality Assurance, and Project Management in February 2012.

(collectively, the "**Additional Deliverables**").

24. Pursuant to the MSA Schedule B, Section 6, AI received the following payments from Adorama on the dates set forth below:

    a) Payment 1- $300,000 on December 22, 2010

    b) Payment 2-$75,000 on October 6, 2010

    c) Payment 3-$75,000 on November 8, 2010

    d) Payment 4-$75,000 on December 20, 2010

    e) Payment 5-$75,000 on January 11, 2011

    f) Payment 6-$75,000 on February 22, 2011

    g) Payment 7-$75,000 on March 30, 2011

    h) Payment 8-$75,000 on April 29, 2011

(collectively, the "**Payments**").

25. On or around November 10, 2011, the "new" Adorama website created by AI was "demoed" for Samsung to demonstrate the functionality of the some or all of

Deliverables delivered to that date to Adorama by AI and to demonstrate the enhanced look and functionality of the "new" Adorama website.

26. On November 10, 2011, Glen, Holman, Adorama's appointed Project Manager on the MSA, notified AI and executives at Adorama that the Samsung "demo" went well and that Adorama would be meeting with Samsung in person to discuss a potential ecommerce partnership.

27. Upon information and belief, Adorama sought to, and did, obtain a partnership with Samsung to sell its products on Adorama's website via the implementation of a new and more sophisticated website created by AI.

### 3. Adorama's Breach

*A. Adorama's Monetary Breach*

28. Adorama failed, pursuant to MSA Schedule B, Section 6, to deliver the required escrow payment of $450,000 (the "**Escrow Payment**") to the Escrow Agent set forth in the Escrow Agreement.

29. From April 1, 2011, when the $450,000 escrow payment was due, and remained unpaid, through March 13, 2012, AI continued to perform services for Adorama on the Appendix C Deliverables and Additional Deliverables and delivered the following invoices:

      a)   $450,000 due to Escrow Agent on April 1, 2012;

      b)   $110,000 for services rendered in January 2012;

      c)   $110,000 for services rendered in February 2012; and

      d)   Unremitted $50,000 in Escrow Agent's possession.

(collectively, the "**Unpaid Invoices**")

30. Adorama has failed to remit payment on the Unpaid Invoices in material breach of the

MSA and the MSA Schedule B.

B. *Adorama's Failure to Test Deliverables*

31. Section 6 of the MSA provides in relevant part that:

6.  Acceptance of Services.

6.1   Each Deliverable identified on a Schedule as being subject to acceptance testing shall be subject to acceptance testing by Client to verify that the Deliverable satisfies the acceptance criteria mutually agreed to by Client and AII for said Deliverable.   The acceptance criteria for each Deliverable shall be included in the applicable Schedule.   The acceptance criteria shall be jointly developed and mutually agreed to in writing by Client and AII and set forth in each Schedule.   The parties shall endeavor to include such acceptance criteria on the Schedule before work commences on the Deliverable, and in any event, such criteria shall be inserted in the appropriate Schedule no later than thirty (30) days in advance of the date identified in the Schedule for completion of the Deliverable.  If Client in good faith cannot agree to any of the acceptance criteria proposed by AII, Client shall be obligated to either (i) terminate the Schedule after payment to AII for all of its services through such termination date, or (ii) accept the acceptance criteria as proposed by AII.

6.2    Acceptance testing for each Deliverable subject to such testing shall commence within five (5) business days of the date on which AII notifies Client Project Manager, in writing, that the Deliverable has been satisfactorily completed, in AII's opinion, and is ready for acceptance testing by the Client. Acceptance testing shall continue for the period of time specifie3d in the acceptance criteria or, if no such time period has been agreed upon by the parties, for a period of fifteen (15) consecutive days ("the Initial Acceptance Period").

6.3   In the event that any Deliverable does not conform to the acceptance testing with in the Initial Acceptance Period described above, Client shall give AII written notice thereof.   Client shall cooperate with AII in identifying in what respects the Deliverable fails to confirm to the criteria.   AII shall, at no cost to Client, promptly correct any deficiencies which prevent such Deliverable from confirming to the acceptance criteria.  Upon completion of the corrective action by AII, Client shall repeat the acceptance test until the Deliverable has successfully conformed to the acceptance criteria.

