**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**ALEXANDER INTERACTIVE, INC.,**
**ALEXANDER SCHMELKIN and**
**JOSH LEVINE**                                         **Case No. 12 cv 6608 (KPC)**
                                                        **ECF CASE**
                         **Plaintiffs,**
                                                        **SECOND AMENDED**
                                                              **COMPLAINT**


                  **-against-**
                                                        **Plaintiff Demands**
                                                        <u>**Trial By Jury**</u>


**ADORAMA, INC., ADORAMA ENTERPRISES LLC,**
**EUGENE MENDLOWITS, AND**
**MENDEL MENDLOWITS,**

                         **Defendants.**
-------------------------------------------------------------------X

        Plaintiffs, Alexander Interactive, Inc. ("**AI**"), Alexander Schmelkin ("**Schmelkin**") and

Josh Levine ("**Levine,**" together with AI and Schmelkin, the "**Plaintiffs**"), file this Second

amended complaint ("**Second Amended Complaint**") against Adorama, Inc. ("**Adorama**"),

Adorama Enterprises LLC ("**Adorama LLC**"), Eugene Mendlowits ("**EM**") and Mendel

Mendlowits ("**MM**," together with Adorama, Adorama LLC and EM, the "**Defendants**"), and

respectfully sets forth, alleges and represents as follows:

                        <u>**PARTIES AND JURISDICTION**</u>

1.  Plaintiff, AI, is a Corporation, duly formed and operating under the laws of the State of

    New York. AI maintains its headquarters at, and operates from, 149 Fifth Avenue, 8th

    Floor, New York, New York.  Plaintiff, Schmelkin, is a citizen and resident of New

    York, New York.  Plaintiff, Levine, is a citizen and resident of New York, New York.

2.  Upon information and belief, Defendant, Adorama, is a Corporation, duly formed and operating under the laws of the State of New York.  Adorama maintains its principal executive offices at, and operates from, 42 West 18th St., New York, New York 10011 (the "**Retail Store**").

3.  Upon information and belief, Defendant, Adorama LLC, is a Limited Liability Company, duly formed and operating under the laws of the State of New York with its principal place of business at 42 West 18th St., New York, New York, 10011.  Upon information and belief, Adorama LLC is either a holding company or principal of Adorama and MM and EM are principals of Adorama LLC.

4.  Upon information and belief, Defendant, MM, is an individual and citizen of the State of New York with his residence at 1574 55th ST., Brooklyn, New York 11219 and is a principal, officer and/or director of Adorama and Adorama LLC.

5.  Upon information and belief, Defendant, EM, is an individual and citizen of the State of New York with his residence at 473 Bedford Avenue, Brooklyn, New York 11211.  Upon information and belief, EM is a principal, officer and/or director of Adorama and Adorama LLC.

6.  As set forth more fully hereinbelow, the amount in controversy in this action exceeds $75,000.00, exclusive of costs and interest.

7.  As more fully set forth hereinbelow, Plaintiffs seek relief under applicable federal law and the laws of the State of New York.

8.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. Venue is proper in this District pursuant to 28 U.S.C. §1391.

## APPLICABLE FACTS

### 1. The Agreements

9. AI is a web design and engineering firm dedicated to the principle of transactional intelligence ("**TI**"). AI markets TI as a way of thinking about websites that focuses on behavior, commerce, and measurable success.

10. Adorama and Adorama LLC are businesses engaged in the sale of photographic and other electronics equipment both at it Retail Store and online at www.adorama.com.

11. Upon information and belief, EM and MM are principals, officers and/or directors of both Adorama and Adorama LLC.

12. Upon information and belief, EM is a principal of Leisure Pro, Ltd, which sells leisure equipment relating to diving at the Retail Store and at www.leisurepro.com.

13. Upon information and belief, Adorama LLC and Adorama utilize the same bank accounts, derive income from the same business, share the same principles/officers/directors/members, and operate from the same location.

14. Upon information and belief, both Adorama LLC and Adorama do not engage in or follow corporate formalities.

15. On June 2, 2010, Adorama and AI executed a Master Services Agreement (the "**MSA,**" annexed hereto and made a part hereof as **Exhibit A**), with annexed Schedule A ("**MSA Schedule A,**" annexed hereto and made a part hereof as **Exhibit B**), dated June 2, 2010, pursuant to which AI was retained, in connection with reengineering www.adorama.com, to create and prepare certain Project Deliverables, set forth on MSA Schedule A, delineated as Faceted Feature Analysis, Technical Roadmap, and a Statement of Work

(collectively, the "**Schedule A Deliverables**") for a fee of fifty-thousand dollars ($50,000).

16. After completing the Schedule A Deliverables contemplated on MSA Schedule A, or as otherwise agreed to by AI and Adorama, the Schedule A Deliverables were accepted by Adorama pursuant to the express terms of Section 2 of Schedule B to the MSA (with annexed Appendices A through E)(collectively, the "**MSA Schedule B,**" annexed hereto and made a part hereof as **Exhibit C**)), executed by Adorama and AI on December 21, 2010.

17. Concurrent, and in conjunction, with the execution of MSA Schedule B, Adorama and AI executed an Escrow Agreement, dated December 21, 2010 (the "**Escrow Agreement**"), pursuant to which, *inter alia*, Adorama agreed to deposit with an appointed escrow agent (the "**Escrow Agent,**" annexed hereto and made a part hereof as **Exhibit D**) the sum of $50,000 on December 21, 2010 and the sum of $450,000 on April 1, 2011.

18. AI is a commerce partner of Magento Enterprise (a/k/a Magento, Inc.) ("**Magento**"). According to www.magento.com, "Magento [is an] eCommerce platform [that] serves more than 110,000 merchants worldwide and is supported by a global ecosystem of solution partners and third-party developers. Magento is a feature-rich, open-source, enterprise-class platform that offers merchants a high degree of flexibility and control over the user experience, catalog, content and functionality of their online store." www.magento.com/company.

19. It was anticipated by Adorama, AI and Magento that, upon completion of Adorama's website pursuant to the MSA Schedule B, Adorama's website would operate on a Magento ecommerce platform.

20. To ensure complete compatibility and functionality of Adorama's website on the Magento platform, on November 10, 2010, AI executed with Magento a Magento Custom Services Agreement, with Schedule A (collectively, the "**CSA,**" annexed hereto and made a part hereof as **Exhibit E**) pursuant to which a Magento development team was employed to provide:

   a) Consulting services on Magento architecture;

   b) Consulting services on Magento coding best practices;

   c) Hands-on development support with [AI's] Magento projects and resolution of production defects, as assigned by [AI];

   d) Knowledge transfer on any development work completed as part of the services engagement; and

   e) Code Development

      (i) Software development extensions as defined by a provided specification document
      (ii) Delivery of two standalone extensions that function as defined within the specification document on a clean (native) installation of the latest Enterprise Edition release at the time of contract execution, 1.9x. The stand alone extensions will be delivered as individual archive files consisting of self contained folders including xml, config, and php files.

21. As a precondition of AI's contract with Adorama, AI was required to attach the Magento CSA to the MSA, and such CSA was, indeed, attached to the MSA.

## 2. Contractual Provisions

22. .   The MSA provides that in part that:

   1.2 *Scope of Work.*   A project statement (each, a "Project Statement") shall be included in each Schedule.  Each Project Statement will contain a description of the tacks performed by AII, the deliverables and documentation to be produced by AII (collectively, a "Project" and each discrete portion of a portion of a Project as identified by AII shall be deemed a "Deliverable"), acceptance criteria, if applicable, for each Deliverable, a schedule of performance, a schedule of payments and a statements of AII's then-current rates, if applicable.

