D5NVALEC                    Conference

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ALEXANDER INTERACTIVE, INC.,
     ET AL,
4
                    Plaintiffs,
5
              v.                          12 CV 6608 (PKC)
6
     ADORAMA, ET AL,
7
                    Defendants.
8
     ------------------------------x
9                                         New York, N.Y.
                                          May 23, 2013
10                                        2:45 p.m.

11   Before:

12                   HON. P. KEVIN CASTEL,

13                                        District Judge

14                        APPEARANCES

15   SAVAGE & ASSOCIATES
          Attorneys for Plaintiffs
16   BY:  DENISE L. SAVAGE

17   REISS EISENPRESS & SHEPPE
          Attorneys for Defendants
18   BY:  DANIEL J. BROWN

19   NORWICK SCHAD & GOERING
          Attorneys for Plaintiffs as Counterclaim Defendants
20   BY:  KENNETH P. NORWICK

21   KELLOGG HUBER HANSEN TODD EVANS & FIGEL
          Attorneys for Nonparty Samsung Electronics America
22   BY:  MICHAEL N. MULVANIA

23   HOLLAND & KNIGHT
          Attorneys for Nonparty Magento, Inc.
24   BY:  PATRICK J. SWEENEY

25
```

D5NVALEC                          Conference

```
 1              (In open court)

 2              THE DEPUTY CLERK:  Alexander Interactive, Inc. v.

 3   Adorama, Inc. et al.

 4              Plaintiff ready?

 5              MS. SAVAGE:  Yes.  But first I'd like to defer to

 6   Mr. Mulvania.  He needs to --

 7              THE DEPUTY CLERK:  Just state your appearance.

 8              MS. SAVAGE:  Oh, I'm sorry.

 9              Savage & Associates, Denise Savage, on behalf of the

10   plaintiffs.

11              MR. NORWICK:  Kenneth P. Norwick, Norwick, Schad &

12   Goering.  And I'm here for the plaintiffs as counterclaim

13   defendants.

14              THE COURT:  All right.

15              MR. BROWN:  Daniel J. Brown for defendants from Reiss

16   Sheppe, LLP.

17              Good afternoon, your Honor.

18              THE COURT:  Afternoon.

19              MR. MULVANIA:  Your Honor, Mike Mulvania for nonparty

20   Samsung Electronics America.

21              THE COURT:  All right.

22              MR. SWEENEY:  Your Honor, Patrick Sweeney from Holland

23   & Knight for nonparty Magento, Inc.

24              I was advised by plaintiff's counsel that I should

25   show up today because she is going to argue issues regarding
```

1    some discovery we're involved with in the Northern District of

2    California.

3              THE COURT:  Let's see where we go with this.

4              First of all, the record will reflect that of my

5    pending caseload, I don't think there presently is any case

6    that generates more paper or correspondence or disputes than

7    this case.  And maybe today I'll find out why that is so

8    necessary.

9              But let me hear from the plaintiff first with regard

10   to the outstanding discovery against nonparty Samsung, and then

11   we'll see where we go after that issue is resolved.

12             MS. SAVAGE:  Thank you, your Honor.

13             While we were waiting for your Honor, I had

14   conversations with Adorama's counsel, the defendant's counsel,

15   and Samsung's counsel to see if we could resolve some of the

16   outstanding issues.  Both Samsung and Adorama had indicated

17   that they believe they can provide and will provide sales and

18   inventory information.  I don't want to mischaracterize what

19   you represented to me earlier; is that accurate?

20             MR. MULVANIA:  I believe we have inventory data.  I

21   can't represent for sure that we have it, but I'm pretty

22   confident that we do.

23             THE COURT:  What kind of data, sir?

24             MR. MULVANIA:  It would be data reflecting sales of

25   Samsung products to Adorama.

1            THE COURT:  All right.  During what time period?

2            MR. MULVANIA:  I believe it's during any relevant time

3     period.

4            THE COURT:  Okay.  That's fine.  All right.

5            MS. SAVAGE:  And the only other issue is that we are

6     looking for correspondence by and among any employees of

7     Samsung and employees of Adorama surrounding a so-called

8     Samsung demo that took place, where we believe it was at

9     Adorama's premises one day, and perhaps at Samsung's another.

10    The time period would have been between probably October 2011

11    and February and March of 2012.  And I believe that defendant's

12    counsel has now indicated that Adorama will indeed look for

13    this correspondence to see if any such correspondence exists.

14           What I have said is that in the event they are

15    unsuccessful in finding any correspondence in the defendant's

16    records, what I would like is information regarding what

17    Samsung executives or persons attended these meetings, and I

18    can supply them to Samsung's counsel, that information, and

19    then Samsung could look into its databases to see if it can

20    find any correspondence by and among those employees and

21    Adorama's employees.

22           I don't recall what Mr. Mulvania's response was to

23    that request.

24           Can you address the Court on that?

25           MR. MULVANIA:  Your Honor, the first we've learned

D5NVALEC                         Conference

1    that we need any specific stuff was in the plaintiffs' letter,

2    I believe, from Tuesday.  The subpoena was issued, I believe,

3    some time in December or January.  We believe it just has been

4    incredibly overbroad.  I think one request said --

5              THE COURT:  It was; I've read it.  It was incredibly

6    overbroad.  Not only was it incredibly overbroad, this district

7    has uniform definitions and discovery requests.  They were

8    ignored and violated.  Uniform definitions and discovery

9    requests have been part of the local rules of this Court for

10   something in the neighborhood of 25 years; and it was as if

11   they didn't exist.

12             MS. SAVAGE:  Well, your Honor, I have to say that I've

13   used those definitions in discovery for the past 25 years or

14   so -- well, with the exception of references to metadata or

15   other terms that are of more recent origin -- in the bankruptcy

16   court, in this Court, in other district courts around this

17   country.  And while I understand they are uniform, I didn't

18   understand that it was mandated that the definition couldn't be

19   expanded if it was disclosed to the other side what the

20   definitions entailed.

21             THE COURT:  So, in other words, if you don't like the

22   definition of "documents," you can supply your own definition

23   of documents.

24             MS. SAVAGE:  Well, no, not necessarily.  But I may

25   want to indicate, for example, that there are specific

1    documents that we might need, but I might want to even narrow

2    the definition.

3              THE COURT:  No, you put in your own definition.  Take

4    a look at your subpoena.  That's what you did.  You replaced

5    it.

6              Now, I'm going to punch up -- as soon as I can get my

7    computer booted up -- a copy of the local rules, and we'll find

8    out.

9              MS. SAVAGE:  At the same time, in correspondence with

10   Samsung when they responded --

11             THE COURT:  Excuse me a second.

12             MS. SAVAGE:  May I, your Honor?

13             THE COURT:  No.

14             MS. SAVAGE:  Or would you like me to wait?

15             THE COURT:  Please wait, Ms. Savage.

16             (Pause)

17             THE COURT:  Well, let's just see.

18             Local Civil Rule 26.3(a):

19             "The full text of the definitions and rules of

20   construction set forth in Paragraphs C and D is deemed

21   incorporated by reference into all discovery requests."

22             MS. SAVAGE:  Okay.  So it's deemed incorporated.  So

23   if I expanded on them, then those definitions are nonetheless

24   deemed incorporated.

25             THE COURT:  Ms. Savage, if you had waited, instead of

1    interjecting, you would have learned the next sentence.

2            MS. SAVAGE:  Okay.

3            THE COURT:  "No discovery request shall use broader

4    definitions or rules of construction than those set forth in

5    Paragraphs C and D."

6            MS. SAVAGE:  Okay.

7            THE COURT:  Now, do you want to correct your statement

8    now?

9            MS. SAVAGE:  I will correct my statement.

10           THE COURT:  All right.

11           So when you interject to challenge the Court on a

12   point, you might be well-advised to wait until the Court

13   finishes reading the rule.

14           And it goes on to say:  "This rule shall not preclude

15   the definition of other terms specific to the particular

16   litigation, the use of abbreviations, or a more narrow

17   definition of a term defined in Paragraph C."

18           It does not, however, permit a broader definition.

19   That was violated in your definitions.  And as you stood here

20   today, you were apparently unaware of the content of the rule.

21           MS. SAVAGE:  What I can say, your Honor, is that

22   ultimately the request to Samsung was extremely narrowed via

23   correspondence among the parties.  And while I appreciate that

24   it might have initially been too broad, it wasn't -- they were

25   not definitions that I stood upon; they are not definitions I

D5NVALEC                        Conference

1    attempted to enforce in broad scale.

2              And if you look at the email exchange between

3    Samsung's representative and myself in going through April and

4    into -- I think it was into May or it might have been into

5    April, you will see that I narrowed and very explicitly set

6    forth the documents that we were seeking.   Thus --

7              THE COURT:   That may be well and good, but the reality

8    is that the rule provides, as it does for good reason -- I know

9    this because while in private practice, I was one of the

10   principal draftpersons of the rule.   And it may well be that

11   the rule requires an amendment.   And I urge you, if you're of

12   the view that it requires an amendment, to so apply to the

13   Court.   But until such time as that occurs, I would insist that

14   you comply with the local rule, Ms. Savage.

15             MS. SAVAGE:   I absolutely will, your Honor.

16             THE COURT:   In this and every other case.

17             MS. SAVAGE:   I agree.   And I absolutely will.

18             THE COURT:   All right.

19             MS. SAVAGE:   Thank you, your Honor.

20             I don't think we actually resolved the issue of

21   whether, in lieu of obtaining any correspondence from the

22   defendant by and among employees at Adorama, employees at

23   Samsung -- I could provide names of the employees at Samsung

24   who met with Adorama representatives to see if Samsung could

25   find any correspondence.

1          One of the issues that Mr. Mulvania said to me is that

2     they had these meetings all the time, and Samsung isn't certain

3     who necessarily met with the Adorama representatives.

4     Therefore, so as not to burden Samsung, and now that Adorama

5     has indicated they will at least look for such

6     correspondence -- if they think it still exists, they are not

7     sure -- in the event I don't get anything, the documents from

8     the defendant, at least I can then narrow and provide the

9     information that will narrow the search for Samsung.

10          THE COURT:  Well, I've heard several things from you

11     now.  One was it was in lieu of getting the documents from

12     Adorama, and the other was you were going to seek the documents

13     from Adorama; but if you were unsuccessful in that quest, you

14     would then turn to Samsung.  Which is it?

15          MS. SAVAGE:  I shouldn't have said "in lieu."  I

16     should have said in the absence of getting them initially,

17     first, from Adorama, in the event they can't find any

18     documents, I can get the names of -- at a minimum, of the

19     Samsung representatives from Adorama, then ask Mr. Mulvania to

20     see if Samsung is then able to ascertain whether those Samsung

21     representatives have any correspondence.

22          THE COURT:  You may do that, but I'm not giving you a

23     blank check.  Let's find out what happens, and then we'll hear

24     from Samsung as to what is involved in such a search, depending

25     on the specificity of the information you are able to obtain

D5NVALEC                          Conference

