UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ALEXANDER INTERACTIVE, INC.,　　　　　　　　:　　Case No. 12 CV 6608 (KPC)(JCF)
ALEXANDER SCHMELKIN and JOSH　　　　　　  :　　ECF CASE
LEVINE,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiffs,　　　　　　　　　　　　  :
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-against-　　　　　　　　　　　　　　　  :
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
ADORAMA, INC., ADORAMA ENTERPRISES  :
LLC, EUGENE MENDLOWITS, AND MENDEL  :
MENDLOWITS,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　　　　　　　　　 :
-------------------------------------------------------------------x

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
# OF THEIR MOTION TO COMPEL PRODUCTION OF DOCUMENTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

AI's CEO Testified That Amicon Is "An Extension of AI" and Performed A "Substantial" Amount of Coding Work Throughout the Adorama Project at AI's Direction and Control ..... 4

The Amicon Documents Are Highly Relevant .................................................................. 5

Plaintiffs Refused to Even Request that Amicon Preserve or Produce Documents Related to the Adorama Project ........................................................................................ 6

ARGUMENT ...................................................................................................................... 7

I.     AI HAS "CONTROL" OVER AMICON'S ADORAMA PROJECT DOCUMENTS PURSUANT TO FED. R. CIV. P. 34 BECAUSE AI HAS THE PRACTICAL ABILITY TO OBTAIN SUCH DOCUMENTS ................................... 7

    A.     AI Has the Practical Ability to Obtain the Amicon Documents .......................... 8

    B.     The Amicon Documents Are Highly Relevant and Material to Defendants' Ability to Defend Against Plaintiffs' Claims and Prosecute the Counterclaims ................................................................................................. 10

CONCLUSION ................................................................................................................. 12

## TABLE OF AUTHORITIES

### Cases

*Arthur v. Atkinson Freight Lines Corp.*,
  164 F.R.D. 19 (S.D.N.Y. 2005) .................................................................................... 11

*First American Corp. v. Price Waterhouse LLP*,
  154 F.3d 16 (2d Cir. 1998) ........................................................................................... 8

*Florentia Cont. Corp. v. RTC*,
  1993 WL 127187, at *3 (S.D.N.Y. April 22, 1993) ..................................................... 7

*Golden Trade S.rL v. Lee Apparel Co.*,
  143 F.R.D. 514 (S.D.N.Y. 1992) .................................................................................. 7

*In re Flag Telecom Holdings Ltd. Securities Litigation*,
  236 F.R.D. 177 (S.D.N.Y. 2006) .................................................................................. 7

*MLC Inc. v. North American Philips Corp.*,
  109 F.R.D. 134 (S.D.N.Y. 1986) .................................................................................. 8

*Shcherbakovskiy v. Pa Capo Al Fine, Ltd.*,
  490 F.3d 130 (2d Cir. 2007) ......................................................................................... 8

*The Upper Deck Co. v. Breakey International BV*,
  390 F. Supp.2d 355 (S.D.N.Y. 2005) ......................................................................... 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x
ALEXANDER INTERACTIVE, INC.,  : Case No. 12 CV 6608 (KPC)(JCF)
ALEXANDER SCHMELKIN and JOSH : ECF CASE
LEVINE, :
 :
               Plaintiffs, :
 :
        -against- :
 :
ADORAMA, INC., ADORAMA ENTERPRISES :
LLC, EUGENE MENDLOWITS, AND MENDEL :
MENDLOWITS, :
 :
              Defendants. :
---------------------------------------------------------------------- x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO COMPEL PRODUCTION OF DOCUMENTS

      Defendants Adorama, Inc. ("Adorama"), Eugene Mendlowits, and Mendel Mendlowits (collectively, "Defendants'), by their attorneys, Reiss Sheppe LLP, submit the following memorandum of law in support of their motion to compel production of documents pursuant to Fed.R.Civ.P. 37(a)(1).

### PRELIMINARY STATEMENT

      This Court should compel Plaintiff Alexander Interactive, Inc. ("AI") to obtain and produce documents in the possession of AI's long-standing affiliate, Amicon Technologies Pvt. Ltd. ("Amicon"), which is headquartered in Mumbai, India, as such documents are highly relevant and within the control of AI.

