# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
ALEXANDER INTERACTIVE, INC., : Case No. 12 CV 6608 (PKC)(JCF)
ALEXANDER SCHMELKIN and JOSH LEVINE : ECF CASE

      Plaintiffs-Counterclaim Defendants : **CERTIFICATION OF ALEXANDER SCHMELKIN IN SUPPORT OF PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION**

-against-

ADORAMA, INC., ADORAMA ENTERPRISES
LLC, EUGENE MENDLOWITS, AND MENDEL
MENDLOWITS,

      Defendants-Counterclaim Plaintiffs :
------------------------------------------------------------------- x

I, Alex Schmelkin, certify, declare and say under penalty of perjury, the following:

1. I am President and CEO of Alexander Interactive, Inc. ("AI"), one of the Plaintiffs in the above captioned action (the "Action").

2. I am also a named Plaintiff in the Action, as is Josh Levine ("Levine," together with AI and the undersigned, the "Plaintiffs"), the Chief Experience Officer of AI.

3. I am executing and filing this Certification in response to, and in support of the Plaintiffs' Objection to, the Defendants' pending Motion to Compel Production ("Defendants' Motion") relating to Amicon Technologies Pvt. Ltd. ("Amicon").

4. The Defendants allege that AI and Amicon are "long-standing affiliate[s]" (Defendants' Motion at pg.1), that "Plaintiffs' relied upon Amicon personnel

for more than just code development and intend to use such evidence against the Defendants in an attempt to establish Plaintiffs' affirmative case" (Defendants' Motion at pg.2) and that '[o]n October 30, 2013, Defendants learned for the first time that not only did Plaintiffs fail to direct Amicon to preserve its documents related to the Adorama project, but also that Plaintiffs never even requested that Amicon provide them with its documents related to the Adorama project so Plaintiffs could include them in Plaintiffs' document production." Defendants' Motion at 4.

5. None of the foregoing statements by Defendants are true. While the Defendants attempt to bootstrap (a) my deposition testimony wherein I explain the distinction between hiring Amicon's tech team or team members as independent contractors to work directly with AI's developers, versus entirely outsourcing a project to another company for completion and (b) Amicon's president Amit Shinde's characterization of Amicon as "AI Mumbai" to demonstrate an affiliation beyond that of just utilizing Amicon's developers on an independent contracting basis, such efforts are misleading and a total red-herring.

6. First, and most importantly, the Defendants did not include in the Defendants' Motion a very important part of my testimony during my deposition wherein I testified as follows:

> Q I would like to talk about Amicon. You were asked about Amicon, who are the shareholders --
>
> Q Who is the -- who are the shareholders of Alexander Interactive?
>
> A Myself and my business partner JoshLevine.

2

Q There are no other business partners?

A Correct. No partners. No other owners.

Q Who are the shareholders of Amicon, if you know?

A I believe that Amit Shinde is a substantial, if not all, shareholder of Amicon. I know and I've heard previous mentions of other family members of his being involved in the business. I know his sister worked for him. I don't know if she is an owner, but I know Amit is certainly an owner.

Q Are you an owner of Amicon?

A No.

Q: Are you an officer?

A No.

Q Are you a director?

A No.

Q Is Mr. Levine an owner of any shares of Amicon?

A No. It's a company in Mumbai where we are not an owner.

Q In Mumbai?

A In India.

Q In India.

10 Is Mr. Levine an officer or director of Amicon, to your knowledge?

A No.

Q Are either of you two employees of Amicon?

A No.

Q To your knowledge do you have any-- strike that. Do you have any access to the proprietary server on -- that hold Amicon's business files, to your knowledge?

A No, we don't.

3

> Q Do you have any right to access any of their hardcopy or digital files located in Mumbai or in Amicon's custody or control?
>
> A No.

Deposition of Alexander Schmelkin, dated October 30, 2013, pp. 471-473, annexed hereto as **Exhibit 1**.

7. To be even more clear, not only do neither I nor Mr. Levine have any interest or control in or of Amicon, neither does Alexander Interactive, Inc. In fact, a review of business listing information from Zauba.com, annexed hereto as **Exhibit 2,** reflects that neither I, Mr. Levine nor AI is a director or authorized representative of Amicon.

8. To my knowledge, Amicon has no joint interest in this litigation, is not a beneficiary of this litigation, nor has it voluntarily cooperated with the parties to and in this litigation.

9. Further, while Defendants allude to or state that Amicon performed services other than code development in connection with the Adorama project, there has been no testimony in this case to the effect, nor could there be, as it's not true. Amicon merely supplied developers to act as independent contractors and assist in coding with AI's team. Such arrangements are extremely commonplace in this industry and, in fact, are more the rule than the exception. In fact, a review of Amicon's *full* website (annexed hereto as **Exhibit 3**) discloses that "Amicon Technologies Pvt. Ltd. was founded in 2004 with an objective to offer software development services of Open Source

4

ERP frameworks. We have worked on multiple projects for US, UK and Australia-based clients." See page 3 of Exhibit 3 under "Our Story."