6.4   When the subject Deliverable has successfully conformed to or satisfied the acceptance criteria, Client shall give AII written notice thereof.

6.5  In the event the parties cannot agree on whether a subject Deliverable has satisfied the acceptance criteria with thirty (30) days of delivery by AII of such Deliverable, then the parties' respective sole remedy against the other party shall be to terminate the Schedule.  Either party may terminate the Schedule upon written notice to the other party.  In such event, Client shall be required to pay only the minimum fee set forth in such Schedule, and shall not thereafter be entitled to use the Deliverable for any purpose whatsoever.

6.6  In the event the applicable Schedule does not identify a Deliverable as being subject to acceptance testing or provides for maintenance or other similar services to be provided to Client, then such Deliverable and services shall not be subject to acceptance testing by Client.

32. Commencing February 24, 2012,  and on the corresponding dates set forth below, AI delivered the following deliverables on which Adorama refused to conduct acceptance testing (pursuant to the MSA and the MSA Schedule B with respect to the Schedule B Deliverables and pursuant to written acceptance testing requirements for the Additional Deliverables):

    a)  Add to cart functionality (February 24, 2012);

    b)  Exact Target email integration (February 24, 2012);

    c)  All site images loaded (February 24, 2012);

    d)  QAS verification (February 24, 2012);

    e)  Bill Me Later integration (February 24, 2012); and

    f)  Enterprise Service Bus (March 9, 2012).

(collectively, the "**Untested Deliverables,**" together with the Additional Deliverables, and the Appendix C Deliverables, the "**Deliverables**")

33. While Adorama contended that AI failed to deliver certain Deliverables by certain deadlines, Section 1.4 of the MSA provides that "Client acknowledges that [proposed] dates [of completion] are best estimates only."   Adorama did not seek to terminate the MSA.

34. Because of Adorama's refusal to comply with the terms of the MSA, MSA Schedule B and other acceptance testing criteria agreed to by AI and Adorama, coupled with Adorama's failure to comply with its monetary obligations under the MSA, MSA Schedule B and Escrow Agreement, pursuant to Section 11.2.2 of the MSA, on March 19, 2012, AI notified Adorama in writing ("**Termination Notice**") that it was terminating the MSA because of Adorama's material breach of the terms of the MSA, the MSA Schedule B and the Escrow Agreement.

35. The Termination Notice notified Adorama that it had a fifteen (15) business day cure period.

36. Adorama failed to undertake any steps to cure the following material breaches of the MSA set forth in the Termination Notice:

    a) Failing to pay the January 2012 and February 2012 charges for ongoing work;

    b) Failure and unwillingness to validate, conduct acceptance testing and accept deliverables delivered by AI;

    c) Failure and unwillingness to provide meaningful feedback and cooperation to AI in an effort to facilitate completion of the project;

    d) Failure to negotiate in good faith; and

    e) Failure to make the required $450,000 payment into Escrow.

37. Pursuant to Section 11.4 of the MSA, Adorama has failed to pay to AI all invoices for work completed by AI prior to the date of the Termination Notice.

38. AI employees worked in excess of 30,000 billable hours for which it was not remunerated by Adorama.

11

39. Pursuant to the applicable terms of the MSA, AI is owed, at a minimum, $720,000 on outstanding invoices.

40. Section 5.2 of the MSA provides that:

> 5.2 *Late Payment*.  In the event Client fails to make payment to AII when such payment is due, then without prejudice to any other right or remedy, AII shall be entitled to charge Client, and Client shall be obligated to pay, interest at a rate of 1.5% per month on the amount due.  In addition, in the case of a late or no payment, AII reserves the right to stop service and recover its costs of collection, including attorneys' fees, if applicable.

### C.  *Adorama's License/Copyright Infringement*

41. Pursuant to the MSA, AI owned all licenses under the MSA and all proprietary rights in the Deliverables.  Specifically, the Deliverables including the underlying computer program created by AI constitute copyrightable subject matter that is protected against unauthorized copying under the laws of the United States.  AI has filed a copyright application for registration of the Deliverables in the United States Copyright Office,  a copy of which application is annexed hereto and made a part hereof as **Exhibit A**, which application remains pending.