1.3 *Additional Services*.  AII shall not be required to perform any services other than the services listed on a Schedule.  Upon request by Client [Adorama, Inc.], AII may agree to provide certain additional services for client.  AII may agree to provide certain additional services for Client.  If AII agrees to provide additional services, the parties shall set forth in writing the terms and conditions by which the provision of such additional services will be governed.  Unless otherwise agreed by the parties in writing, Client shall pay AII for all such additional services on a time and material basis at AII's then-current rates.

1.4 *Completion Dates*.  In the event that a Schedule includes dates for completion of certain Deliverables, Client acknowledges that such dates are best estimates only.  In the event that AII is unable to meet such estimated completion despite its commercially reasonable efforts to do so, Client agrees that it shall, in good faith, renegotiate the fees set forth in such Schedule, taking into account the additional time necessary to complete the applicable Deliverable.  In the event the parties cannot agree on revised fees, the parties agree to submit the matter to binding arbitration, conducted in accordance with the rules and procedures of the American Arbitration Association.

**********

2.	License.

2.1  Upon payment in full by Client of all fees associated with the work performed under a Schedule, AII shall grant to Client a worldwide, royalty-free, non-exclusive license to the Deliverables delivered pursuant to such Schedule, limited to use of the Deliverables as a Website or Web system only, and not for any other purpose without the prior written consent of AII.

2.2  Client shall not permit any persons or entities other than its employees to access or use the Deliverables.   Client acknowledges and agrees that it shall have no right to use the Deliverables for the benefit of any third party nor to use the Deliverables in a manner inconsistent with the provisions of the Master Agreement or applicable Schedules.  Use of the Deliverables shall be limited to use for the internal business operations of Client and shall not be used directly or indirectly for the benefit of any third party.  Client shall not distribute, sell, sublicense, or otherwise transfer the Deliverables without AII's prior written consent.  Client shall not translate, modify, adapt, decompile, disassemble, or reverse engineer any Deliverable.

2.3  Except for the right of Client to use the Deliverables as set forth herein, all trademarks, service marks, patents, copyrights, trade secrets, and other intellectual property and proprietary rights in and to the Deliverables are and shall remain the exclusive property of AII. Client shall not take any actions that jeopardize AII's proprietary rights.

2.4  AII shall be free during and after the development of work to be performed under any Schedule to develop similar work for any other entity.

6.  Acceptance of Services

6.1  Each Deliverable identified on a Schedule as being subject to acceptance shall be subject to acceptance testing by Client to verify that the Deliverable satisfies acceptance criteria mutually agreed to by Client and AII and set forth on each Schedule.  The parties shall endeavor to include such acceptance criteria on the Schedule before work commences on the Deliverable, and in any event, such criteria shall be inserted into the appropriate Schedule no later than thirty (30) days in advance of the date identified in the Schedule for completion of the Deliverable.  If Client in good faith cannot agree to any of the acceptance criteria proposed by AII, Client shall be obligated to either (i) terminate the Schedule after payment to AII for all of its services through the termination date, or (ii) accept the acceptance criteria as proposed by AII.

Acceptance testing for each Deliverable subject to such testing shall commence within five (5) business days of the date on which AII notifies Client Project Manager, in writing, that the Deliverable has been satisfactorily completed, in AII's opinion, and is ready for acceptance testing by Client.  Acceptance testing shall continue for the period of time specified in the acceptance criteria or, if no such time period has been agreed upon by the parties, for a period of fifteen (15) consecutive days ("the Initial Acceptance Period").

In the event that any Deliverable does not confirm to the acceptance testing within the Initial Acceptance Period described above, Client shall give AII written notice thereof.  Client shall cooperate with AII in identifying in what respects the Deliverable fails to confirm to the criteria.  AII shall, at no cost to Client, promptly correct any deficiencies which prevent such Deliverable from confirming to the acceptance criteria.  Upon completion of the corrective action by AII, Client shall repeat the acceptance test until the Deliverable has successfully confirmed to the acceptance criteria.

When the subject Deliverable has successfully conformed to or satisfied the acceptance criteria, Client shall give AII written notice thereof.

In the event the parties cannot agree on whether a subject Deliverable has satisfied the acceptance criteria within thirty (30) days of delivery by AII of such Deliverable, then the parties' respective sole remedy against the other party shall be to terminate the Schedule.  Either party may terminate the Schedule upon written notice to the other party.  In such event, Client shall be required to pay only the minimum fee set forth in the Schedule, and shall not thereafter be entitled to use the Deliverable for any purpose whatsoever.

In the event the applicable Schedule does not identify a Deliverable as being subject to acceptance testing or provides for maintenance or similar services to be provided to Client, then such Deliverable and services shall not be subject to acceptance testing by Client.

*********

8.3   Unless otherwise mutually agreed to by the parties in writing, AII agrees not to, directly or indirectly, employ, engage or solicit the employment or engagement of, for or on behalf of themselves or any third party, any personnel of Client directly or indirectly associated with AII's work effort under any Schedule during the term of such Schedule and for a period of twelve (12) consecutive months thereafter.  Unless otherwise mutually agreed to by the parties in writing, Client agrees not to hire or to solicit the employment of any of the AII Personnel directly or indirectly associates with AII's services hereunder or under any Schedule during the term of such Schedule and for a period of twelve (12) consecutive months thereafter.

**********

11.   Term and Termination

11.1   This Agreement shall commence on the date indicated above and shall continue in full force and effect thereafter unless and until terminated in accordance with the provisions of this Master Agreement or until satisfactory completion of the services provided herein and in all Schedules, based on the criteria set forth in each Schedule.

11.2   Either party may terminate this Agreement upon written notice to the other party in any of the following events:

     11.2.1   *****

     11.2.2   If the other party has breached a material term of this Agreement and failed to cure such breach within fifteen (15) days of notice thereof from the non-breaching party;..

11.4   Upon any termination of this Agreement, Client shall pay all invoices for work completed prior to the date of termination and the License shall be deemed terminated.

*See, MSA, inter alia, Exhibit A hereto.*

## 3.  Performance by AI

23. Upon execution of the MSA Schedule B, AI immediately commenced services.

8

24. Upon execution of the Magento CSA, Magento provided a developer who interfaced and worked with AI providing the following services (for which AI was invoiced by and paid to Magento the sum of $64,490.00):

    i.  Consulting services on Magento architecture (November – December 2010);

    ii.  Consulting services on Magento coding best practices (November – December 20120);

    iii.  Catalog migration and Enterprise Service Bus ("ESB") integration (February 2011);

    iv.  Knowledge transfer on any development work completed as part of the services agreement (February 2011);

    v.  Memory optimization in Magento's ESB module (July 21, 2011);

    vi.  Performance optimization (July 25, 2011); and

    vii.  Code review (October 25, 2011).

(collectively, the "**Magento Services**").