```
 1    from Adorama.

 2              MS. SAVAGE:  Okay.

 3              THE COURT:  That's my ruling.

 4              MS. SAVAGE:  Okay.  Thank you, your Honor.

 5         So once I guess -- assuming Adorama is unable to find

 6    any such documents, but can provide me with names of the

 7    Samsung representatives, should I write -- I should just submit

 8    another letter to the Court asking for another discovery

 9    conference?

10              THE COURT:  Absolutely not.  Absolutely not.  You

11    should confer with Samsung's counsel in an effort to resolve

12    it.

13              MS. SAVAGE:  Okay.

14              THE COURT:  Not write to the Court and advise that

15    Adorama was unable to locate documents and you've obtained

16    names from them.  Do not write to the Court so advising.

17              MS. SAVAGE:  Okay.  I believe that that resolves the

18    Samsung issue.

19              THE COURT:  Thank you.

20              MS. SAVAGE:  Would you like to move on to -- what

21    would you like to move on to next, your Honor?

22              THE COURT:  I'll let you know.

23         Mr. Mulvania, would you care to be excused at this

24    point?

25              MR. MULVANIA:  Yes, your Honor.
```

1          Your ruling is very agreeable to Samsung.

2          THE COURT:  Okay.  Thank you.

3          MR. MULVANIA:  Thanks, your Honor.

4          THE COURT:  All right.

5          Now, let me inquire, with regard to Magento, let's get

6     into the procedure here.

7          There is a subpoena that was issued out of which

8     court, Northern District of California?

9          MS. SAVAGE:  There was a document subpoena and

10    deposition subpoenas issued out of this Court initially.

11         EBay is the 100 percent owner of Magento, Inc.  EBay

12    has an office here in New York City in Chelsea.  And my office

13    served both the *subpoena duces tecum* and the deposition

14    subpoenas on eBay's New York State registered agent.  And it

15    was served on Magento, care of eBay, eBay's registered agent.

16         EBay California, in-house counsel responded on behalf

17    of Magento.  They actually produced 66,000 documents responsive

18    to the subpoena; we worked with their in-house counsel.  And we

19    adjourned the depositions because there was a delay in being

20    able to get all the documents together.

21         After that, we were contacted -- actually, eBay's

22    in-house counsel then raised objections to the subpoenas being

23    issued out of this Court, arguing that they should have been

24    issued out of the court in northern California, because that's

25    where Magento is.

D5NVALEC                    Conference

1          My position, I argued on behalf of the plaintiffs, was

2     you're a global corporation; you have a location here in New

3     York City, you have a registered agent --

4          THE COURT:  Magento is a global corporation?

5          MS. SAVAGE:  EBay is a global corporation.

6          THE COURT:  Let's assume eBay is present in all 50

7     states, all territories, and in all countries recognized by the

8     United Nations.  Of what significance is that relative to

9     Magento?

10          MS. SAVAGE:  Well, Magento is a 100 percent

11     wholly-owned subsidiary --

12          THE COURT:  Correct.

13          MS. SAVAGE:  -- of eBay.  And eBay's in-house counsel

14     was the representative and was the responsive entity with

15     respect to the subpoena, all the documents.  It represented

16     Magento at its depositions in California.  Magento doesn't have

17     in-house counsel.

18          THE COURT:  Is the general counsel a person?

19          MS. SAVAGE:  Yes.

20          THE COURT:  Then they are not an entity.

21          MS. SAVAGE:  I'm sorry, you lost me on that one, your

22     Honor.

23          THE COURT:  Well, you said they were the responsive

24     entity; the general counsel was the general entity.

25          MS. SAVAGE:  EBay's in-house counsel -- eBay was the

1    responsive entity by and through its in-house counsel on behalf

2    of Magento, Inc.

3          THE COURT:  Now, did you try this argument on the

4    judge out in California?

5          MS. SAVAGE:  No, because the miscellaneous proceeding

6    was started by the defendants out there, and so we just

7    utilized the jurisdiction.  And, in fact, he was wondering --

8    he made us prove that he had jurisdiction over this matter,

9    because the matter was pending here in New York.  So we

10   actually had to make a jurisdictional argument in northern

11   California to demonstrate that he could rule.

12         THE COURT:  Right.  And Magento has its principal

13   place of business in California; is that correct?

14         MS. SAVAGE:  From what I understand.

15         THE COURT:  And you served Magento in -- is this the

16   Northern District of California?

17         MS. SAVAGE:  Yes.  I also served them via the Northern

18   District of California after they raised these objections; but

19   at the same time, I had still had served them with subpoenas

20   out of this Court, as well.

21         THE COURT:  Is Magento present in this district?

22         MS. SAVAGE:  It is via as a wholly-owned subsidiary of

23   eBay.  And they performed work in this district for -- they had

24   their employees come to this district and perform work for my

25   client here in New York City.  So they are present.

D5NVALEC                          Conference

1              THE COURT:  There is long-arm jurisdiction under Rule

2     45, but it extends to the 100-mile bulge.  That's the extent of

3     long-arm jurisdiction under Rule 45.

4              If you're dealing with a nonparty witness, you cannot

5     bootstrap New York's long-arm statute to conduct discovery

6     against someone who admittedly transacted business in the State

7     of New York.  You could sue that person in the State of New

8     York perhaps, but Rule 45's scope does not extend on the

9     long-arm basis.

10             MS. SAVAGE:  Well, if we're going to go with that

11    argument --

12             THE COURT:  It's not an argument.  It's a principle of

13    law.  Do you have any support for a contrary proposition,

14    Ms. Savage?

15             MS. SAVAGE:  I don't know that we even have to get

16    into that, and I'll tell you why, your Honor.  We want to

17    obtain jurisdiction over an employee named Vitaliy Korotum.  He

18    doesn't work out of the Magento office in California; he works

19    in the Ukraine.

20             Now, I --

21             THE COURT:  You say you want to obtain jurisdiction

22    over them.  You want to name him as a defendant, is that --

23             MS. SAVAGE:  No, I want to be able to subpoena him --

24             THE COURT:  All right.

25             MS. SAVAGE:  -- to depose him.

D5NVALEC                    Conference

 1          And I served the subpoena for him in California out of

 2     this Court and also out of the court in California.

 3          THE COURT:  All right.

 4          Have you employed the Hague Convention?

 5          MS. SAVAGE:  Well, what happened was when we were in

 6     California and we were -- we spoke with eBay's in-house counsel

 7     who was present at the depositions in California and

 8     represented Magento's people who were deposed, we were told --

 9     and I actually think one of the witnesses testified about this,

10     as well -- that Mr. Korotum is a resident of the Ukraine, but

11     he is often in this country working either at Magento's

12     premises or working at locations all around the country because

13     he does coding, source coding.

14          THE COURT:  Well, that's good for you.  That's very

15     good for you, because you should be able to serve him with a

16     Rule 45 subpoena when he's next in some American jurisdiction.

17          MS. SAVAGE:  Correct.

18          THE COURT:  And I recommend you do that.

19          MS. SAVAGE:  And so to that end, I had asked eBay's

20     in-house counsel to advise me of Mr. Korotum's schedule over

21     the next couple of months so that we would know when he was in

22     this country so that we would be able to serve him.  And

23     Magento has refused to provide that information to us to

24     facilitate our ability to serve Mr. Korotum.

25          THE COURT:  All right.

1          So what did the judge in the Northern District of

2     California have to say when you brought this to his attention?

3          MS. SAVAGE:  That issue has not yet been raised with

4     the judge in the Northern District of California.

5          THE COURT:  All right.  Well, then I assume it will.

6          MS. SAVAGE:  So your Honor does not -- even though

7     there is a subpoena for Mr. Korotum that was issued initially

8     out of also this jurisdiction, your position is it's not in the

9     100-mile radius.  He could be in the -- I don't even know where

10    he is; he could be in the 100-mile radius right now.

11         THE COURT:  I don't have positions, because I'm not a

12    party to this case.

13         MS. SAVAGE:  Or I should say your ruling.

14         THE COURT:  Well, I'm inviting you to argue your

15    position.  I know what Rule 45 says.  And I'd be happy to be

16    acquainted with any facts or law you wish to present me with

17    for the proposition that I have the authority to enforce a

18    subpoena against this individual.  I gather you have not served

19    him with a subpoena out of this Court; is that correct?

20         MS. SAVAGE:  We had served it at Magento's offices,

21    unaware that he was not at that location at the time.

22         THE COURT:  But you didn't serve him.

23         MS. SAVAGE:  No, because we have not been able to

24    ascertain where he is.

25         THE COURT:  And that subpoena at Magento's offices was

1     issued out of the Northern District of California, right?

2              MS. SAVAGE:  And one was issued out of here, as well.

3              THE COURT:  For Mr. -- what's his name again?

4              MS. SAVAGE:  Korotum.