      On October 30, 2013, Defendants learned for the first time that Plaintiffs never instructed Amicon to either preserve its Adorama project documents and never included them in Plaintiffs' production, notwithstanding that AI has the practical ability to obtain and produce Amicon's documents concerning the Adorama project. Specifically, discovery has revealed the following

evidencing AI's practical ability to obtain Amicon's documents regarding the Adorama project:

- AI's CEO, Alexander Schmelkin, twice testified during two days of deposition that he viewed Amicon as "more like an in-house team or an extension AI".

- Mr. Schmelkin referred to Amicon as "[AI's] Mumbai operation" in correspondence with Amicon's CEO, Amit Shinde.

- Mr. Shinde repeatedly referred to Amicon as "AI Mumbai" in a lengthy exchange with Mr. Schmelkin wherein he also described Amicon as being part of the "[AI] family," and Amicon's important contributions to AI's financial growth over the past several years.

- AI relied on Amicon developers for "substantial" coding work throughout the entire development phase of the Adorama project at AI's direction and control. Indeed, AI's billing records reflect that Amicon billed AI for thousands of hours of Amicon's work on different phases of the Adorama project from January 2011 through March 2012.

- AI continued to work with Amicon on other projects, including as recently as a few months ago.

Amicon's documents also are unquestionably relevant to this action. Discovery has revealed, among other things, an October 26, 2011 email exchange between AI and Amicon wherein Mr. Schmelkin lambasts Mr. Shinde for repeated and ongoing instances of poor coding work by Amicon on the Adorama project, causing project delays and complaints from Adorama executives, all of which directly support Defendants' defenses and counterclaims. Moreover, as detailed herein, discovery also has shown that Plaintiffs relied upon Amicon personnel for more than just code development and intend to use such evidence against Defendants in an attempt to establish Plaintiffs' affirmative case. Plaintiffs should not be allowed to cherry pick Amicon

documents where, as here, it is evident they have the practical ability to obtain and produce all of the relevant documents.

## FACTUAL BACKGROUND

AI agreed to build Adorama's new website for a fixed price of $1.325 million and AI agreed to have the website completed by May 2011. Not only did AI fail to deliver on both of these promises, but by January 2012, more than six months after the project was to be completed and after Adorama had paid AI $825,000, AI still had not provided Adorama with a completed website. Instead, AI candidly admitted it had completely mismanaged the project and then demanded that Adorama pay AI an additional $110,000 per month for a minimum of six months without even guaranteeing that AI would be able to deliver a finished product by the end of that time period (or the end of any time period). *See* Declaration of Daniel J. Brown, Esq. dated November 20, 2013 ("Brown Decl.") at Ex. C (annexing Declaration of Glen Holman dated October 28, 2013 ("Holman Decl.)).

Rather than invest additional resources without any assurances with regard to an outcome, Adorama sought an independent audit of AI's work to determine if proceeding with AI made sense. AI agreed to participate in the audit and provided all the source material for the audit. *See* Holman Decl. at 11. The audit results – completed by the company upon whose platform the website was being built – revealed that AI's work was essentially useless. *See id.* at 12-13.

Discovery has shown that AI assigned a substantial amount of coding work on the Adorama project to Amicon—almost three thousand hours worth—and that AI had disputes with Amicon about, among other things, the poor quality of Amicon's coding work which caused delays and prompted complaints from Adorama's executives. *See* Brown Decl. at Exhibits E, F, I.