10. Starting at page 8 of Exhibit 3, one can see the multitude of services provided by Amicon including, but not limited to, "Open Source Solutions" (pg.9), "Enterprise Resource Planning" (pg.10), "Advanced E-Commerce/E-Business," using Opentaps, ofbiz and Magento platforms (pg.13), "CRM/SFA-Customer Relationship Management and Sales Force Automation" (pg.14), "Portals," (pg.15), "Social Networking" (pg.17), "Development" (pg. 19), "Integration" (pg. 15), "Cross-Media"(pg 21), "Analytics" (pg. 22), "Deployment" (pg. 23), "Support" (pg. 24), "Maintenance" (pg. 25), and "Dedicated Offshore Teams" (pg.26).

11. "Dedicated Offshore Teams" (Exhibit 3, pg. 26) is described as follows by Amicon on its site:

> Amicon has introduced "Dedicated offshore Team" as a popular alternative for companies who want all the benefits of having a skilled dedicated offshore team in a cost-effective and quick way.
>
> A dedicated team is in essence an *extension* of your own development team! You can easily afford to hire highly skilled offshore OFBiz/Opentaps/Magento/Lifeway resources at the right cost, step up productivity and increase profit margins. For seamless collaboration between offshore office and client project staff, we provide support through live chat/email/voice (including VOIP)/video.
>
> There are 3 easy steps to start your dedicated team:
>
> 1. Amicon recruits and trains the dedicated OFBiz/Opentaps/Magento/Liferay team accordingly to your requirements. You can be involved in the interview process.
> 2. Your dedicated team works from our offices in india exclusively on your projects at a fixed hourly/monthly cost
> 3. Our Project Manager/Technical Lead will report your dedicated team's work progress on (sic) daily basis directly to you or your project manager and co-ordinate your directives

5

and timelines. *We align ourselves with our customers as partners* to assist them in achieving their goals and objectives.

12. As reflected in Amicon's site, Amicon provides services and offshore teams for a variety of ecommerce platforms and a multitude of companies on different continents with oversight by Amicon and its own project manager and technical lead. As Amicon explains, its teams act as an "extension" of their client's development teams and it views all its customers as "partners" (which is the expressed relationship that Amicon wants with all of its clients). AI has always interpreted this language (mirrored in Mr. Shinde's email touted by the Defendants in the Defendants' Motion), as marketing and public relations language and nothing more, as there was no partnership or special relationship between AI and Amicon other than that of consultant/client.

13. Ultimately, as admitted by the Defendants, AI has, indeed, produced all documents that it has relating to work performed by Amicon in connection with the Adorama. Such documents included (a) all correspondence by and among all AI employees, on the one hand, and Amicon employees, on the other hand, (b) all JIRA tickets and BASECAMP entries reflecting and delineating *all* of Amicon's work performed on the Adorama project (comprising thousands of pages), reflecting each deliverable/module worked on, issues raised in connection with the coding, conversations between all developers and tech leads relating to coding, testing and quality assurance issues, and (c) a copy of the actual deliverables encompassing Amicon's work (i.e. all of their coding). The idea or allegation that Adorama has not received

6

all documentation regarding Amicon's work performed on the Adorama project could not be more false.

14. All of the aforementioned documents were produced at least ten (10) months to one (1) year ago and no information regarding Amicon or AI's issues, if any, with their developers' work was hidden from Adorama. Moreover, throughout the Adorama project, Adorama knew of Amicon's services in connection with the building of the Adorama Magento site, Glen Holman (as Adorama's project manager on the Adorama Project) had direct access to all of the subcontractors working through Amicon, and included Amicon subcontractors in BASECAMP posts regarding the status of the Adorama project. Additionally, the Defendants received hundreds of documents from Magento, Inc. in discovery relating to correspondence with and work performed by Amicon. See **Exhibit 4** annexed hereto reflecting screenshots of thousands of bates stamped numbered documents produced by AI, Adorama and Magento, Inc., relating to, referencing, encompassing, Amicon's services in connection with the Adorama project

15. It was not until October 30, 2013, that I (or anyone else to my knowledge) was questioned about AI's production of documents relating to Amicon, alleged that AI had a duty to obtain any documents (if any exist that haven't otherwise been produced) from Amicon's business files arising in connection with "internal communications" at Amicon, or communications by and among Amicon and any "third parties," (see Defendants' Motion at 11-12, n.3), or

7

accused AI of failing to produce all of the documents in its possession, custody and control, which, in fact, AI has.

16. I hereby represent that AI does not have a Master Services Agreement with Amicon and any agreement with Amicon is encompassed in documentation already produced to Adorama, which such agreements are generally informal and discuss only pricing matters. I do not know of any documents warranting, affording or authorizing AI, nor commanding Amicon to be compelled to produce to AI, any internal business documents not exchanged or provided to AI (and produced to the Defendants), nor of any right to demand documents exchanged by and among Amicon and any third parties. Upon information and belief, this information was shared by my counsel with Defendants' counsel prior to the filing of Defendants' Motion.

17. One last point I believe worth mentioning is that Amicon's services were in the nature of those provided by Magento, Inc., Magento eCommerce Academy, BlueVision, and iFuel, all consulting companies providing coding and development contractors as Amicon did in connection with the Adorama project. Reaching out to specialized developers and augmenting an agency's in-house staff for a particular project is customary in this industry and consistent with how projects of this scope and nature are customarily completed by eCommerce Website Agencies; yet no allegations were made by the Defendants that AI had a duty to obtain documents from these entities based upon a special relationship, because, of course, there was none.

Dated: December 5, 2013

______________________________

Alexander Schmelkin