42. Pursuant to Section 11.4, upon the termination of the MSA, all Licenses under the agreement are deemed terminated.

43. Pursuant to Section 8.1 of the MSA, "[u]ntil Client acquires a license to use the Deliverables, the only permitted use by Client of such Deliverables shall be to perform acceptance testing, and for no other use."

44.  Section 2 of the MSA provides in relevant part as follows:

> 2.  License
>
> 2.1 *Upon payment in full by Client of all fees associated with the work performed under a Schedule*, AII shall grant to Client a worldwide, royalty-free, non-exclusive license to the Deliverables delivered pursuant to such Schedule, limited

to use of the Deliverables as a Website or Web system only, and not for any other purpose without the prior written consent of AII.

2.2 Client shall not permit any persons or entities other than its employees to access or use the Deliverables.  Client acknowledges and agrees that it shall have no right to use the Deliverables for the benefit of any third party nor to use the Deliverables in a manner inconsistent with the provisions of the Master Agreement or applicable Schedules.  Use of the Deliverables shall be limited to use for the internal business operations of Clients and shall not be used directly or indirectly for the benefit of any third party.  Client shall not distribute, sell, sublicense, or otherwise transfer the Deliverables without AII's prior written consent. Client shall not translate, modify, adapt, decompile, disassemble, or reverse engineer any Deliverable.

2.3 Except for the right of Client to use the Deliverables as set forth herein, all trademarks, services marks, patents, copyrights, trade secrets, and other intellectual property and proprietary rights in and to the Deliverables are and shall remain the exclusive property of AII.  Client shall not take any actions that jeopardize AII's proprietary rights.

(emphasis added).

45.  In or around July 25, 2012, AI discovered that Adorama, in violation of Section 2, Section 8.1 and Section 11.4 of the MSA, and in violation of applicable federal and state law, intentionally and fraudulently utilized certain graphic Deliverables (i.e. licenses) on its existing website, www.adorama.com to, among other things, successfully lure Samsung to allow Adorama to sell its products on its website, create other Adorama brand-enhancement, and create a "brand-halo experience", ultimately increasing Adorama sales, revenues and profits.

   D.  *Adorama's Violation of the Non-Solicitation Clause*

46. Section 8.3 and 8.4 provide in relevant part that:

8.3 [Mutual Non-Solicitation…] Unless otherwise mutually agreed to by the parties in writing, Client agrees not to hire or to solicit employment of any of the AII Personnel directly or indirectly associated with AII's services hereunder or under any Schedule during the term of such Schedule and for a period of twelve (12) consecutive months thereafter.

8.4 The provisions of this Section 8 will survive termination or expiration of this Agreement.

47.   Section 3.2 of the MSA defines "AII Personnel" as any AI "employee, personnel or *independent contractors*." (emphasis added).

48.   Upon information and belief, in and around July 31, 2012, Adorama solicited Magento, (an express "Independent Contractor" of AI pursuant to Section 27 of the CSA), to perform services for Adorama that had been or were to be performed by AI.

*E.  Adorama's Improper Modification of Deliverables*

49.   Because of Adorama's solicitation of independent contractors who provided services in connection with the MSA, the MSA Schedule B, and the Magento CSA, and in light of Adorama's infringement of the license for the Deliverables, which is reflected on Adorama's home page at www.adorama.com, upon information and belief, AI believes that one or more of the Defendants has been translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI in violation of Sections 2.2, 2.3, 8.1 and 11.4 of the MSA.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Injunction and Impoundment-Copyrighted Software – 17 U.S.C. §§ 502, 503 & F.R.C.P. 65**

50.   AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 49 set forth hereinabove.

51.   Upon information and belief, one or more of the Defendants is in possession of and has infringed on AI's copyrights in one or more of its Deliverables.

52.   AI seeks to permanently enjoin the Defendants from infringing AI's copyrights in its Deliverables and demands that the Deliverables be impounded from the Defendants.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
### Injunction – Infringement/Use of Software Licenses and Misappropriation of Trade Secrets
### F.R.C.P. 65

53. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 52 set forth hereinabove.