25. Pursuant to the MSA Schedule B, AI (in conjunction with the Magento Services under the CSA), on the dates set forth below, AI created and delivered to Adorama all of the deliverables (as this term is defined in Section 1.2 of the MSA) set forth on Appendix C to MSA Schedule B:

    i.  Integration Design Specification (November 2012);

    ii.  Project Schedule and Iteration Plan (November 2012);

    iii.  Functional Requirements Document (March 2011 – June 2011);

    iv.  Personas (December 2010);

v.   Analytics Reports (December 2010);

vi.   Strategy and User Experience Recommendation (December 2012);

vii.   Sitemap (December 8, 2010);

viii.   Wireframes (February 8, 2011 – May 4, 2011);

ix.   Creative Brief (December 9, 2011 – December 13, 2011);

x.   Concept Design (February 17, 2011 – February 23, 2011);

xi.   Applied Design (March 1, 2011 – May 12, 2011);

xii.   HTML, CSS, and Javascript (March 2011 – March 2012);

xiii.   Magento Enterprise (March 2011 – March 2012);

xiv.   Hosting Specification and System Administration (November 29, 2010 and ongoing through engagement);

xv.   Launch Plan (June 7, 2011);

xvi.   QA Test Plan (April 2011 – March 2012);

xvii.   Website Testing (March 2011 – March 2012);

xviii.   User Acceptance Testing (July 25, 2011, August 4, 2011, February 24, 2012, and, upon information and belief, among other dates;

xix.   Training (May 31, 2011, June 23, 2011); and

xx.   Multivariate Testing Engine.

(collectively, the "**Appendix C Deliverables**" (See Schedule B, annexed hereto as Exhibit C))

26. Pursuant to Section 1.3 of the MSA, AI (in conjunction with Magento's services under the CSA), on the dates set forth below, AI created and delivered to Adorama the following additional Deliverables (as this term is utilized in the MSA Schedule B) requested and agreed to by Adorama:

10

    i.  Demo for Samsung (December 2011 – January 2012);

    ii.  Taxonomy (December 2010);

    iii.  Treejack Survey (December 2010);

    iv.  Card Sorting (December 2010);

    v.  Development, Quality Assurance, and Project Management in January 2012;

    vi.  Development, Quality Assurance, and Project Management in February 2012.

(collectively, the "**Additional Deliverables**").

27. Pursuant to the MSA Schedule B, Section 6, AI received the following payments from Adorama on the dates set forth below:

    i.  Payment 1- $300,000 on December 22, 2010

    ii.  Payment 2-$75,000 on October 6, 2010

    iii.  Payment 3-$75,000 on November 8, 2010

    iv.  Payment 4-$75,000 on December 20, 2010

    v.  Payment 5-$75,000 on January 11, 2011

    vi.  Payment 6-$75,000 on February 22, 2011

    vii.  Payment 7-$75,000 on March 30, 2011

    viii.  Payment 8-$75,000 on April 29, 2011

(collectively, the "**Payments**").

28. On or around November 10, 2011, the "new" Adorama website created by AI was "demoed" for Samsung to demonstrate the functionality of the some or all of

Deliverables delivered to that date to Adorama by AI and to demonstrate the enhanced look and functionality of the "new" Adorama website.

29. On November 10, 2011, Glen, Holman, Adorama's appointed Project Manager on the MSA, notified AI and executives at Adorama that the Samsung "demo" went well and that Adorama would be meeting with Samsung in person to discuss a potential ecommerce partnership.

30. Upon information and belief, Adorama sought to, and did, obtain a partnership with Samsung to sell its products on Adorama's website via the implementation of a new and more sophisticated website created by AI.  *See email from Glen Holman to Alexander Schmelkin, dated January 3, 2012* (the "**Samsung Email**"), annexed hereto and made a part hereof as **Exhibit F.**

### 4. Adorama's Breach

*A.  Adorama's Monetary Breach*

31. Adorama failed, pursuant to MSA Schedule B, Section 6, to deliver the required escrow payment of $450,000 (the "**Escrow Payment**") to the Escrow Agent set forth in the Escrow Agreement.

32. From April 1, 2011, when the $450,000 escrow payment was due, and remained unpaid, through March 13, 2012, AI continued to perform services for Adorama on the Appendix C Deliverables and Additional Deliverables and delivered the following invoices:

    i.   $450,000 due to Escrow Agent on April 1, 2012;

    ii.   $110,000 for services rendered in January 2012;

    iii.   $110,000 for services rendered in February 2012; and

    iv.   Unremitted $50,000 in Escrow Agent's possession.

(collectively, the "**Unpaid Invoices**")

33. Adorama has failed to remit payment on the Unpaid Invoices in material breach of the

MSA and the MSA Schedule B.

*B. Adorama's Failure to Test Deliverables*

34. Section 6 of the MSA provides in relevant part that:

6.  Acceptance of Services.

6.1   Each Deliverable identified on a Schedule as being subject to acceptance testing shall be subject to acceptance testing by Client to verify that the Deliverable satisfies the acceptance criteria mutually agreed to by Client and AII for said Deliverable.   The acceptance criteria for each Deliverable shall be included in the applicable Schedule.   The acceptance criteria shall be jointly developed and mutually agreed to in writing by Client and AII and set forth in each Schedule.  The parties shall endeavor to include such acceptance criteria on the Schedule before work commences on the Deliverable, and in any event, such criteria shall be inserted in the appropriate Schedule no later than thirty (30) days in advance of the date identified in the Schedule for completion of the Deliverable.  If Client in good faith cannot agree to any of the acceptance criteria proposed by AII, Client shall be obligated to either (i) terminate the Schedule after payment to AII for all of its services through such termination date, or (ii) accept the acceptance criteria as proposed by AII.

6.2   Acceptance testing for each Deliverable subject to such testing shall commence within five (5) business days of the date on which AII notifies Client Project Manager, in writing, that the Deliverable has been satisfactorily completed, in AII's opinion, and is ready for acceptance testing by the Client. Acceptance testing shall continue for the period of time specifie3d in the acceptance criteria or, if no such time period has been agreed upon by the parties, for a period of fifteen (15) consecutive days ("the Initial Acceptance Period").

6.3   In the event that any Deliverable does not conform to the acceptance testing with in the Initial Acceptance Period described above, Client shall give AII written notice thereof.   Client shall cooperate with AII in identifying in what respects the Deliverable fails to confirm to the criteria.   AII shall, at no cost to Client, promptly correct any deficiencies which prevent such Deliverable from confirming to the acceptance criteria.  Upon completion of the corrective action by AII, Client shall repeat the acceptance test until the Deliverable has successfully conformed to the acceptance criteria.

6.4   When the subject Deliverable has successfully conformed to or satisfied the acceptance criteria, Client shall give AII written notice thereof.

6.5  In the event the parties cannot agree on whether a subject Deliverable has satisfied the acceptance criteria with thirty (30) days of delivery by AII of such Deliverable, then the parties' respective sole remedy against the other party shall be to terminate the Schedule.  Either party may terminate the Schedule upon written notice to the other party.  In such event, Client shall be required to pay only the minimum fee set forth in such Schedule, and shall not thereafter be entitled to use the Deliverable for any purpose whatsoever.

6.6  In the event the applicable Schedule does not identify a Deliverable as being subject to acceptance testing or provides for maintenance or other similar services to be provided to Client, then such Deliverable and services shall not be subject to acceptance testing by Client.

35. Commencing February 24, 2012,  and on the corresponding dates set forth below, AI delivered the following deliverables on which Adorama refused to conduct acceptance testing (pursuant to the MSA and the MSA Schedule B with respect to the Schedule B Deliverables and pursuant to written acceptance testing requirements for the Additional Deliverables):

    i.   Add to cart functionality (February 24, 2012);

    ii.  Exact Target email integration (February 24, 2012);

    iii. All site images loaded (February 24, 2012);

    iv.  QAS verification (February 24, 2012);

    v.   Bill Me Later integration (February 24, 2012); and

    vi.  Enterprise Service Bus (March 9, 2012).

(collectively, the "**Untested Deliverables,**" together with the Additional Deliverables, and the Appendix C Deliverables, the "**Deliverables**")

36. While Adorama contended that AI failed to deliver certain Deliverables by certain deadlines, Section 1.4 of the MSA provides that "Client acknowledges that [proposed]

dates [of completion] are best estimates only."   Adorama did not seek to terminate the MSA.