5              THE COURT:  Korotum.

6              So there was a subpoena issued out of the Southern

7     District of New York to Mr. Korotum, and where was that served?

8              MS. SAVAGE:  Magento, his office in California.

9              THE COURT:  How would that be effective under Rule 45?

10             MS. SAVAGE:  We did not know that he was not at the

11    premises at the time.

12             THE COURT:  So there's no subpoena before me which I

13    could enforce if I wanted to.

14             MS. SAVAGE:  Well, there is a production request to

15    Magento directly in which we have asked to obtain information

16    as to when Mr. Korotum will be in this country again so we are

17    able to serve him.

18             THE COURT:  All right.  And you've made that request

19    to Magento where you have a subpoena, which you have served on

20    them out of the Northern District of California.  And what has

21    transpired?

22             MS. SAVAGE:  Magento's in-house counsel said he would

23    take it under advisement.  This was during the depositions that

24    were going on in California.  A letter from Mr. Sweeney on

25    behalf of Magento advised us that they would not disclose

1   Mr. Korotum's schedule.

2            THE COURT:  Okay.  All right.

3            What's before me to decide?

4            MS. SAVAGE:  Well, there are a number of things

5   relating to Magento.

6            While the Court did not enter a letter or memo,

7   endorse a letter directing Magento to be here, I asked if

8   Magento would appear so that we could use this status

9   conference to address all the outstanding discovery issues so

10  we didn't have to send more paper to your Honor and we could

11  engage in some kind of judicial economy in approaching all the

12  discovery issues in this case.

13           So I can list to you all the Magento issues that are

14  outstanding, or we can put everything to you in writing and

15  appear before your Honor at another time.

16           THE COURT:  Well, what I'm trying to get to,

17  Ms. Savage, is whether I am the right judge for you to be

18  directing your disputes with Magento to.  That's the threshold

19  question.

20           MS. SAVAGE:  Well, and here's my response to this:  We

21  served a *subpoena duces tecum* out of this Court.  We have not

22  served a *subpoena duces tecum* out of the Northern District; it

23  was served out of this Court on January 6th of 2013.  It was

24  served on eBay's registered agent here in New York, and

25  ultimately it was sent to eBay's counsel in California.

1            EBay's counsel in California contacted me representing

2      that eBay was contacting me on behalf of Magento, a

3      wholly-owned subsidiary.  To that end, Magento's counsel then

4      responded, sent 66,000 documents, and a very lengthy privilege

5      log.  They never raised jurisdictional objections within the

6      14-day period under Rule 45.  And, thus, it's my argument they

7      waived it.

8            THE COURT:  All right.  Do you have support for that

9      proposition?  Because it seems to me that an alternative way of

10     looking at this is if I get an invalid subpoena issued out of

11     the wrong district, I might say reasonably and appropriately I

12     haven't been served, the subpoena is not valid; but I believe

13     this person could issue a valid subpoena to me, an enforceable

14     subpoena.  And why do I want to go through all that bother?

15     Let me gather documents and produce them to the other side.

16     That would be, it seems to me, a most reasonable way to

17     proceed, wouldn't it?

18            MS. SAVAGE:  It would.  And I guess if I were that

19     attorney, I would have responded saying I believe that you have

20     issues in terms of obtaining jurisdiction over my client;

21     however, because it's just a matter of you serving the subpoena

22     out of the Northern District, we are prepared to produce these

23     documents without waiving any jurisdictional arguments or

24     rights.  But that wasn't done.

25            THE COURT:  All right.

D5NVALEC                        Conference

1          Well, let's hear from Magento.  Are you before me or

2     are you not before me?

3          MR. SWEENEY:  Your Honor, respectfully, we are not

4     before you.  I am just here to -- as I said in my letter, to

5     make sure that we are not prejudiced by any discussions that

6     would go on with counsel and the Court, and to object to any

7     efforts to enforce these facially-invalid subpoenas.

8          THE COURT:  The argument that has been asserted is

9     that there was purported service on Magento of a subpoena

10    issued out of this Court which Magento had actual knowledge of

11    and which Magento did not object.  And by not objecting within

12    the 14-day period set forth in 45(c)(2)(B), it waived any

13    objection and, therefore, this Court acquired good jurisdiction

14    to serve to -- to consider relief against Magento.

15         What say you?

16         MR. SWEENEY:  I will respond in two ways:

17         First of all, if it's a facially-invalid subpoena,

18    then it's of no force and effect from the beginning, so there's

19    no need to object.

20         Secondly, I would say that almost immediately we

21    engaged in good-faith discussions about responding to the

22    subpoena and possible objections.  And I believe under the

23    *Conquered Boat* line of cases, that means that we can go beyond

24    the 14 days if, in fact, we did miss the 14 days.  I can't say

25    that to be the case, but if we did, I think we're safe under

D5NVALEC                        Conference

1   *Conquered Boat*.

2           THE COURT:  Well, why do you say a facially-invalid

3   subpoena as opposed to a subpoena which you might assert was

4   improperly served?  Could not a party issue a subpoena out of

5   this district and consent to service in this district, or

6   consent to this Court's jurisdiction?

7           MR. SWEENEY:  Under Rule 45, if the witnesses and

8   documents are in a different district, then it's

9   facially-invalid.

10          Could they consent?  I think it's more along the lines

11  of what your Honor was discussing earlier.  We are the nonparty

12  good-faith participant in these proceedings here.  We actually

13  wanted to proceed in good faith and minimize costs; but what we

14  got instead was multiplication of costs by counsel's repeated

15  efforts to overreach and drag us into this Court, when, in

16  fact, there were discussions point-blank about if there were

17  going to be issues with these subpoenas, then it should be

18  taken up in the Northern District.

19          Ten days later, counsel filed her first letter

20  requesting that we appear before your Honor.  She subsequently

21  withdrew that, but the timing is disturbing to us to say the

22  least.

23          So there was no consent.  Consent being any kind of

24  willful waiver of a right, absolutely not.

25          THE COURT:  All right.  Let me hear from Ms. Savage.

1          MS. SAVAGE:  Your Honor, there was clearly consent,

2     because the subpoena was sent back on January 6th of 2013.

3     Magento never -- the *subpoena duces tecum.*

4          Magento never, ever -- eBay on behalf of Magento, I

5     should say, never ever asserted any jurisdictional issues, any

6     improper service; it never asserted that it didn't represent

7     Magento, that service had been improper by utilizing the New

8     York State registered agent.  None of that ever came up.  There

9     is nothing in writing regarding that, nor was there anything

10    verbally.  There was never a motion made to quash the subpoena,

11    for a protective order; there was literally nothing that

12    demonstrates any question made by eBay of the propriety of

13    serving that *subpoena duces tecum* out of this district.  And

14    ultimately, eBay produced 66,000 documents on behalf of

15    Magento, and a privilege log.  And it was only when we started

16    to schedule the depositions in California which took place --

17         MR. BROWN:  The last week of April and beginning of

18    May.

19         MS. SAVAGE:  -- the last week of April and the

20    beginning of May.  And we started scheduling those at the

21    beginning of April, I believe, long past any time to start

22    objecting to any service or jurisdictional or propriety issues

23    relating to the *subpoena duces tecum* served on January 6th,

24    that all of a sudden issues are raised as to the propriety of

25    service of the subpoenas.

1          And I should mention that even then I don't believe

2     that even an issue was raised as to the propriety of the

3     service of the *subpoena duces tecum*, but, instead, was only

4     raised as to the propriety of the service of the deposition

5     subpoenas out of this Court.

6          THE COURT:  Mr. Sweeney, let me tell you where we are

7     on this.

8          It appears to me that the plaintiff and Magento will

9     be before a person of the black-robed variety sorting through

10    the scope of a subpoena and the scope of discovery as it

11    relates to the action before me.

12         We can have a fine old time litigating jurisdiction

13    under Rule 45, and we probably can make some new law; it would

14    be great.  There isn't a lot of case law under Rule 45; most

15    judges don't trifle with extended briefing and argument on such

16    issues, because there are more sensible, practical solutions.

17         But we can do that.

18         And then I can write a nice decision, and then you all

19    can go up to the Circuit; it will be great.  We'll have a fine

20    old time.  Then you'll be on the lecture circuit, Ms. Savage

21    will be on the lecture circuit with you.  It will be terrific.

22         Or we can get to the bottom of what it is that Magento

23    ought to be required to do in this case or not required to do

24    in this case.  A judge will get to the bottom of that, whether

25    it is me or a colleague in the Northern District of California.