3

On October 30, 2013, Defendants learned for the first time that not only did Plaintiffs fail to direct Amicon to preserve its documents related to the Adorama project, but also that Plaintiffs never even requested that Amicon provide them with its documents related to the Adorama project so that Plaintiffs could include them in Plaintiffs' document production. *See* Brown Decl. at 2. Upon learning of this, Defendants promptly requested such documents from Plaintiffs. *See id.* at 3. However, Plaintiffs refuse to produce such documents, claiming they have no duty to request any such documents from Amicon and that Amicon is not under Plaintiffs' "control" for purposes of Fed. R. Civ. P. 34. *See id.*

**AI's CEO Testified That Amicon Is "An Extension of AI" and Performed A "Substantial" Amount of Coding Work Throughout the Adorama Project at AI's Direction and Control**

Discovery has shown that AI has a long-standing, ongoing affiliation with Amicon such that AI unquestionably has the practical ability to request and obtain Amicon's documents reflecting its work on the Adorama project:

- AI's CEO, Alexander Schmelkin, testified during his May 20, 2013 deposition that AI's relationship with Amicon as being more akin to that of an affiliate, describing Amicon as "an extension of [the AI] team". Brown Decl. at Ex. D.

- During the October 30th deposition, Mr. Schmelkin again confirmed that Amicon was "more like an in-house team or an extension of AI." *Id.* at Ex. E. During this second day of deposition, Mr. Schmelkin even glibly commented on how well put his description of Amicon as an affiliate of AI was from his first day of testimony when it was read back to him. *See id.*

- In an October 26, 2011 email to Amicon's CEO, Amit Shinde, Mr. Schmelkin referred to Amicon as "[AI's] Mumbai operation." *See id.* at Ex. F.

- Amicon's CEO, Amit Shinde, described Amicon's relationship with AI in terms similar to that used by Mr. Schmelkin. Specifically, Mr. Shinde wrote to Mr. Schmelkin that he believes that "Amicon is an extension of AI. Amicon is pretty much Ai Mumbai. Amicon is like [Ai's] company . . . We are part of the [AI] family." *Id.*

4

- Mr. Shinde wrote that Amicon had provided substantial contributions to AI's growth given the parties' relationship over more than five years together, and repeatedly referred to Amicon as "AI Mumbai." *Id.*

- Mr. Schmelkin testified during his May 20, 2013 deposition that AI was still actively working with Amicon on projects. *See* Brown Decl. at Ex. D.

- Mr. Schmelkin testified during his October 30, 2013 deposition not only that Amicon had performed a "substantial" amount of coding work throughout the Adorama project, but also that AI had worked with Amicon on other projects as recently as a few months ago. *See id.* at Ex. E.

- Amicon billed AI for approximately 3,000 hours of work on the Adorama project. AI's billing records indicate Amicon's involvement in virtually every phase of the Adorama project, including without limitation, project management oversight, code development, quality assurance and testing from January 2011 through March 2012. *See id.* at Ex I.

- Mr. Schmelkin testified during his deposition that Amicon was working at AI's direction and control on Adorama coding assigned during all of the development phases of the Adorama project, not on one particular module/component. *See id.* at Ex. D.

- Plaintiffs' document production reflects that AI relied on Amicon not only as a partner in developing code for the proposed Adorama website, but also for project management, and during the post-code development period during AI's failed attempts to comply with its quality assurance obligations and rush to provide the flawed website to Adorama for user acceptance testing. *See id.* at Exs. G-H.

### The Amicon Documents Are Highly Relevant

There also is no question that Amicon's documents are highly relevant and responsive to Defendants' First Request for Production, which was served upon Plaintiffs in December 2012. *See* Brown Decl. at Ex. A. Such documents are material to Defendants' ability to defend against Plaintiffs' affirmative claims and prosecute Defendants' counterclaims. By way of example, during the October 30th deposition, Mr. Schmelkin was questioned regarding an email exchange dated October 26, 2011, between and among Mr. Schmelkin, Mr. Cotty of AI and Amit Shinde, CEO of Amicon. The exchange reflected that AI and Amicon had significant, ongoing disputes

5

regarding, among other things, (i) AI's concerns regarding repeated examples of poor Amicon coding work on the Adorama project (and other AI-Amicon collaborations) leading to complaints from Adorama's executives and other clients; (ii) AI's decision to hire the cheapest Amicon developers to work on the Adorama project; and (iii) AI's failure to offer Amicon's developers access to Magento training or any background information on the Adorama project. *See id.* at Ex. F.