54. Upon information and belief, one or more of the Defendants has infringed on AI's licenses in one or more of its Deliverables and constitutes misappropriation in and of AI's trade secrets.

55. AI seeks to enjoin the Defendant from infringing on AI's licenses in its Deliverables.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Injunction - Solicitation – F.R.C.P. 65

56. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 55 set forth hereinabove.

57.  Upon information and belief, Adorama has violated the non-solicitation provision of the MSA by soliciting Magento to perform services for Adorama within the scope of the MSA and it Schedules.

58. AI seeks to enjoin Adorama from soliciting Magento and any other "AII Personnel" in violation of the non-solicitation provision of the MSA.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Injunction - Confidentiality – F.R.C.P. 65

59. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 58 set forth hereinabove.

60. Upon information and belief, one or more of the Defendants has been translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI in violation of Sections 2.2, 2.3, 8.1 and 11.4 of the MSA.

61.  AI seeks to permanently enjoin the Defendants from translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York

Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Breach of Contract**

62. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 61 set forth hereinabove.

63. Adorama violated material provisions of the MSA, MSA Schedule B and the Escrow Agreement.

64. Adorama materially breached the MSA by failing to remit payment to AI for services rendered.

65. Adorama materially breached the MSA by soliciting Magento.

66. Adorama materially breached the MSA by violating the confidentiality provision therein by using, translating, adapting, decompiling, disassembling and/or reverse engineering of any one or more of the Deliverables without AI's authorization.

67. Adorama materially breached the MSA by infringing AI's licenses and copyrights.

68. Adorama materially breached the MSA and MSA Schedule B by failing to engage in required acceptance testing on certain Deliverables.

69. Adorama materially breached the MSA, MSA Schedule B and the Escrow Agreement by failing to deliver the $450,000 required payment to the Escrow Agent.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits,

a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
### Copyright Infringement-17 U.S.C. § 501, et.seq

70. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 69 set forth hereinabove.

71.  Adorama was in material breach of the MSA, and AI terminated the MSA.

72. AI has not authorized Adorama and/or any other one or more of the Defendants (whether or not the MSA was breached and they were a party thereto) to use, translate, modify, adapt, decompile, disassemble and/or reverse engineer of any one or more of the Deliverables delivered by AI.

73.  Upon information and belief, one or more of the Defendants' willfully has, and willfully continues to use, translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of the Deliverables delivered by AI.

74.  One or more of the Defendants created derivative works based upon AI's Deliverables by incorporating these derivative works in Adorama's website.

75. The Defendants' conduct constitutes willful infringement of AI's copyrights in the Deliverables within the meaning of 17 U.S.C. § 504(c)(2).

76. The Defendants' conduct does not constitute fair use of AI's Deliverables where the purpose and character of the Defendants' use is of a commercial nature, and a substantial portion of AI's Deliverables were copied, adapted, used, disassembled, translated or re-engineered.

77. The use, translation, modification, adaptation, decompiling, disassembly and/or reverse engineering of one or more of the Deliverables by any one or more of the Defendants constitutes a copyright infringement.  Each act of infringement constitutes a separate base for statutory damages under 17 U.S.C. § 504.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Software License Infringement

78. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 78 set forth hereinabove.

79. Upon information and belief, without AI's authorization, one or more of the Defendants' has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

80. The MSA and its Schedules were materially breached by Adorama and the MSA and Schedules were terminated by AI by the Termination Notice.

81.  Use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables by any one or more of the Defendants is and continues to be an infringement of AI's Software Licenses.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York

Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Misappropriation of Trade Secrets-Restatement of Torts 2d, § 757

82. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 81 set forth hereinabove.

83. Upon information and belief, without AI's authorization, one or more of the Defendants' has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

84. The Defendants use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables constitutes theft of the Deliverables, which are AI's trade secrets.

85. Use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables by any one or more of the Defendants constitutes misappropriation of AI's trade secrets.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Unjust Enrichment

86. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 85 set forth hereinabove.

87. Upon information and belief, without AI's authorization and without paying just and equal compensations, one or more of the Defendants' has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

88. Via the use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables, Adorama enhanced its brand-halo, obtained a partnership with Samsung to sell Samsung products, and increased its sales, revenues and profits.