37. Because of Adorama's refusal to comply with the terms of the MSA, MSA Schedule B and other acceptance testing criteria agreed to by AI and Adorama, coupled with Adorama's failure to comply with its monetary obligations under the MSA, MSA Schedule B and Escrow Agreement, pursuant to Section 11.2.2 of the MSA, on March 19, 2012, AI notified Adorama in writing ("**Termination Notice,**" annexed hereto and made a part hereof as **Exhibit G**) that it was terminating the MSA because of Adorama's material breach of the terms of the MSA, the MSA Schedule B and the Escrow Agreement.

38. The Termination Notice notified Adorama that it had a fifteen (15) business day cure period.

39. Adorama failed to undertake any steps to cure the following material breaches of the MSA set forth in the Termination Notice:

    i.  Failing to pay the January 2012 and February 2012 charges for ongoing work;

    ii.  Failure and unwillingness to validate, conduct acceptance testing and accept deliverables delivered by AI;

    iii.  Failure and unwillingness to provide meaningful feedback and cooperation to AI in an effort to facilitate completion of the project;

    iv.  Failure to negotiate in good faith; and

    v.  Failure to make the required $450,000 payment into Escrow.

40. Pursuant to Section 11.4 of the MSA, Adorama has failed to pay to AI all invoices for work completed by AI prior to the date of the Termination Notice.

41. AI employees worked in excess of 30,000 billable hours for which it was not remunerated by Adorama.

42. Pursuant to the applicable terms of the MSA, AI is owed, at a minimum, $720,000 on outstanding invoices.

43. Section 5.2 of the MSA provides that:

> 5.2 *Late Payment*.  In the event Client fails to make payment to AII when such payment is due, then without prejudice to any other right or remedy, AII shall be entitled to charge Client, and Client shall be obligated to pay, interest at a rate of 1.5% per month on the amount due.  In addition, in the case of a late or no payment, AII reserves the right to stop service and recover its costs of collection, including attorneys' fees, if applicable.

C.  *Adorama's License/ Infringement*

44. Pursuant to the MSA, AI owned all licenses under the MSA and all proprietary rights in the Deliverables. Specifically, the Deliverables including the underlying computer program created by AI constitute copyrightable subject matter that is protected against unauthorized copying under the laws of the United States.  AI has filed a copyright application for registration of the Deliverables in the United States Copyright Office and received a copyright for its Deliverables, a copy of which application and copyright approval is annexed hereto and made a part hereof as **Exhibit H**.

45. Pursuant to Section 11.4, upon the termination of the MSA, all Licenses under the agreement are deemed terminated.

46. Pursuant to Section 8.1 of the MSA, "[u]ntil Client acquires a license to use the Deliverables, the only permitted use by Client of such Deliverables shall be to perform acceptance testing, and for no other use."

47. Section 2 of the MSA provides in relevant part as follows:

> 2. License
>
> 2.1 *Upon payment in full by Client of all fees associated with the work performed under a Schedule*, AII shall grant to Client a worldwide, royalty-free, non-exclusive license to the Deliverables delivered pursuant to such Schedule, limited to use of the Deliverables as a Website or Web system only, and not for any other purpose without the prior written consent of AII.
>
> 2.2 Client shall not permit any persons or entities other than its employees to access or use the Deliverables.  Client acknowledges and agrees that it shall have no right to use the Deliverables for the benefit of any third party nor to use the Deliverables in a manner inconsistent with the provisions of the Master Agreement or applicable Schedules.  Use of the Deliverables shall be limited to use for the internal business operations of Clients and shall not be used directly or indirectly for the benefit of any third party.  Client shall not distribute, sell, sublicense, or otherwise transfer the Deliverables without AII's prior written consent. Client shall not translate, modify, adapt, decompile, disassemble, or reverse engineer any Deliverable.
>
> 2.3 Except for the right of Client to use the Deliverables as set forth herein, all trademarks, services marks, patents, copyrights, trade secrets, and other intellectual property and proprietary rights in and to the Deliverables are and shall remain the exclusive property of AII.  Client shall not take any actions that jeopardize AII's proprietary rights.

(emphasis added).

48. In or around July 25, 2012, AI discovered that Adorama, in violation of Section 2, Section 8.1 and Section 11.4 of the MSA, and in violation of applicable federal and state law, intentionally and fraudulently utilized certain graphic Deliverables (i.e. licenses and Copyrights) on its existing website, www.adorama.com to, among other things, successfully lure Samsung to allow Adorama to sell its products on its website, create other Adorama brand-enhancement, and create a "brand-halo experience", ultimately increasing Adorama sales, revenues and profits.

49. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by EM to transfer, translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of AI licenses under the MSA.

50. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by EM and MM to transfer, translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of AI's licenses under the MSA.

51. Upon information and belief, at the time the AI licenses were transferred, translated, modified, adapted, decompiled, disassembled and/or reverse engineered by Adorama and/or Adorama LLC, MM knew Adorama and/or Adorama LLC were engaging in said conduct and fostered said conduct.

52. Upon information and belief, at the time AI licenses under the MSA were transferred, translated, modified, adapted, decompiled, disassembled and/or reverse engineered by Adorama and/or Adorama LLC, EM and MM knew Adorama and/or Adorama LLC were engaging in said conduct and directed and/or fostered said violation of the licenses and Copyrights.

53. In or around July 25, 2012, AI discovered that Adorama, in violation of Section 2, Section 8.1 and Section 11.4 of the MSA, and in violation of applicable federal and state law, intentionally and fraudulently utilized certain graphic Deliverables (i.e. Copyrights) on its existing website, [www.adorama.com](www.adorama.com) to, among other things, successfully lure Samsung to allow Adorama to sell its products on its website, create other Adorama brand-enhancement, and create a "brand-halo experience", ultimately increasing Adorama sales, revenues and profits.

54. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by EM to transfer, translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of AI Copyrights.

55. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by MM to transfer, translate, modify, adapt, decompile, disassemble and/or reverse engineer, and thus infringe, one or more of AI's Copyrights.

56. Upon information and belief, at the time the AI Copyrights were transfer, translated, modified, adapted, decompiled, disassembled and/or reverse engineered, and thus infringed, by Adorama and/or Adorama LLC, MM knew Adorama and/or Adorama LLC were engaging in said conduct and fostered said conduct.

57. Upon information and belief, at the time AI licenses under the MSA were transfer, translated, modified, adapted, decompiled, disassembled and/or reverse engineered, and thus infringed, by Adorama and/or Adorama LLC, EM knew Adorama and/or Adorama LLC were engaging in said conduct and fostered said conduct.

D. *Adorama's Violation of the Non-Solicitation Clause*

58. Section 8.3 and 8.4 provide in relevant part that:

> 8.3 [Mutual Non-Solicitation…] Unless otherwise mutually agreed to by the parties in writing, Client agrees not to hire or to solicit employment of any of the AII Personnel directly or indirectly associated with AII's services hereunder or under any Schedule during the term of such Schedule and for a period of twelve (12) consecutive months thereafter.

> 8.4 The provisions of this Section 8 will survive termination or expiration of this Agreement.

59. Section 3.2 of the MSA defines "AII Personnel" as any AI "employee, personnel or *independent contractors*." (emphasis added).

60. Upon information and belief, in and around July 31, 2012, Adorama solicited Magento, (an express "Independent Contractor" of AI pursuant to Section 27 of the CSA), to perform services for Adorama that had been or were to be performed by AI.