```
 1   That will happen.  The question is whether you would like to go
 2   through the frall-di-rall of the briefing, we can brief it, and
 3   we'll get to a judicial resolution of the issue.  And then you
 4   will either sort the issue out here or in the Northern District
 5   of California.
 6           Where do you stand, sir?
 7           MR. SWEENEY:  I kind of like to be in the Northern
 8   District of California.  If you're asking me to consent to
 9   jurisdiction here, I will have to consult that.
10           THE COURT:  This is what I think we should do:  I
11   should give you a few minutes to make a phone call, and then
12   we'll reconvene.
13           MS. SAVAGE:  We can discuss issues as and between the
14   defendant and the plaintiff while Mr. Sweeney makes a phone
15   call.
16           THE COURT:  Or not.
17           MS. SAVAGE:  Okay.  That's fine, your Honor.
18           MR. SWEENEY:  And, your Honor, just so I'm sure
19   exactly what I'm asking here, there's no issue about the
20   subpoenas upon individuals, that they were somehow valid by
21   being served from this district.
22           THE COURT:  Not at this stage of the game.
23           MR. SWEENEY:  So we're just talking about the subpoena
24   that was served upon eBay, and whether or not that was good
25   service.
```

1          THE COURT:  No, we are not talking about whether it's

2     good service.  We're not talking about whether it's good

3     service.

4          MR. SWEENEY:  We're beyond that.

5          THE COURT:  The question is whether we go beyond that

6     and get the issues, the discovery issues, resolved, and we move

7     on from here, or we litigate the issue of the propriety and,

8     more particularly, whether or not the absence of a motion to

9     quash had any -- had the impact of waiving any defense that you

10    might otherwise have to the subpoena in that regard.  So that's

11    the issue.

12         We either go the route of briefing all this --

13    eventually I can safely and confidently tell you that your

14    client will be before a judge resolving these issues, either me

15    or another fine judge.  We're a little bit like McDonald's here

16    with the golden arches.  We try and provide uniform type

17    service; it's the same Federal Rules of Civil Procedure; and

18    hopefully you get the same fine, great service in the other

19    court.

20         But I'll give you a chance to make that call, and I

21    would ask you to do so at this point.

22         MR. SWEENEY:  I have to run down to the COs and get my

23    phone.

24         THE COURT:  All right.

25         (Pause)

1           THE COURT:  All right.  Mr. Sweeney, what say you?

2           MR. SWEENEY:  Your Honor, I was not able to get in

3    touch with someone that could permit me to waive their rights.

4    So at this point we're going to have to say that we would not

5    consent.  If that changes, we'll advise the Court as soon as

6    possible.

7           THE COURT:  All right.

8           So what I think prudently at this point the plaintiff

9    is welcome to do is file a formal motion to compel.  You'll

10   have an opportunity to respond to the motion to compel.  You'll

11   have an opportunity to reply, and I will rule on the basis of

12   the motion to compel.

13          MS. SAVAGE:  Thank you, your Honor.

14          THE COURT:  If something changes, you'll let

15   Ms. Savage know and you'll let me know, and we'll see whether

16   we can hammer this out.

17          MR. SWEENEY:  Very good.

18          And that's just with respect to the *subpoena duces*

19   *tecum* served on eBay, not with respect to the other --

20          THE COURT:  That is my understanding, as well.

21          All right.  Now, there's a joint request to extend the

22   discovery period.

23          Ms. Savage, what is your position on that?  Fact

24   discovery extended to July 31, 2013.

25          MS. SAVAGE:  I support it.