**Plaintiffs Refused to Even Request that Amicon Preserve or Produce Documents Related to the Adorama Project**

During Mr. Schmelkin's October 30, 2013 deposition, AI's counsel acknowledged: (i) AI limited its document production to Amicon documents that were in AI's possession, custody or control and, at no time, instructed Amicon to either preserve documents related to the Adorama project or requested that Amicon provide to it Amicon documents related to the Adorama project, including Amicon's internal communications regarding the Adorama project; and (ii) Plaintiffs refused to make any such request or demand of Amicon because AI believed that Amicon is an independent entity and not under AI's control. *See* Brown Decl. at 1.

By email dated October 31, 2013, Defendants notified Plaintiffs that Defendants believed that AI had withheld documents within its control with respect to Amicon, all of which are responsive within Defendants' Request for Production of Documents which was served on Plaintiffs in December 2012. *See id.* at Ex. A. On November 12, 2013, Defendants again wrote to Plaintiffs requesting the production of Amicon's documents, including citations to case law and annexing deposition excerpts from Mr. Schmelkin's deposition. *See id.* at Ex. B.

On November 13, 2013, the parties engaged in a meet and confer conference pursuant to Fed. R. Civ. P. 37(a)(1). *See* Brown Decl. at 6. Unable to deny the clear relevance of the requested documents, Plaintiffs nonetheless advised Defendants that their refusal to comply

remained unchanged. More specifically, Plaintiffs advised Defendants that AI's practical ability to obtain documents from Amicon is irrelevant because Plaintiffs believe that AI does not have any duty to attempt to obtain the requested documents from Amicon. Plaintiffs also refused Defendants' request that Plaintiffs, at a minimum, produce documents evidencing the nature of AI's relationship with Amicon (*i.e.*, any Master Services Agreement or other contract as between AI and Amicon). *See id.* at 7.

## ARGUMENT

### I. AI HAS "CONTROL" OVER AMICON'S ADORAMA PROJECT DOCUMENTS PURSUANT TO FED. R. CIV. P. 34 BECAUSE AI HAS THE PRACTICAL ABILITY TO OBTAIN SUCH DOCUMENTS

Plaintiffs' failure to request and obtain documents from Amicon relating to the Adorama project violates Plaintiffs' discovery obligations where, as here, the documents are not only highly relevant, but also within AI's practical ability to obtain pursuant to the well settled broad definition of "control" applied by federal district courts for purposes of construing a party's obligation to obtain and produce documents from a non-party under Fed. R. Civ. P. 34. *See, e.g., In re Flag Telecom Holdings Ltd. Securities Litigation*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (holding that "[t]he concept of control has been construed broadly. If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have control even if the documents are in possession of a non-party") (internal quotations and citations omitted); *Florentia Cont. Corp. v. RTC,* 1993 WL 127187, at *3 (S.D.N.Y. April 22, 1993) (Control is defined as "the legal right, authority or ability to obtain upon demand documents in the possession of another); *Golden Trade S.rL v. Lee Apparel Co.*, 143 F.R.D. 514, 425 (S.D.N.Y. 1992) (Courts have also interpreted Rule 34 to require production "if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement"); *MLC Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 136-37 (S.D.N.Y. 1986) (holding that "the term

7

control is broadly construed" and extends to instances in which the producing party has "the legal right to obtain documents" even if the documents are "beyond the jurisdiction of the court," and that a producing party "cannot be allowed to shield crucial documents from discovery by parties with whom it has dealt in the United States merely by storing them with its affiliate abroad") (internal citations omitted).

In 2007, the Second Circuit issued a ruling discussing the obligation of a party upon whom a document demand has been served to obtain documents from a non-party. *See Shcherbakovskiy v. Pa Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("[I]f a party has access and the practical ability to possess documents not available to the party seeking them, production may be required.").[1]