89. The Defendants use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables has, thus. unjustly enriched Adorama.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Recovery and Turnover

90. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 89 set forth hereinabove.

91.  Upon information and belief, without AI's authorization, one or more of the Defendants is in possession of and has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

92. Adorama was and continues to be in material breach of the MSA, MSA Schedule B and the Escrow Agreement.

93. The MSA, MSA Schedule B and the Escrow Agreement were terminated by AI via the Termination Notice.

94. AI demands recovery and turnover from all Defendants all Deliverables (in any form, whether disassembled, decoupled, adapted or re-engineered) to AI.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Damages – 17 U.S.C. §§ 504 & 505

95. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 94 set forth hereinabove.

96. AI suffered and seeks actual damages via the Defendant's infringement of AI's copyrights.

97. One or more of the Defendants profited from the infringement of AI's copyrights.

98. AI seeks and is entitled to an award of actual damages suffered by AI and of profits obtained by the Defendants.

99. AI reserves its right to seek statutory damages per infringement.

100. AI seeks and is entitled to an award of costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Damages-Breach of Contract

101. AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 100 set forth hereinabove.

102. AI seeks and is entitled to judgment against Adorama for actual damages arising from breach of the MSA.

103. AI seeks and is entitled to judgment against Adorama for consequential damages arising from breach of the MSA, including, but not limited to, damages to AI's reputation, business opportunities and goodwill.

104. AI seeks and is entitled to judgment against Adorama for punitive damages arising from Adorama's intentional breach of the MSA.

105. AI seeks and is entitled to judgment against Adorama for profits and other benefits gained by Adorama as a consequence of its breach of the MSA.

106.     AI seeks and is entitled to judgment against Adorama for costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Damages-License Infringement

107.     AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 106 set forth hereinabove.

108.     AI seeks and is entitled to judgment against the Defendants for actual damages arising from the Defendants' intentional license infringement of the Deliverables.

109.     AI seeks and is entitled to judgment against the Defendants for consequential damages arising from the Defendants' intentional license infringement of the Deliverables.

110.     AI seeks and is entitled to judgment against Defendants for punitive damages arising from Defendants' intentional license infringement of the Deliverables.

111.     AI seeks and is entitled to judgment against Defendants for all profits any and all of the Defendants derived from their illegal use, adaptation, translation, decompiling, disassembling and/or re-engineering of any one or more of the Deliverables via infringement of AI's licenses therein.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Damages-Theft of Trade Secrets

112.    AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 111 set forth hereinabove.

113.    AI seeks and is entitled to judgment against the Defendants for actual damages arising from their theft of trade secrets from AI.

114.    AI seeks and is entitled to judgment against the Defendants for consequential damages arising from their theft of trade secrets from AI.

115.    AI seeks and is entitled to judgment against the Defendants for punitive damages arising from their theft of trade secrets from AI.

116.    AI seeks and is entitled to judgment against the Defendants for profits gained by the Defendants via their theft of trade secrets from AI.

117.    AI seeks and is entitled to judgment against the Defendants for costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-

judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FIFTHEENTH CAUSE OF ACTION
### Damages-Interest

118.     AI reasserts and realleges the facts and allegations set forth in paragraphs 1 through 117 set forth hereinabove.

119.     AI seeks and is entitled to interest on payments due under the MSA at 1.5% per month that unpaid invoices under the MSA and MSA Schedule B have remained unpaid.

120.     AI seeks and is entitled to statutory interest on the full judgment entered herein.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment in favor of AI against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, jointly and severally, as applicable, including permanent injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

Dated:  White Plains, New York
       August 24, 2012

                          *Savage & Associates, P.C.*
                          Attorneys for Alexander Interactive, Inc.,
                          Plaintiff

                       By:  __/s/  Denise L. Savage___
                             Denise L. Savage (ds1498)
                             50 Main Street
                             Suite 1000
                             White Plains, New York  10606
                             Direct: 914.455.0087
                             (T) 914.271.5150, Ext. 1301
                             (F) 914.271.5255
                             dsavage@savagelitigation.com
                             http://www.savagelitigation.com