   E. *Adorama's Improper Modification of Deliverables*

61. Because of Adorama's solicitation of independent contractors who provided services in connection with the MSA, the MSA Schedule B, and the Magento CSA, and in light of Adorama's infringement of the license for the Deliverables, which is reflected on Adorama's home page at www.adorama.com, upon information and belief, one or more of the Defendants has been translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI in violation of Sections 2.2, 2.3, 8.1 and 11.4 of the MSA.

62. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by EM to translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of the Deliverables delivered by AI under the MSA.

63. Upon information and belief, Adorama and Adorama LLC, and its employees, were directed by MM to translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of the Deliverables delivered by AI under the MSA.

64. Upon information and belief, at the time the Deliverables were translated, modified, adapted, decompiled, disassembled and/or reverse engineered by Adorama and/or Adorama LLC, MM knew Adorama and/or Adorama LLC were engaging in said conduct.

65. Upon information and belief, at the time the Deliverables were translated, modified, adapted, decompiled, disassembled and/or reverse engineered by Adorama and/or Adorama LLC, EM knew Adorama and/or Adorama LLC were engaging in said conduct.

**5.  Adorama's Intimidation and Defamation**

66.  After AI's service of the Termination Notice on Adorama and the effective termination of the MSA thereby, and after Adorama and Magento commenced negotiations to have Magento complete the creation of the new Adorama website.

67. On March 19, 2012, after the service of the Notice of Termination, and because Mr. Schmelkin would not participate on a call with Adorama and Magento, EM sent the following email to Mr. Schmelkin:

> **Subject:** RE: Follow Up meeting
> **Date:**  Monday, March 19, 2012 7:29:04 PM Eastern Daylight Time
> **From:**  Eugene Mendlowits
> **To:**    Alex Schmelkin
>
> So I take it you don't want to be on the call . Problem with your proposal is do it my way or
>
> terminate you , what response did you expect ? F Y I " I CAN NOT AGREE TO YOUR TERMS"
>
> as a friend you're going down a slippery slope , not sure if you deserve to get so bruised or worst .

68. In July 2012, Mr. Schmelkin was contacted by Magento and told that Magento was seeking to complete the new Adorama website and wanted to "include" AI in the process.

69. Mr. Schmelkin notified Magento that he objected to Magento's solicitation of Adorama because it violated a non-solicitation provision of the CSA.  Moreover, Mr. Schmelkin notified Magento that he did not consent to the use of AI's source code as the foundation

for the work Magento would undertake to complete the new Adorama website because of

Adorama's breach of the MSA.

70. During Mr. Schmelkin's conversations with Magento, Mr. Schmelkin was contacted by

EM and Mr. Glen Holman, the project manager at Adorama.  Via cajoling and threats,

EM and Holman attempted to compel AI to complete the Adorama website and/or return

funds paid under the MSA.

71. Because Mr. Schmelkin did not respond to EM's or Holman's calls and emails, on

August 27, 2012, Holman sent an email (the "Holman Email") to Mr. Schmelkin

threatening to publish a press release alleging defamatory statements against AI unless

Mr. Schmelkin contacted EM and succumbed to EM's intimidation.  In part, Mr.

Holman's email stated:

> *Alex,*
>
> *Off the record, they [Adorama, EM, MM] are preparing a press release regarding termination of the relationship which (and trust me on this) wont bode well for your company.*
>
> *While I cant share the entire draft, I can say that I suggest you call Eugene.*

Mr. Holman then set forth "a few of the 'softer' snippets" that he said would be included
in the press release.

72. In response to this email, on August 28, 2012, Mr. Schmelkin's undersigned counsel sent

the following letter (in part) to EM:

> Based upon the voluminous documents that we have reviewed and the explicit language of the executed MSA underlying the facts in the Complaint, we know the allegations in the purported Adorama Press Release are demonstrably false. Thus, any publication of such a Press Release containing this information will be clearly defamatory to AI.
>
> It is AI's firm position that this matter should be handled through the Courts, not the media.  However, should Adorama choose to publish the Press Release, you are on notice that AI will take further aggressive legal action against Adorama,

including, but not limited to, amending the Complaint to allege defamation claims and to seek additional and treble damages against Adorama. Further, AI will be compelled to consider its own press release disclosing the filing of the Complaint, Adorama's breach of the MSA, Adorama's intentional infringement of AI's copyrights and licenses and misappropriation of AI's trade secrets, and Adorama threats made to AI in writing, among other information.

The attempted bullying and tag-teaming of AI stops now. All further inquiries relating to AI must hereinafter be made through our office.

73. Upon information and belief, no press release was published by Adorama in August 2012. Instead, on or about September 6, 2012, AI discovered that Adorama created a blog on WordPress (http://aiexposed.wordpress.com/tag/alex-schmelkin/) stating the following of and concerning the Plaintiffs, in the colors and typeset set forth below:



*Review: Alexander Interactive Failed to Deliver*

Adorama contracted Alexander Interactive for a fixed-bid project in March 2010 for the design and development of the retailer's ecommerce platform to meet the public launch date of May 15, 2011. Following the selection of Alexander Interactive for the project, Adorama spent many months educating the AI team and paying for the time AI requested to research the company's needs and requirements. According to Adorama, the project has not reached production-ready.

Misdeeds, poor workmanship and lousy customer service are not news but the impact on corporations and individuals is no less painful and the lessons too expensive to chalk up to experience. Alexander Interactive assured Adorama —

for the price of $1.3 million+ — that they would customize the Magento software and to fully support Adorama's ecommerce needs by the May 2011 deadline. Mid-way through the project, Alexander Interactive convinced Adorama that several hundred thousand dollars in additional fees were absolutely necessary to complete the project and that these additional charges would ensure on time delivery. As weeks and months went by, Alex Schmelkin of Alexander Interactive (AI) repeatedly informed Adorama that the project remained on track even as delivery dates were constantly being pushed.

After stalling repeatedly and many unrealized promises, Alexander informed Adorama in February 2012 that it was suspending development unless Adorama agreed to a minimum increase of 50%. **This revised implementation plan presented by Alexander added a staggering $600,000+ in additional costs and further delays of six months.**

In August 2012, Adorama – completely dissatisfied with the turn of events, and with the agreement of Alexander Interactive, contracted EBay-owned Magento to conduct an independent audit of the work to date. Magento concluded that after 18 months, the project as developed by Alexander Interactive would necessitate an additional investment of $1.5 million, a further 8-month delay and a re-architecture of website's technology to meet the deliverables as promised by Mr. Schmelkin when the deal was struck.

At a complete stopgap Adorama has turned to the Internet to seek wisdom and support for other companies or individuals similarly misled by Alexander Interactive. A chorus of voices seeking solutions may be the peaceful road to resolving what appears to be an all-out hostage situation.

(the "**Adorama Article**")

74. On September 10, 2012, Adorama added a link on the Wordpress site to the following press release, of and concerning the Plaintiffs, that Adorama published in PR Web (http://www.prweb.com/releases/2012/9/prweb9875018.htm) an online magazine:

### New York Digital Agency Alexander Interactive Gives Up on $1.3M Magento Website

EBay-owned Magenta concludes agency's continued work on Adorama website would require an additional $1.5M, an eight-month delay, and a re-architecture of the site's technology to meet the deliverables promised at signing

*New York, NY (PRWEB) September 10, 2012*

Adorama Inc., the New York-headquartered photography and electronics megastore, contracted in Fall 2010 with digital agency Alexander Interactive for a fixed-bid project: to redesign and develop the retailer's website to meet a public launch date of May 15, 2011. On February 3, 2011, Alexander Interactive's CEO Alex Schmelkin issued a press release stating that his company was "developing one of the largest implementations on the Magento Enterprise platform for a new client, Adorama, one of the nation's largest photo and expanding electronics retail and mail order suppliers."