```
1              THE COURT:  All right.

2              And the defendants are seeking it, so is that correct?

3              MR. BROWN:  Yes, your Honor.

4              THE COURT:  All right.

5              Based on what I've read and what I've seen, I think

6     it's reasonable, so fact discovery will be extended to July

7     31st.

8              MS. SAVAGE:  And will there be a corresponding

9     extension of expert discovery, your Honor?

10             THE COURT:  I'm going to see whether I can work that

11    out.

12             MS. SAVAGE:  Okay.  Thank you, your Honor.

13             THE COURT:  And I'll extend expert discovery to

14    September 6.  I'll make that September 13th.

15             MS. SAVAGE:  Are there any Jewish holidays?

16             THE COURT:  There may very well be.

17             MS. SAVAGE:  Okay.

18             THE COURT:  But, in fact, September 13th may be a

19    Jewish holiday.

20             MS. SAVAGE:  Okay.

21             THE COURT:  But nothing need transpire on September

22    13th.  I was going to do it September 6th, but -- is that a

23    problem?

24             MS. SAVAGE:  No, no, that's fine.  I know that the

25    defendants are --
```

 1            THE COURT:  Anybody object to July 31 for fact

 2    discovery and September 13 for expert discovery?

 3            MS. SAVAGE:  Are you all right?

 4            MR. BROWN:  No objection.

 5            MS. SAVAGE:  Thank you, your Honor.

 6            MR. BROWN:  Your Honor, can I have one question?

 7            THE COURT:  Yes.

 8            MR. BROWN:  I just want to clarify that is the

 9    extension on fact discovery for all fact discovery or just the

10    fact discovery that was set forth in our --

11            THE COURT:  I think the only way to do this rationally

12    is for all fact discovery.

13            MR. BROWN:  Thank you.

14            THE COURT:  I think doing it otherwise is going to

15    lead to predictable skirmishes on the subject of what was or

16    was not within the scope of the letter or what else there is a

17    need to conduct discovery on.  So I'm going to keep it open

18    till July 31.

19            MR. BROWN:  Thank you, Judge.

20            THE COURT:  All right.

21            Now, what discovery between plaintiff and defendant do

22    I need to resolve today?

23            MR. BROWN:  Only a couple of things from defendants'

24    perspective, your Honor.  And I'm happy to address also the

25    plaintiffs' requests, as well, but maybe I'll leave that to

1    Ms. Savage.

2              From defendants' side, we have two items that remain

3    outstanding:  One is our request for production of AI's

4    customer complaint information, and we've been asking for this

5    since February.  And specifically, your Honor, this goes

6    towards Adorama's defense on the defamation claim that's been

7    brought against Adorama.

8              Specifically, AI is going after Adorama with respect

9    to a press release in which Adorama called out AI for poor

10   worksmanship, customer service related to the website work

11   which Adorama states was not performed properly and which left

12   them with useless source code.

13             THE COURT:  All right.

14             Let me hear from the plaintiff on this one.

15             MS. SAVAGE:  Our position -- or our issue with this

16   particular request was we wanted an understanding of what the

17   word "complaint" meant; because the development of a website is

18   extremely complex.  These aren't like little tiny websites that

19   are developed by Alexander Interactive.  These are very, very

20   large retail e-commerce websites; they are complicated

21   websites.

22             So what is a complaint?  You know, if a client -- I --

23             THE COURT:  Fair question.  What's the answer to the

24   question what's a complaint?

25             MR. BROWN:  The answer, your Honor, is we have

1    narrowed it.  And we've asked for complaints regarding -- from

2    customers regarding the quality of the deliverables that were

3    submitted, just like we had.

4            And we're willing to further narrow that to also

5    complaints regarding what's known in the industry as user

6    acceptance testing, which, in our case, it's Adorama's position

7    that the plaintiffs rushed the process, and trying to get the

8    work out the door, because it was too difficult for them to

9    perform, and they wanted to rush it out to Adorama so that

10   Adorama could then perform user acceptance testing.

11           The problem was that Adorama was getting material

12   which had bugs in it and which were not supposed to be there;

13   so they couldn't perform the user acceptance testing.

14           We suspect that there are other clients out there that

15   have experienced the same type of quality complaints from the

16   plaintiffs, and we're entitled -- and we believe we're entitled

17   to explore that in defense of our defamation claim.

18           THE COURT:  All right.

19           So how does the narrowing of the definition bring us

20   closer to a resolution, Ms. Savage?

21           MS. SAVAGE:  Well, first of all, there weren't

22   allegations in the aiexposed.com website and the PR web press

23   release that discussed bugs or anything of that nature that

24   came up.  So I'm not even sure how that particular issue is

25   relevant.

1          THE COURT:  Well, in a defamation claim, let's say

2      that somebody says you do very poor work, okay, and you seek

3      damages for injury to your reputation.

4          MS. SAVAGE:  Right.

5          THE COURT:  But another client says you do fabulous

6      work, but you stole from me.  That would tarnish your

7      reputation and make your reputation worth less, even though it

8      is not the complaint in the announced or challenged defamatory

9      statement.

10         MS. SAVAGE:  Well, I will tell you this --

11         THE COURT:  I really shouldn't have to be in the

12     situation of doing this, but that would be the -- that would be

13     the answer to your inquiry.

14         Go ahead.

15         MS. SAVAGE:  What I will say is that yesterday we

16     deposed the owner of Adorama, Inc.  And we questioned him

17     regarding the creation and establishment of this aiexposed.com

18     website and the publishing of the press release.  And the

19     questions we asked were -- ultimately the AI exposed website

20     and the press release invited customers of my client to contact

21     Adorama, to log on to the website, and blog and make comments

22     about any poor work or any poor experiences with my client.

23         Yesterday, the owner of Adorama testified they got not

24     a single call that he knew of regarding any of the

25     information -- you know, from the press release --

1          THE COURT:  Ma'am, ma'am, we're talking about

2     narrowing a document request.  It's terrific that that's what

3     the testimony was; and presumably, therefore, you may not have

4     any documents responsive, which ends the matter.

5          The question is with regard to the scope of document

6     production.

7          MS. SAVAGE:  And I'm getting to that.

8          THE COURT:  Well, get to it quickly please.  I don't

9     need to hear what the testimony was yesterday.

10          MS. SAVAGE:  So in addition to that, we heard that

11     Adorama also engaged in an online search to see if there was

12     any negative information out there about AI -- about my client,

13     and the answer was no.

14          Now, as far as the complaints are concerned, what we

15     did was we had agreed to produce any documents where conflicts

16     with any of Alexander interactive's former clients and itself

17     resulted in a client walking away from a contract, or a

18     contract being resolved by a settlement agreement or lawsuit or

19     something of that nature.  There were only two such situations,

20     and we provided copies of those executed settlement agreements.

21          THE COURT:  But not adjustments in price.

22          MS. SAVAGE:  In fact, the clients paid my client --

23     the clients paid Alexander Interactive, because they were in

24     breach.

25          THE COURT:  Right.

1           MS. SAVAGE:  And that was the resolution.

2           THE COURT:  But you're not willing to produce

3    documents relating to customers where AI made an adjustment in

4    price in favor of the customer in response to a customer

5    complaint.

6           MS. SAVAGE:  Oh.  So here --

7           THE COURT:  I take it.  Is that correct?

8           MS. SAVAGE:  Well, they would literally have to go

9    through every single file of every single customer.  They are

10   asking for documents going back to 2008.

11          THE COURT:  Well, how many customers have you had

12   since 2008?

13          MS. SAVAGE:  Two thousand or -- I mean it's a lot of

14   customers.  I mean you're talking about going through files and

15   files and files, electronic and otherwise, to find all these

16   documents.  I mean it's ridiculously burdensome.

17          But putting that even aside, okay, what Mr. Brown

18   raised was this user acceptance testing, this UAT, and the

19   issue of customers getting bugs in source code deliverables

20   from my client.

21          And I just want to explain a little bit about the

22   process to -- because I think that this is a very misleading

23   concept that because there are bugs in a deliverable to a

24   client, and a client recognizes those bugs or finds bugs itself

25   in its own user acceptance testing, that that somehow

1   constitutes a complaint.

2           The bottom line is is that when you develop software

3   or a source code deliverable, you have to go through an immense

4   amount of testing.  My client does quality assurance testing on

5   its site to find bugs that it can find and attempt to resolve

6   as many bugs as possible before it then turns over the

7   deliverable to the client to do its own user acceptance

8   testing.

9           And in the contract, in particular with Adorama or in

10  every contract, for the scope of work, the SOW, the acceptance

11  testing is actually delineated based upon the type of

12  deliverable.  So the user acceptance testing and the acceptance

13  criteria in Adorama's contract could be totally different than

14  the user acceptance testing and the testing criteria in all

15  these other contracts.  And finding a bug doesn't constitute a