### A. AI Has the Practical Ability to Obtain the Amicon Documents

As detailed above, AI has the practical ability to obtain documents from Amicon given the two companies' longstanding and ongoing business affiliation for the past seven years. Indeed, AI's CEO (Alex Schmelkin) testified twice under oath that AI continues to work with Amicon on different projects and refused to characterize Amicon as an outsource provider or as a traditional consultant/independent contractor. Moreover, Mr. Schmelkin twice confirmed that he views Amicon as an "extension of AI"(*see* Brown Decl. at Exs. D-E) and even referred to Amicon as AI's "Mumbai operation" *See id.* at Ex. F. Importantly, Amicon's CEO, Amit Shinde, shared Mr. Schmelkin's view regarding Amicon's special relationship with AI, noting Amicon's "substantial" contributions to AI's growth during the parties' relationship, and further describing Amicon as "AI Mumbai" throughout a lengthy exchange in which the parties

---

[1] Nor should Defendants be required to seek discovery directly from Amicon via the Hague Convention where, as here, AI has the practical ability to obtain such documents pursuant to Fed. R. Civ. P. 34. *See First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) ("The discovery procedures provided by the Hague Convention, however, are neither the exclusive nor even necessarily, the first means for obtaining discovery of a foreign entity, as compared with the Federal Rules of Civil Procedure").

discussed, among other things, quality complaints on Amicon's coding work for the Adorama project.

Indeed, a comparison of AI's and Amicon's websites further corroborates Mr. Schmelkin's testimony (and Mr. Shinde's view) that Amicon is an extension of AI in that virtually all of Amicon's clients also are listed as clients on AI's website (*i.e.*, Action Anytime, Costumes, Barielle, Schwinn Bike, Cache, Jonard Industry Corp., PexSupply,com, RugsUSA.com, Steiner Sports Memorabilia, Envelopes.com). *Compare* www.alexanderinteractive.com *with* www.amicontech.com.

Discovery also has shown that Amicon played a major role in the code development work throughout all of the phases of the Adorama project as opposed to being assigned a discrete module/component. Specifically, Mr. Schmelkin's deposition testimony and other discovery confirm that Amicon performed "substantial" coding work during the Adorama project during all phases of the development process, and at AI's direction and control for which Amicon submitted billing invoices to AI for payment. *See* Brown Decl. at Ex. F (wherein Mr. Schmelkin complains about Amicon's poor coding quality despite AI paying its invoices). And, Plaintiffs' document production reflects that Amicon personnel billed thousands of hours to AI for work performed on the Adorama project, including among other things, project management oversight, code development, quality assurance and testing from January 2011 through March 2012. *See* Brown Decl. at Ex. I.

Moreover, discovery also has shown that AI relied upon Amicon not only as its partner in developing code for the proposed Adorama website, but also during the post-code development period when AI rushed to provide a flawed website to Adorama for user acceptance testing. Importantly, the post-code development phases of the parties' relationship, which included AI's obligation to complete quality assurance, remain in sharp dispute and have been the focus of

9

many of the depositions in this matter. In that regard, discovery has shown that Plaintiffs intends to rely upon Amicon to prove their affirmative case. By way of example, during Plaintiffs' October 9, 2013 deposition of Adorama's Glen Holman, Mr. Holman was questioned extensively regarding a June 2011 "Basecamp" exchange including Nikita Shinde of Amicon and other AI developers for the purpose of demonstrating Adorama's alleged failure to provide timely, detailed feedback to AI and/or conduct user acceptance testing. *See* Brown Decl. at Exs. G-H.[2] More specifically, the exchange reflects direct communications between Mr. Holman and Ms. Shinde, and AI's directive that Mr. Holman should follow Ms. Shinde's instructions to carry out a purported "iterative" user acceptance testing, thus demonstrating Amicon's active participation in the Adorama project beyond code work assignments in India, and that Amicon personnel were presented as trusted members of AI's development team. Clearly, Plaintiffs should not be permitted to cherry pick among the Amicon documents it wishes to produce and use against Defendants and withhold a full production of Amicon's documents. *See The Upper Deck Co. v. Breakey International BV*, 390 F. Supp.2d 355, 362 (S.D.N.Y. 2005) (a party cannot shield itself from discovery and then use withheld information as a sword to defeat summary judgment).

Given all of the foregoing, including that AI paid Amicon for its coding work and other tasks it was assigned on the Adorama project, it is evident AI has the practical ability to request and obtain Amicon's documents relating to the Adorama project.