In May 2012, a year after the original proposed launch date, Adorama, with the agreement of Alexander Interactive, contacted Ebay-owned Magento to conduct an audit of the work to date. In August 2012, Magento concluded that the project as developed by Alexander Interactive would necessitate an additional investment of $1.5 million (on top of the initial $1.3 million fee), a further 8-month delay and a re-architecture of website's technology to meet the deliverables as promised when the deal was signed.

"With permission from Alexander Interactive, we implemented the website design of the project," stated Harry Drummer, Adorama Chief Operating Officer. "However, the technological platform they delivered was unusable, so we were forced to put our in-house team to work bringing the site to fruition by upgrading our existing platform."

Following Magento's audit of Alexander Interactive's work to date, an intellectual property/copyrights suit was filed on August 29, 2012 by Alexander Interactive vs. Adorama, Inc. in the Southern District Court of New York, case number 1:2012cv06608.

"We are disappointed in the turn of events," says Drummer. "And were stunned when Alexander Interactive gave up on the work and halted the ecommerce project, requesting an additional $600,000-plus in fees," continued Drummer.

Adorama is launching AIEXposed.com, an open forum for businesses to share their experiences with Alexander Interactive. The well-respected company hopes to harness the power of the Internet to bring about equitable solutions and remedies to the situation.

(the "**Adorama Press Release**")

75. The WordPress website includes a September 5, 2012 entry, and PR Web page also includes a window, stating the following, of and concerning the Plaintiffs, in the typeset below:

**aiexposed.com** **is an open forum for dissatisfied and frustrated clients of New York City-based Alexander Interactive (AI) owned by Alex Schmelkin and Joshua Levine. aiexposed.com is a community-based forum for businesses to share experiences of delayed and failed Internet projects under construction by Alexander Interactive. Not just a complaint board, this forum invites Alexander Interactive to take the initiative to correct their mistakes and make good on work promised.**

Click the follow button on the right to be added to our mailing list.

**6 Sep 2012: Review: Alexander interactive failed to deliver**
*A review of the experiences of Adorama with Alexander Interactive and Alex Schmelkin.*

Together, we can expose Alex Schmelkin, President and Co-Founder of Alexander Interactive and his firm and urge them to do right by all of us. We invite you to sign up for updates and to participate by posting your experiences or commenting on those of others.

(the "**Adorama Blog,**" together with the Adorama Article and the Adorama Press Release, the

"**Defamatory Statements**")

76. The PR Web page reflects Harry Drummer/Glen Holman at Adorama.com 212-741-0401

as the contact for the Adorama Press Release.

77. Neither AI, Schmelkin nor Levine is, nor constitute, a "public figure," as this term is

defined under applicable defamation law, as neither of the Plaintiffs' names is so familiar

as to be a household word. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41

L. Ed. 2d 789 (1974).

78. No applicable "privilege exists by and among one or more of the Plaintiffs, on the one

hand, and one or more of the Defendants, on the other hand.

79. As set forth in the Holman Email and on the face of the Defamatory Statements, the

Defamatory Statements were published by the Defendants to intimidate the Plaintiffs.

80. As set forth in the Holman Email and on the face of the Defamatory Statements, the Defamatory Statements were published by the Defendants with implied and actual malice toward the Plaintiffs as the Defamatory Statements were made with knowledge that it was false or with reckless disregard of whether it was false or not, as more fully set forth below.

81. Publishing the Defamatory Statements by the Defendants was grossly irresponsible as they malign the Plaintiffs without regard to veracity of the statements and fail to disclose any underlying facts to support the defamatory allegations.

82. The Defamatory Statements were drafted and published at the direction of EM and MM as officers and directors of Adorama and as individuals who have directed the publication of the Defamatory Statement.

83. The Defamatory Statements are actionable as they include words which affect the Plaintiffs in their professional by imputing to them dishonesty, misconduct and/or unfitness in conducting their profession and trade. *Wasserman v. Haller,* 216 A.D.2d 289, 627 N.Y.S.2d 456 (2d Dept. 1995).

84. The Defamatory Statements are patently defamatory as they imply the existence of undisclosed facts underlying allegations of falsely alleged "misdeeds," "misrepresentations," "poor workmanship" and "lousy customer service."

85. The Defendants seek to, and the Defamatory Statements, injure the Defendants and their trade, business and profession by falsely accusing the Plaintiffs, collectively or individually of the following, or implying persons should not do business with the Plaintiffs:

a.  The article on Aiexposed.com is entitled "Alexander Interactive *Exposed*—
    Reviews of Alex Schmelkin's New York Digital Agency—Find out the *Truth*
    about Alexander Interactive. **CAUTION**" This title and emphasized words imply
    undisclosed facts underlying Adorama's allegations, misconduct by AI and Mr.
    Schmelkin and "caution" people not to hire AI or Schmelkin.  These highlighted
    words are clear innuendo to attack the Plaintiffs' reputations and are thus, a direct,
    intentional and malicious attack on the Plaintiffs' credibility and reputation.

b.  "Review: Alexander Interactive Failed to Deliver."  This is false and implies
    undisclosed underlying facts.    In fact, AI delivered all Deliverables pursuant to
    the express provisions of the CSA but Adorama failed to test the Untested
    Deliverables.

c.  "According to Adorama, the project has not reached production ready."  This
    statement is a non-sequitor and operates as nothing more than innuendo, as
    "production ready" has no meaning under the CSA and fails to convey to the
    reader the underlying and undisclosed facts that would render the "project"
    production ready.

d.  "Misdeeds, poor workmanship and lousy customer service are not news but the
    impact on corporations and individuals is no less painful and the lessons too
    expensive to chalk up to experience."  This statement is a direct attack on the
    Plaintiffs' trade, profession and business credibility and performance with a
    wholesale failure to disclose any facts to support these allegations.   In particular,
    "misdeeds" is defined as an offense, wrong, crime, fault, sin, misconduct,
    trespass, misdemeanor, transgression, or villainy, as defined by the

freeonlinedictionary.com, Merriam Webster online dictionary and Cambridge online Dictionary.  Thus, by alleging the Plaintiffs engaged in "misdeeds" is the equivalent of accusing the Plaintiffs of criminal conduct, which such allegations are defamatory per se, actionable, false and grossly irresponsible.

e.  "Alexander Interactive assured Adorama — for the price of $1.3 million+ — that they would customize the Magento software and to fully support Adorama's ecommerce needs by the May 2011 deadline."  This statement is false.  While the May 2011 was a proposed deadline, the MSA expressly provides that all proposed dates are "estimates" only and are subject to change. MSA at Section 1.4.  Thus, no "assurances" were made by AI nor was May 2011 a deadline in any sense of the word.

f.  "After stalling repeatedly and many unrealized promises, Alexander informed Adorama in February 2012 that it was suspending development unless Adorama agreed to a minimum increase of 50%."  This statement is false.  AI did not stall nor fail to provide the services contemplated under the MSA; nor does Adorama identify any facts underlying these allegations.  Further, AI did not "suspend development," seeking to extort (i.e. the innuendo of this statement) a "minimum increase of 50% (of what?) it terminated the MSA pursuant to the terms of the MSA by serving Adorama with a Termination Notice and provided Adorama an opportunity to cure its defaults under the MSA.