16  complaint; that is just the nature of --

17          THE COURT:  Well, you're not helping me with defining

18  the scope of the discovery.  Thank you for the education.  I am

19  not surprised that in providing deliverables, there would be

20  bugs or a punch list.  I appreciate that fact.

21          We haven't advanced the ball here any.

22          MS. SAVAGE:  What I'm saying though is that my

23  interpretation of what Mr. Brown just argued to you was that

24  he's saying if a client sends back a deliverable after user

25  acceptance testing and says, Hey, I found a bug, fix this, that

D5NVALEC                        Conference

1      that constitutes a complaint.  I mean that would literally

2      include every single project probably that Alexander

3      Interactive worked on, because it's an iterative process, and

4      that's just how these things go.

5             So, again, it's so incredibly overbroad and burdensome

6      and it's an impossible characterization, that I just don't see

7      how that moves the ball in this case or assists Adorama in its

8      analysis of Alexander Interaction's reputation or performance.

9             I mean the question is how many sites has Alexander

10     Interactive launched or not launched on behalf of its clients?

11     And it's launched them all successfully.

12             THE COURT:  Thank you.

13             MS. SAVAGE:  Thank you.

14             THE COURT:  Do you want to respond?

15             MR. BROWN:  Judge, well, a couple things.

16             One, with respect to the attempt to narrow to provide

17     us with customers where the matters led to complaints or

18     contracts being walked away from, that leaves -- they've only

19     produced two documents:  They produced unexecuted settlement

20     agreements --

21             MS. SAVAGE:  No, I gave the signed ones to Matt

22     yesterday.

23             THE COURT:  Please.  Ms. Savage, when someone else is

24     speaking, I insist that you refrain.  If you want to speak, you

25     should rise and address the Court.

1        I would like to note for the record, that there have

2   been I don't think -- I think a very accurate number is at

3   least eight occasions in the course of this argument where

4   while you have been addressing the Court, you have turned your

5   head away from the Court to lean back to opposing counsel to

6   seek a confirmation or denial of what you're saying.

7        That's inappropriate.

8        MS. SAVAGE:  No, your Honor, I am trying to resolve

9   issues with counsel by leaning back in order to narrow the

10  issues that we're putting before your Honor.  And I don't

11  understand why you feel compelled to be so abusive toward me.

12       THE COURT:  Ma'am, I'm sorry you feel that way.

13       MS. SAVAGE:  I do feel that way, your Honor.  I have

14  been very respectful in this chamber.  Very respectful.

15  Regardless of the tone that you've taken toward me, I have been

16  extremely respectful, and I have responded to every one of your

17  comments.  And if I have leaned back or spoken to defense

18  counsel, it's because he's not right next to me, and I am

19  trying to resolve issues so that we can narrow these matters

20  before your Honor.

21       THE COURT:  Thank you.

22       Please don't interrupt your adversary.

23       MR. BROWN:  May I continue, your Honor?

24       THE COURT:  Yes.

25       MR. BROWN:  Thank you.

1          With respect to the two settlement agreements that

2     have been produced, the agreement was we're not really

3     interested in settlement agreements, Judge, we want to get at

4     the complaints that gave rise to these settlement agreements to

5     see if other customers have experienced the same experience

6     that we've had, Adorama.

7          And there was an agreement that plaintiffs were going

8     to produce documents relating to the complaints which resulted

9     in the termination of contracts, settlement of contract

10    disputes, or clients that walked away.  We got two settlement

11    agreements, and we didn't get the complaints leading up to

12    that.

13         So we would ask that at a minimum, we get the

14    complaints that led to these settlement agreements being

15    executed.  We're not really interested in settlement

16    agreements.

17         The second point, your Honor --

18         THE COURT:  Well, let's find out about the first

19    point.

20         Any objection to that, Ms. Savage?

21         MS. SAVAGE:  To what?  I'm sorry.

22         THE COURT:  All right.

23         If you can repeat that again please.

24         MR. BROWN:  Sure.

25         The understanding that we have reached, at least as

1    part of our lengthy meet-and-confers that took place prior to

2    today, your Honor, was that at a minimum plaintiffs were going

3    to produce documents relating to the complaints by Alexander

4    Interactive clients which resulted in the termination of

5    contracts, settlements of contract disputes, or a client walked

6    away.

7         All we've received to date are two settlement

8    agreements which give no indication of the underlying

9    complaints.  We've been promised the underlying complaints,

10   which are really the heart of the matter here.

11        THE COURT:  Let me see whether I understand you.

12        There are two customers, two different customers; is

13   that correct?

14        MR. BROWN:  Correct, your Honor.

15        THE COURT:  And you seek the complaints which led to

16   the settlement agreements as to those two customers.

17        MR. BROWN:  Correct.  Which was what was promised us.

18        THE COURT:  Any objection in providing that?

19        MS. SAVAGE:  The only thing I can say, your Honor, is

20   I think the fact that the customers ended up paying Alexander

21   Interactive implicitly demonstrates that Alexander Interactive

22   wasn't at fault.

23        But, having said that, I will ask my client if he has

24   any correspondence underlying any of the disputes relating to

25   the contract, and we will forward it to defense counsel, unless

1   it's privileged obviously.

2            THE COURT:  All right.

3            Does that satisfy that prong of it, sir?

4            MR. BROWN:  Yes, it does, your Honor.

5            THE COURT:  Okay.  Next point.

6            MR. BROWN:  Now, the next point is providing us with

7   just this scope of documents obviously leaves a whole sort of

8   category of customer complaints where the matter could have

9   been resolved as you noted, with a price adjustment, or in a

10  way which didn't involve a settlement or a contract being

11  terminated.  Those are very narrow areas that we've been

12  provided here.

13            And I recognize that providing every instance in which

14  a bug was discovered is not practical perhaps; but we are

15  seeking instances where customers have -- like us, have

16  experienced serious issues with regard to the quality of the

17  deliverables that have been performed which prolonged the

18  engagement and the timeline for delivery.

19            And Alexander Interactive is a very sophisticated

20  shop, your Honor.  There's no way that we can -- that anyone

21  here should seriously believe that they have hard copy files

22  that they have to go through.  We have more time with

23  Mr. Schmelkin, who's the CEO, for his deposition, and we have

24  other time with other defendants.  I am convinced that this

25  information can be called up very quickly.

1          THE COURT:  All right.

2          That is denied without prejudice to your right to ask

3    questions in deposition, and we'll see what you learn.

4          Next point.

5          MR. BROWN:  The other point that we have is we have

6    asked for production of performance evaluations for the members

7    of the AI, the Alexander Interactive developers who worked on

8    the Adorama project.

9          Part of our defense is to show that there was

10   significant attrition during this project, which involved a

11   steep learning curve.  We had testimony from the head of the

12   Magento expert consulting out in California, who testified that

13   they observed a significant attrition of key employees, and

14   that there's a steep learning curve on this type of project,

15   and that was one of the factors that contributed to the

16   failure.

17         Part of our defense is that AI lacked the competence

18   to complete this project.  There's been testimony from some of

19   the witnesses that there was a formal review process.  We want

20   those performance evaluations; we think they'll support

21   Adorama's defense here.

22         THE COURT:  Performance evaluations as to which

23   projects?

24         MR. BROWN:  As to the Adorama project -- as to the

25   Adorama project for the AI developers who worked on them, just

1   those --

2           THE COURT:  All right.

3           An internal evaluation of the Adorama project.

4           MR. BROWN:  Internal evaluation of anyone on the AI

5   development team who worked on the Adorama project.

6           THE COURT:  You've asked for this; and has this been

7   met with an objection?

8           MR. BROWN:  Well, it was.  And then we had a

9   meet-and-confer on a Sunday before -- on May 6 before we

10  submitted our May 7th letter, Judge.  And we had an agreement.

11  We had an agreement that these were going to be turned over,

12  not personnel files, because there are privacy issues.  And

13  then on May 7th, that agreement -- their agreement was reneged,

14  and there was an objection lodged that this request related to

15  a second document request which plaintiffs' counsel claimed is

16  untimely pursuant to the first case management order.

17          It's our position that this document --

18          THE COURT:  All right.

19          I don't need to hear that.

20          Ms. Savage, any objection to producing these

21  performance evaluations?

22          MS. SAVAGE:  The only thing that I'm getting from this

23  is that it sounds like what your Honor is saying is a little

24  bit different than what Mr. Brown is asking for.

25          It sounds like your Honor is saying, Mr. Brown, are

1    you looking for performance reviews solely relating to an

2    employee's performance on the Adorama project, whereas

3    Mr. Brown is saying he wants just the performance reviews

4    overall of these employees.

5         THE COURT:  These are personnel files and performance