### B. The Amicon Documents Are Highly Relevant and Material to Defendants' Ability to Defend Against Plaintiffs' Claims and Prosecute the Counterclaims

The Amicon documents also should be produced given their clear relevance to the parties' dispute. Indeed, by way of example, Mr. Schmelkin was questioned during his October 30th deposition regarding an email exchange dated October 26, 2011, between and among Mr.

---

[2] Nikita Shinde is identified on Amicon's website as a Business Analyst and Project Manager. *See* www.amicontech.com.

10

Schmelkin, Mr. Cotty of AI and Amit Shinde, CEO of Amicon, regarding:

> (i) Mr. Schmelkin's complaints to Amicon about repeated examples of poor Amicon coding work on the Adorama project which prompted complaints by Adorama's executives;
>
> (ii) AI's decision to hire the cheapest Amicon developers to work on the Adorama project; and
>
> (iii) AI's failure to offer Amicon's developers access to Magento training or any background information on the Adorama project.

*See* Brown Decl. at Ex. F.

The ongoing dispute between AI and Amicon reflected above is direct evidence of Plaintiffs' awareness that it had been repeatedly passing off coding work to Adorama despite knowing it was of poor quality and not anywhere near ready for either "iterative" or final user acceptance testing, and thus goes to the heart of Defendants' position that Plaintiffs failed to meet their contractual obligations because, among other things, they wanted to preserve a high profit margin on a fixed price project and were willing to sacrifice quality in order to do so. Further, such documents support Defendants' counterclaims because Plaintiffs knowingly misrepresented the quality of AI's work product to Defendants. And, such documents further corroborate Magento, Inc.'s July 2012 audit findings (and Magento Academy's audit findings as acknowledged by Mr. Schmelkin in his October 26, 2011 email to Mr. Shinde, *see* Brown Decl. at Ex. F) that AI's code work was deeply flawed, which Plaintiffs dispute as biased. For these reasons too, Defendants should be afforded the opportunity to obtain the full production of Amicon's Adorama project documents.[3]

---

[3] Defendants anticipate that Plaintiffs will oppose production of Amicon's documents by claiming that they have already produced all of Amicon's documents sent to AI during the project, and that such production satisfies their discovery obligations. Given Amicon's integral role in developing the proposed Adorama website and the poor

11

## CONCLUSION

Given Mr. Schmelkin's testimony and other discovery demonstrating the clear relevance of Amicon's documents as well as AI's practical ability to obtain and produce such documents, Defendants respectfully submit that this Court should compel Plaintiffs to immediately contact Amicon and request that Amicon assemble and produce all of Amicon's documents relating to the work it performed on the Adorama project, including without limitation any and all internal communications among Amicon developers, any communications between Amicon and Plaintiffs, as well any communications by and among Amicon developers and third parties concerning the Adorama project, together with such other further relief this Court deems just and proper.

Dated: New York, New York
November 20, 2013

**REISS SHEPPE LLP**

By: _____
Matthew Sheppe
Daniel J. Brown
425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Fax: (212) 753-3829
Email: msheppe@reisssheppe.com

*Attorneys for
Defendants/Counterclaim Plaintiffs*

---

quality of its coding work, Defendants should be afforded the opportunity to obtain a full production of Amicon's documents, including without limitation all internal communications among Amicon employees on the Adorama project, all communications between Amicon and Plaintiffs, and all communications between Amicon and third parties related to the Adorama project. Relatedly, Defendants' demand for the Amicon documents does not constitute a new discovery demand insofar as such documents fall within the parameters of Defendants' First Request for Production (*see* Brown Decl. at Ex. A) and, therefore, Plaintiffs are obligated to produce such documents pursuant to Fed. R. Civ. P. 26(e). *See Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 2005) (discussing duty to supplement disclosures under Rule 26(e)).

12

To:    Denise L. Savage, Esq.
Savage & Associates P.C.
50 Main Street, Suite 1000
White Plains, New York 10606

*Attorneys for Plaintiffs*


Kenneth P. Norwick, Esq.
Norwick, Schad & Goering
110 East 59th Street
New York, New York 10022

*Attorneys for Counterclaim Defendants*