g.  "Magento concluded that after 18 months, the project as developed by Alexander Interactive would necessitate an additional investment of $1.5 million, a further 8-month delay and a re-architecture of website's technology to meet the

deliverables as promised by Mr. Schmelkin when the deal was struck."   This
statement fails to disclose innumerable facts, most particularly that (i) the
aforementioned finding by Magento comprised a proposal for work to be
performed by Magento (not AI), arising from cross-solicitation between Adorama
and Magento (in violation of anti-solicitation provisions in both the Magento
Agreement and MSA), (ii) Adorama failed to disclose that Magento was a
retained contractor by AI and was integral in developing the "architecture" to
interface with the Magento ecommerce platform, (iii)  Adorama falsely implies
that Deliverables were not "on track" by failing to disclose that the MSA
expressly provides that all dates proposed were estimates, that Untested
Deliverables were delivered by AI and remained untested by Adorama, causing
delays in the project and that Adorama's failure to test the Untested Deliverables
and make required payments under the MSA compelled AI to send the
Termination Notice pursuant to the express provisions of the MSA.  Together, this
is a direct attack of the business reputation and credibility of AI, Levine and
Schmelkin.

h.   "'With permission from Alexander Interactive, we implemented the website
design of the project," stated Harry Drummer, Adorama Chief Operating Officer.
"However, the technological platform they delivered was unusable, so we were
forced to put our in-house team to work bringing the site to fruition by upgrading
our existing platform.'"   This statement is false because (i) AI never gave
Adorama permission to implement 'the website design of the project,' especially
considering that upon serving the Termination Notice and the termination of the

MSA becoming effective, Adorama and it principles, officers and directors (i.e. EM, MM, Adorama Enterprise), were prohibited under the express terms of the MSA from utilizing any Deliverables (i.e. AI's licenses, copyrights and other proprietary property), MSA at Section 11.4, and (ii) the technological platform was usable and successful as it lured Samsung to make Adorama and authorized retail partner.  *See* Samsung Email.

i.   The Adorama Blog contends that aiexposed.com is a "community-based forum for businesses to share experiences of delayed and failed Internet projects under construction by Alexander Interactive.  Not just a complaint board, this forum invites Alexander Interactive to take the initiative to correct their mistakes and make good on work promised."  This allegation falsely accuses of making "mistakes" and failing to "make good on work promised."  It implies that there is undisclosed information to the reader seeking to have the reader infer improper conduct by the Plaintiffs.  Further, this statement directly attacks the business reputation, reliability and credibility of AI, Schmelkin and Levine.

j.   The Plaintiffs' malicious, willful, intimidating and manipulative conduct is further reflected in its statement in the Adorama Blog stating: "Together, we can expose Alex Schmelkin, President and Co-Founder of Alexander Interactive and his firm and urge them to do right by all of us.  We invite you to sign up for updates and to participate by posting your experiences or commenting on those of others."   This statement implies there is undisclosed information that would "expose" some misconduct by AI and Mr. Schmelkin.  It is a direct attack on AI and Schmelkin's business credibility and reputation.  Further, it falsely implies that there is some

salacious information to expose and that AI and Schmelkin have failed to carry through on obligations which the Plaintiffs' contend they have, pursuant to the express terms of the MSA.

86. Upon information and belief, EM and MM, with malicious, willful, wanton and evil intent, actively engaged in and directed the drafting and publishing of all Defamatory Statements with knowledge of their falsity and intent to damage the Plaintiffs' business credibility and reputations.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Infringement, Injunction and Impoundment-Copyrighted Software – 17 U.S.C. §§ 501, et.
seq., 502, 503 & F.R.C.P. 65**

87. Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 86 set forth hereinabove.

88. Upon information and belief, one or more of the Defendants is in possession of and has infringed on AI's copyrights in one or more of its Deliverables.

89. Adorama was in material breach of the MSA, and AI terminated the MSA.

90. AI has not authorized Adorama and/or any other one or more of the Defendants (whether or not the MSA was breached and they were a party thereto) to use, translate, modify, adapt, decompile, disassemble and/or reverse engineer of any one or more of the Deliverables delivered by AI.

91. Upon information and belief, one or more of the Defendants' willfully has, and willfully continues to use, translate, modify, adapt, decompile, disassemble and/or reverse engineer one or more of the Deliverables delivered by AI.

92. One or more of the Defendants created derivative works based upon AI's Deliverables by incorporating these derivative works in Adorama's website.

93. The Defendants' conduct constitutes willful infringement of AI's copyrights in the Deliverables within the meaning of 17 U.S.C. § 504(c)(2).

94. The Defendants' conduct does not constitute fair use of AI's Deliverables where the purpose and character of the Defendants' use is of a commercial nature, and a substantial portion of AI's Deliverables were copied, adapted, used, disassembled, translated or re-engineered.

95. The use, translation, modification, adaptation, decompiling, disassembly and/or reverse engineering of one or more of the Deliverables by any one or more of the Defendants constitutes a copyright infringement.  Each act of infringement constitutes a separate base for statutory damages under 17 U.S.C. § 504 and AI seeks recovery of profits earned by the Defendants arising from the Copyright Infringement.

96. AI seeks to permanently enjoin the Defendants from infringing AI's copyrights in its Deliverables and demands that the Deliverables be impounded from the Defendants.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Injunction – Infringement/Use of Software Licenses and Misappropriation of Trade Secrets**
**F.R.C.P. 65**

97. Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 96 set forth hereinabove.

33

98. Upon information and belief, one or more of the Defendants has infringed on AI's licenses in one or more of its Deliverables and constitutes misappropriation in and of AI's trade secrets.

99. AI seeks to enjoin the Defendant from infringing on AI's licenses in its Deliverables.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
### Injunction - Solicitation – F.R.C.P. 65

100.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 99 set forth hereinabove.

101.      Upon information and belief, Adorama has violated the non-solicitation provision of the MSA by soliciting Magento to perform services for Adorama within the scope of the MSA and it Schedules.

102.     AI seeks to enjoin Adorama from soliciting Magento and any other "AII Personnel" in violation of the non-solicitation provision of the MSA.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-

judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Injunction - Confidentiality – F.R.C.P. 65

103.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 102 set forth hereinabove.

104.     Upon information and belief, one or more of the Defendants has been translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI in violation of Sections 2.2, 2.3, 8.1 and 11.4 of the MSA.

105.      AI seeks to permanently enjoin the Defendants from translating, modifying, adapting, decompiling, disassembling and/or reverse engineering any one or more of the Deliverables delivered by AI.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Breach of Contract

106.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 105 set forth hereinabove.

107.    Adorama violated material provisions of the MSA, MSA Schedule B and the Escrow Agreement.

108.    Adorama materially breached the MSA by failing to remit payment to AI for services rendered.

109.    Adorama materially breached the MSA by soliciting Magento.

110.    Adorama materially breached the MSA by violating the confidentiality provision therein by using, translating, adapting, decompiling, disassembling and/or reverse engineering of any one or more of the Deliverables without AI's authorization.

111.    Adorama materially breached the MSA by infringing and stealing AI's licenses and copyrights.

112.    Adorama materially breached the MSA and MSA Schedule B by failing to engage in required acceptance testing on certain Deliverables.

113.    Adorama materially breached the MSA, MSA Schedule B and the Escrow Agreement by failing to deliver the $450,000 required payment to the Escrow Agent and additional funds relating to over 30,000 hours billed by AI personnel.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Piercing the Corporate Veil Arising from Tortious Actions and Copyright/License Infringement

114.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 113 set forth hereinabove.

115.     Adorama LLC, EM and MM personally, wantonly, maliciously and willfully participated in tortious acts of drafting, publishing and directing Adorama and its employees to draft and publish the Defamatory Statements and injuring the Plaintiffs therefrom.