6    evaluations of individuals who worked on the Adorama project;

7    is that correct?  Is that what your understanding of the

8    request is?

9         MS. SAVAGE:  Well, that's what I thought the request

10   was, it was over all performance --

11        THE COURT:  Is that the request?

12        MR. BROWN:  Well --

13        THE COURT:  You're looking for the individual

14   personnel files and personnel evaluations of any person

15   employed by AI who worked on the Adorama project, is that what

16   you're seeking?

17        MR. BROWN:  Yes.

18        THE COURT:  That's denied.

19        Okay.  Next point.

20        That's an out-and-out fishing expedition, and that's

21   denied.

22        Next question.

23        MR. BROWN:  From defendants, in terms of defendants'

24   request, since our application has been granted to extend time,

25   no other requests on our side.

1          I'm happy to address plaintiffs' requests, but I'll

2     defer to plaintiffs' counsel.

3          THE COURT:  All right.

4          Let me hear from plaintiffs' counsel.

5          MS. SAVAGE:  Okay.

6          So we have resolved -- Adorama has indicated that it

7     will produce sales revenue -- I'm sorry.

8          Adorama has already produced sales revenue and profit

9     comparisons; but we discovered during the deposition yesterday

10    that even Mr. Mendowits, who testified on behalf of Adorama,

11    was unable to read the report that was produced.  He couldn't

12    even evaluate it or understand it.

13         So Adorama has represented they would get us a

14    different report that is clearer, more self-explanatory; and so

15    we await that report.  And if we have any problems with that

16    particular report in interpreting it, your Honor, we'll meet

17    and confer again and see what we can resolve; and if we can't,

18    we'll come back.

19         THE COURT:  Please try to confine yourself to the

20    outstanding disputes, not the ones that have been resolved.

21         MS. SAVAGE:  Okay.

22         Website analytics.  We asked for all the website

23    analytics on the aiexposed.com website.  We only received the

24    analytics for the month of May 2013.  We wanted going back to

25    the time the site was created, back to September.  I don't

1    recall whether that data is going to be produced or not by the

2    defendants.

3         MR. BROWN:  I'll check with my client and see.  If

4    it's a document that we have readily available, we'll produce

5    it.

6         MS. SAVAGE:  The third item is the defendant Adorama,

7    Inc. has been the subject of -- and a related entity named

8    Leisure Pro, which is owned by the same owners.  And the two

9    companies are in the same building, and they share employees

10   and resources.  We have testimony regarding that information.

11        They have been the subject of a number of legal

12   actions that contain similar allegations to the allegations in

13   this case, patent infringement -- I mean this is copyright

14   infringement, but -- allegations of left of licenses of fraud

15   in connection -- and we believe that there's a pattern of

16   conduct that has occurred with the way this company operates,

17   and we believe that information regarding these lawsuits and

18   any discovery exchanged by the parties is relevant to the point

19   of impeachment of the witnesses.

20        THE COURT:  This is litigation against Adorama; is

21   that correct?

22        MS. SAVAGE:  Yes.

23        THE COURT:  All right.

24        That application is denied at this juncture.

25        MS. SAVAGE:  Next is we had ask for analytics

1   regarding the aiexposed.com website, information regarding page

2   views, referring websites, referring searches, engine search

3   terms, and all reports on web traffic regarding source, region,

4   technology, and user.  We have not received those documents

5   yet.

6           MR. BROWN:  Your Honor, I think we've -- I discussed

7   this at length with my client, and I think we've produced

8   everything we have.  I'll go back again and ask him a third

9   time, but I don't think we have anything else to produce on

10  this.

11          THE COURT:  You don't have any objection to the

12  production; it's that in your -- you're representing to the

13  Court that you have produced all that there is to be produced.

14          MR. BROWN:  That's correct.

15          THE COURT:  Okay.

16          MS. SAVAGE:  There's also been testimony by the owner

17  of Adorama that prior to hiring Alexander Interactive to create

18  this -- let me take a step back.

19          Adorama has and had an existing website called

20  adorama.com.  They came to AI to create a new website on a new

21  e-commerce platform.  That e-commerce platform is Magento.

22          Prior to coming to Alexander Interactive, my client,

23  the plaintiff in this case, apparently Adorama went to another

24  entity called Intetics.  And it was testified to that Adorama

25  spent $3 million with Intetics trying to get a website started,

1    a new website, rather.  And the same allegations were coming

2    out that Intetics lied to Adorama, and that they made false

3    promises, and they couldn't do -- it was literally like a

4    regurgitation of everything that's been alleged in this case

5    against AI.

6              So we have demanded information regarding the contract

7    that Adorama had with Intetics and all the underlying

8    information to see.  Again, I mean this is just the nature of

9    the game with Adorama.

10             THE COURT:  All right.

11             Now, is there any defamation claim brought by Adorama

12   against your client?

13             MS. SAVAGE:  No.

14             THE COURT:  Let me hear from counsel.

15             MR. BROWN:  Thank you, Judge.

16             Two points there.

17             The *Intetics* case that counsel is making reference to

18   is actually one of the prior lawsuits that plaintiffs are

19   seeking information on.  And that application has been denied.

20   This is just another way to get at that.

21             Second of all, Intetics involved -- it was a

22   third-party website designer which performed services for

23   Adorama years prior to Adorama engaging AI.  It has nothing to

24   do with the Magento e-commerce development that's at issue

25   here.  AI was engaged to develop a completely new website, have

1    a brand-new website right from the start, not build on the

2    existing website.  This is completely irrelevant and a fishing

3    expedition.

4                THE COURT:  What time period was this?

5                MR. BROWN:  I think it was -- I don't know the dates

6    specifically.  I think it was 2007/2008 period, your Honor.

7                THE COURT:  Right.

8                And what was the period of the work with AI?

9                MR. BROWN:  AI was engaged in 2010 through 2012.

10               MS. SAVAGE:  If I may, your Honor.

11               Mr. Mendowits testified yesterday that the work

12   performed by Intetics took three years or a little longer, and

13   it went through 2009.  And it was after Adorama decided to

14   abandon Intetics and its work that it then turned to AI or

15   looking for another entity to do a website.

16               But Intetics was hired -- it might have been on a

17   different platform than Magento, but Intetics was hired to do

18   what AI was ultimately hired to do.  And I think the experience

19   that Intetics had with Adorama and the testimony by

20   Mr. Mendowits yesterday indicates this pattern of being unable

21   to coordinate decisions within the Adorama company, unwilling

22   to accept deliverables, this inability to manage these

23   situations.  And I think that really goes to the heart of

24   whether or not AI did properly perform but just couldn't

25   coordinate to get this matter complete because of what takes

1    place in Adorama.

2         And I'm not trying to do a back-door to get into the

3    *Intetics* case.  The *Intetics* litigation had nothing to do with

4    the contract that Intetics had with Adorama.  The *Intetics*

5    litigation was a nonsolicitation -- or a violation of a

6    solicitation provision case where after Intetics was fired

7    basically by Adorama, Adorama took eight of its -- Intetics's

8    employees, and formed another entity, and then started using

9    those former Intetics employees to do coding for Adorama's

10   site.

11        So Intetics sued Adorama for violation of a

12   nonsolicitation provision in its agreement.  So it has nothing

13   to do with the development of the site itself.

14        THE COURT:  All right.

15        At this juncture and on the proffered reason of

16   relevance, I'm not going to require Adorama to produce

17   documents relating to any aspect of its relationship with

18   Intetics.

19        I don't believe that a "pattern of conduct" in this

20   instance, that there is any preliminary showing that there is

21   such a pattern that would open the door to such discovery; and

22   I have my doubts that it would be relevant because of

23   difference both in time and subject matter of the agreement.

24   So I am not going to grant discovery there.

25        Ms. Savage, next one.

1          MS. SAVAGE:  The one last thing that I have on my list

2     is we had served -- timely served interrogatory requests.  And

3     it included 33 interrogatory requests, which is eight requests

4     above the maximum of 25 under the rules, Federal Rules of Civil

5     Procedure.

6          We ask leave at this time to be authorized to have the

7     33 interrogatory requests served and responded to.

8          THE COURT:  All right.

9          And how do these interrogatories fit in with -- how do

10    these interrogatories fit in with the local rule in this

11    district on interrogatories?

12         MS. SAVAGE:  In what sense?

13         THE COURT:  Their scope, the matters covered in the

14    interrogatories.

15         MS. SAVAGE:  Well, the matters covered go directly to

16    either denials of certain issues made in the answers and

17    seeking explanations, it goes to counterclaims that were made

18    in the case.  So I mean in terms of --

19         THE COURT:  Do you have a copy of them with you?

20    Anybody have a copy?

21         MR. BROWN:  I do, Judge.

22         THE COURT:  All right.

23         MR. BROWN:  Would you like to see them, your Honor?

24         THE COURT:  I would, please.

25         MR. BROWN:  Permission to approach.