116.     Adorama LLC, EM and MM knowingly and intentionally induced Adorama and its employees and contractors to engage in copyright and license infringement of AI's Deliverables, Copyright and Licenses.

117.      WHEREFORE, Plaintiffs, AI, Schmelkin and Levine, demand judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Software License Infringement

118.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 117 set forth hereinabove.

119.     Upon information and belief, without AI's authorization, one or more of the Defendants has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

120.     The MSA and its Schedules were materially breached by Adorama and the MSA and Schedules were terminated by AI by the Termination Notice.

121.     Use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables by any one or more of the Defendants is and continues to be an infringement of AI's Software Licenses.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Misappropriation of Trade Secrets-Restatement of Torts 2d, § 757

122.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 121 set forth hereinabove.

123.     Upon information and belief, without AI's authorization, one or more of the Defendants' has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

124.     The Defendants use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables constitutes theft of the Deliverables, which are AI's trade secrets.

125.     Use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables by any one or more of the Defendants constitutes misappropriation of AI's trade secrets.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Unjust Enrichment

126.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 125 set forth hereinabove.

127.     Upon information and belief, without AI's authorization and without paying just and equal compensations, one or more of the Defendants' has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

128.     Via the use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables, Adorama enhanced its brand-halo, obtained a partnership with Samsung to sell Samsung products, and increased its sales, revenues and profits.  *See* Samsung Email.

129.     The Defendants use, translation, adaptation, decompiling, disassembly and/or reverse engineering of any one or more of the Deliverables has, thus. unjustly enriched Adorama.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits,

a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Recovery and Turnover

130.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 129 set forth hereinabove.

131.      Upon information and belief, without AI's authorization, one or more of the Defendants is in possession of and has, and continues to, use, translate, modify, adapt, decompile, disassemble and/or reverse engineer any one or more of the Deliverables.

132.     Adorama was and continues to be in material breach of the MSA, MSA Schedule B and the Escrow Agreement.

133.     The MSA, MSA Schedule B and the Escrow Agreement were terminated by AI via the Termination Notice.

134.     AI demands recovery and turnover from all Defendants all Deliverables (in any form, whether disassembled, decoupled, adapted or re-engineered) to AI.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Damages – 17 U.S.C. §§ 504 & 505

135.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 134 set forth hereinabove.

136.     AI suffered and seeks actual damages via the Defendant's infringement of AI's copyrights.

137.     One or more of the Defendants profited from the infringement of AI's copyrights.

138.     AI seeks and is entitled to an award of actual damages suffered by AI and of profits obtained by the Defendants.

139.     AI reserves its right to seek statutory damages per infringement.

140.     AI seeks and is entitled to an award of costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Damages-Breach of Contract

141.      Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 140 set forth hereinabove.

142.     AI seeks and is entitled to judgment against Adorama for actual damages arising from breach of the MSA.

143.     AI seeks and is entitled to judgment against Adorama for consequential damages arising from breach of the MSA, including, but not limited to, damages to AI's reputation, business opportunities and goodwill.

144.     AI seeks and is entitled to judgment against Adorama for punitive damages arising from Adorama's intentional breach of the MSA.

145.     AI seeks and is entitled to judgment against Adorama for profits and other benefits gained by Adorama as a consequence of its breach of the MSA.

146.     AI seeks and is entitled to judgment against Adorama for costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Damages-License Infringement

147.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 146 set forth hereinabove.

148.     AI seeks and is entitled to judgment against the Defendants for actual damages arising from the Defendants' intentional license infringement of the Deliverables.

149.     AI seeks and is entitled to judgment against the Defendants for consequential damages arising from the Defendants' intentional license infringement of the Deliverables.

150.     AI seeks and is entitled to judgment against Defendants for punitive damages arising from Defendants' intentional license infringement of the Deliverables.

151.     AI seeks and is entitled to judgment against Defendants for all profits any and all of the Defendants derived from their illegal use, adaptation, translation, decompiling, disassembling and/or re-engineering of any one or more of the Deliverables via infringement of AI's licenses therein.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Damages-Theft of Trade Secrets

152.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 151 set forth hereinabove.

153.     AI seeks and is entitled to judgment against the Defendants for actual damages arising from their theft of trade secrets from AI.

154.     AI seeks and is entitled to judgment against the Defendants for consequential damages arising from their theft of trade secrets from AI.

155.     AI seeks and is entitled to judgment against the Defendants for punitive damages arising from their theft of trade secrets from AI.

156.     AI seeks and is entitled to judgment against the Defendants for profits gained by the Defendants via their theft of trade secrets from AI.

157.     AI seeks and is entitled to judgment against the Defendants for costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, as applicable, including injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A FIFTHEENTH CAUSE OF ACTION
### Damages-Interest

158.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 157 set forth hereinabove.

159.     AI seeks and is entitled to interest on payments due under the MSA at 1.5% per month that unpaid invoices under the MSA and MSA Schedule B have remained unpaid.

160.     AI seeks and is entitled to statutory interest on the full judgment entered herein.

WHEREFORE, Plaintiff, AI, a New York Corporation, demands judgment in favor of AI against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, jointly and severally, as applicable, including permanent

injunctive relief, damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### (General Compensatory, Special and Punitive Damages- Defamation)

161.     Plaintiffs reassert and reallege the facts and allegations set forth in paragraphs 1 through 160 set forth hereinabove.

162.     The Defendants have published Defamatory Statements of fact on WordPress and PRWeb, that are false, that are "of and concerning" AI, Schmelkin and Levine, are made with the applicable level of fault on the part of the speaker, cause special harm and cause defamation *per se*, and are not protected by any privilege.

163.     The published Defamatory Statements by the Defendants impugn AI, Levine and Schmelkin's professional integrity, performance and credit worthiness.

164.     The published Defamatory Statements are patently false and were made with actual malice and/or with wanton or willful disregard of the Plaintiffs' rights and reputations.

165.     The Defendants acted maliciously as its acts in publishing the Defamatory Statements were an intentional, evil-minded act.

166.     The Defendants acted willfully and wantonly as it engaged in a deliberate act in publishing the Defamatory Statements with knowledge or a high degree of probability of harm to another and who foreseeably might be harmed by the Defendants' acts and reckless indifference to the consequence of the acts.

167.     Adorama LLC, EM and MM participated in and directed the drafting and publishing of the Defamatory Statements.

168.     AI, Schmelkin and Levine seek judgment against the Defendants for General Compensatory, Special And Punitive damages.

WHEREFORE, Plaintiffs, AI, Schmelkin and Levine demand judgment against the Defendants, Adorama, Inc., a New York Corporation, Adorama Enterprises, LLC, a New York Limited Liability Company, Eugene Mendlowits, a New York resident, and Mendel Mendlowits, a New York resident, jointly and severally, for permanent injunctive relief, general compensatory, special and punitive damages, prejudgment and post-judgment interest, costs, attorneys fees, and for such other and further relief as the court deems just and proper.

Dated:  White Plains, New York
         November 19 , 2012

*Savage Law Group, PLLC*
Attorneys for Alexander Interactive, Inc., Alexander Schmelkin and Josh Levine, Plaintiffs

By:    /s/  Denise L. Savage
       Denise L. Savage (ds1498)
       50 Main Street
       Suite 1000
       White Plains, New York  10606
       Direct: 914.455.0087
       (T) 914.271.5150, Ext. 1301
       (F) 914.271.5255
       dsavage@savagelitigation.com
       http://www.savagelitigation.com