```
1              THE COURT:  Please.

2              Show them to Ms. Savage; make sure they are an

3    accurate copy of what these are.

4              Are those the interrogatories?

5              MS. SAVAGE:  Yes, your Honor.

6              MR. BROWN:  I think there are number 34.

7              MS. SAVAGE:  Or 34, yeah.

8              MR. BROWN:  There are 34 of them, Judge.  Sorry about

9    the hole punch, Judge.

10             THE COURT:  All right.

11             In this district, we have Local Rule 33.3, which

12   provides -- well, do you want to address the local rule or

13   shall I -- anything you want to say or --

14             MS. SAVAGE:  No, your Honor.

15             THE COURT:  Okay.  33.3(a) provides:  Unless otherwise

16   ordered by the Court, at the commencement of discovery -- which

17   is not where we are now -- interrogatories are restricted to

18   seeking the names of witnesses with knowledge of information,

19   computation of categories of damage alleged, and the existence,

20   custodian, location, and general description of relevant

21   documents, including pertinent insurance agreements and other

22   physical evidence or information of a similar nature.

23             Under B, which is where we are, during discovery,

24   interrogatories other than those seeking the information which

25   I've just described in (a) above, may only be served, one, if
```

1    they are a more practical method of obtaining the information

2    sought than a request for production or a deposition; or, two,

3    if ordered by the Court.

4           Finally, at the conclusion of other discovery, and at

5    least 30 days prior to the discovery cutoff, interrogatories

6    seeking the claims and contentions of the opposing party may be

7    served unless the Court has ordered otherwise.

8           Here, it appears to me that the interrogatories are of

9    a different sort; that discovery would be more practical

10   through document requests and through depositions.  Many of

11   them are in the form list all Bates stamped numbers of

12   documents produced and witnesses who will testify in support of

13   defendants' allegation, and then a paragraph number is

14   identified.  And this seems to be the case for many or most of

15   the interrogatories.

16          So I will not require the defendants to respond to

17   them at this stage.

18          Have the defendants served any interrogatories on the

19   plaintiff?

20          MR. BROWN:  No, Judge, we have not.

21          THE COURT:  Okay.  All right.

22          And I will note for the record that in connection with

23   the joint pretrial conference process, I will require that the

24   parties identify all documents which they intend to offer as

25   exhibits at trial, all witnesses who they anticipate testifying

1   at trial, all depositions that they seek to introduce at trial.

2   And it seems to me that in combination with the discovery

3   devices that are available, this is a more effective and

4   efficient means to obtain discovery in this case.

5            Anything else, Ms. Savage?

6            MS. SAVAGE:  No, your Honor.

7            I just want to advise the Court that the interrogatory

8   deadline in the order predated the start of depositions and

9   discovery, so I felt compelled to serve the interrogatories

10  before that deadline.

11           THE COURT:  I understand.  All right.

12           MS. SAVAGE:  Thank you, your Honor.

13           THE COURT:  And what I'm going to do is I'm going to

14  have the next case management conference for September 5 at

15  noon, unless that is inconvenient to any of you.

16           Is that inconvenient, Ms. Savage?

17           MS. SAVAGE:  Only if it's the first day of school.

18           THE COURT:  Let me --

19           MS. SAVAGE:  And I don't know what the first day of

20  school is yet.

21           THE COURT:  All right.

22           Well, you'll let me know if it's a problem.

23           MS. SAVAGE:  Okay.

24           THE COURT:  The 5th is a Thursday.

25           MS. SAVAGE:  Okay.  Thank you, your Honor.

1          THE COURT:  Mr. Sheppe, does that present any

2    difficulty to you?

3          MR. BROWN:  It's Mr. Brown, your Honor.

4          THE COURT:  I'm sorry.  Mr. Brown.

5          MR. BROWN:  No problem.  No problem.  We can be here.

6          THE COURT:  All right.

7          So then we'll leave it at the 5th.  And if it becomes

8    a problem, we can adjust it accordingly.

9          Ms. Savage, would you prefer it the next week?

10          MS. SAVAGE:  No, no, that's fine.  I mean I'll just --

11    I'm sure it's not a problem.

12          Thank you, your Honor.

13          THE COURT:  All right.

14          So fact discovery is extended to July 31; expert

15    discovery is extended to September 13; and the next conference,

16    as indicated, September 5.

17          MS. SAVAGE:  Sorry, your Honor.

18          There was one other thing I forgot to bring up.  I'm

19    not sure it it's an issue anymore.

20          There is a deposition of Steven Lai, L-A-I, and

21    "Steven" with a "V.," on May 30th.  I had asked that it be

22    moved.  My daughter's senior prom is on the 30th, so I have to

23    be with her to do all her stuff.

24          I'm not sure that Mr. Brown was okay with moving it,

25    and I just wanted confirmation that that could be done.

D5NVALEC                         Conference

1            THE COURT:  Mr. Brown, that can be done, I am sure.

2            MR. BROWN:  It can, your Honor, now that all fact

3    discovery has been extended, and I'll so notify Mr. Lai, who's

4    a nonparty.

5            Thank you.

6            THE COURT:  So that's taken care of.

7            Anything else?

8            MS. SAVAGE:  No, that's it.

9            Thank you so much, your Honor.

10            THE COURT:  Thank you all very much for coming in.

11            MR. BROWN:  Thank you, Judge.

12                              *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25