UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

ALEXANDER INTERACTIVE, INC.,
ALEXANDER SCHMELKIN and JOSH
LEVINE,

            Plaintiffs,

              -against-

ADORAMA, INC., ADORAMA ENTERPRISES
LLC, EUGENE MENDLOWITS, AND
MENDEL MENDLOWITS,

            Defendants.

------------------------------------------------------------- x

12-CV-6608 (PKC)

**ANSWER, AFFIRMATIVE
DEFENSES AND AMENDED
COUNTERCLAIMS**

      Defendants Adorama, Inc., Adorama Enterprises, LLC, Eugene Mendlowits and

Mendel Mendlowits, by their undersigned counsel, Reiss Sheppe LLP, as and for their

Answer, Affirmative Defenses and Counterclaims to the Second Amended Complaint

dated November 19, 2012 in this action (the "Complaint"), allege as follows:

      1.  Defendants are without knowledge or information sufficient to respond to the

truth of the allegations contained in Paragraph 1 of the Complaint.

      2.  Admitted.

      3.  Defendants deny the allegations in paragraph 3 of the Complaint, except admit

that Adorama LLC is a New York limited liability company.

      4.  Defendants deny the allegations contained in Paragraph 4 of the Complaint,

except admit that Mendel Mendlowits is an individual and citizen of the State of New

York.

5.   Defendants admit the allegations contained in Paragraph 5 of the Complaint except deny that Eugene Mendlowits is a principal, officer and/or director of Adorama Enterprises LLC.

6.   Defendants deny the allegations contained in Paragraph 6 of the Complaint and respectfully refer all questions of law to the Court.

7.   Defendants deny the allegations contained in Paragraph 7 of the Complaint and respectfully refer all questions of law to the Court.

## JURISDICTION AND VENUE

8.   Defendants submit that the allegations set forth in Paragraph 8 of the Complaint are legal conclusions to which to no response is required.

## APPLICABLE FACTS

9.   Defendants are without information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint.

10. Admitted with respect to Adorama, Inc., but denied with respect to Adorama Enterprises, LLC.

11. Defendants admit the allegations contained in Paragraph 11 of the complaint as they relate to Adorama, Inc. and deny the remaining allegations contained in Paragraph 11 of the Complaint.

12. Admitted.

13. Defendants deny the allegations contained in Paragraph 13 of the Complaint.

14. Defendants deny the allegations contained in Paragraph 14 of the Complaint.

2

15. Defendants admit that Adorama and AI executed the MSA as defined in paragraph 15 of the Complaint, but state that the MSA speaks for itself and respectfully refer all questions of law to the Court.

16. Defendants state that Adorama executed the MSA Schedule B as defined in Paragraph 16 of the Complaint, and further state that the document speaks for itself and respectfully refer all questions of law to the Court.

17. Defendants admit that Adorama, Inc. and Alexander Interactive, Inc. are parties to an Escrow Agreement as defined in Paragraph 17 of the Complaint, but state that the Escrow Agreement speaks for itself and respectfully refer all questions of law to the Court.

18. Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 18 of the Complaint.

19. Admitted with respect to Adorama, but Defendants deny knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 19 of the Complaint as they relate to AI and/or Magento.

20. Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 20 of the Complaint.

21. Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 21 of the Complaint.  To the extent that Paragraph 21 refers to an agreement between AI and Magento, Defendants state that any such agreement speaks for itself and respectfully refer all questions of law to the Court.

22. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court.

23. Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 23 of the Complaint.

24. Defendants are without knowledge or information sufficient to form a belief as to the truth of allegations contained in Paragraph 24 of the Complaint.

25. Admitted with respect to 25(i)-(xi), but denied with respect to the remaining allegations in Paragraph 25 of the Complaint.

26. Defendants deny the allegations contained in Paragraph 26 of the Complaint.

27. Admitted.

28. Defendants deny the allegations contained in Paragraph 28 of the Complaint.

29. Defendants admit that Glen Holman notified AI that a presentation made to Samsung in November 2011 had gone well, but deny the suggestion that AI's work in connection with the MSA played any role in developing Adorama's relationship with Samsung.

30. Defendants admit that Adorama solicited a business relationship with Samsung, but deny the allegations included in Paragraph 30 of the Complaint to the extent they allege that a partnership was formed or suggest that any relationship between Adorama and Samsung occurred as a result of work performed by AI.

31. Defendants deny the allegations contained in Paragraph 31 of the Complaint.

32. Defendants deny the allegations contained in Paragraph 32 of the Complaint.

33. Defendants deny the allegations contained in Paragraph 33 of the Complaint and respectfully refer all questions of law to the Court.

34. Defendants state that the MSA is an agreement that speaks for itself and respectfully refer Plaintiffs to the MSA and any questions of law to the Court.

35. Defendants deny the allegations contained in Paragraph 35 of the Complaint.

36. Defendants admit the allegations of Paragraph 36 of the Complaint to the extent they allege that Plaintiffs were notified of their failure to deliver Deliverables by the required deadlines.  To the extent Paragraph 36 references the MSA, Defendants state that the MSA is an agreement that speaks for itself and respectfully refer Plaintiffs to the MSA and any questions of law to the Court.

37. Defendants admit that AI sent correspondence to Adorama, Inc. purporting to terminate the MSA dated as of March 19, 2012, but deny the remaining allegations contained in Paragraph 37 of the Complaint.

38. Defendants state that the allegations in Paragraph 38 refer to the Termination Notice, which is a document that speaks for itself and deny the allegations to the extent they suggest, imply or infer that Adorama breached the MSA in any way or that AI properly terminated the MSA.

39. Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40. Defendants deny the allegations contained in Paragraph 40 of the Complaint.

41. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 41 of the Complaint.

42. Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43. Defendants state that the allegations in Paragraph 43 of the Complaint refer to the MSA, which is a document that speaks for itself and respectfully refer any questions of law to the Court.

44. Defendants state that the allegations in Paragraph 44 of the Complaint refer to the MSA, which is a document that speaks for itself and respectfully refer any questions of law to the Court. To the extent Paragraph 44 of the Complaint alleges otherwise, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein. To the extent the allegations contained in Paragraph 44 of the Complaint require a response they are denied.

45. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 45 of the Complaint require a response they are denied.

46. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 46 of the Complaint require a response they are denied.

47. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 47 of the Complaint require a response they are denied.

48. Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49. Defendants deny the allegations contained in Paragraph 49 of the Complaint.

50. Defendants deny the allegations contained in Paragraph 50 of the Complaint.

51. Defendants deny the allegations contained in Paragraph 51 of the Complaint.

52. Defendants deny the allegations contained in Paragraph 52 of the Complaint.

53. Defendants deny the allegations contained in Paragraph 53 of the Complaint.

54. Defendants deny the allegations contained in Paragraph 54 of the Complaint.

55. Defendants deny the allegations contained in Paragraph 55 of the Complaint.

56. Defendants deny the allegations contained in Paragraph 56 of the Complaint.

57. Defendants deny the allegations contained in Paragraph 57 of the Complaint.

58. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 58 of the Complaint require a response they are denied.

59. Defendants state that the MSA speaks for itself and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 59 of the Complaint require a response they are denied.

60. Defendants deny the allegations contained in Paragraph 60 of the Complaint.

61. Defendants deny the allegations contained in Paragraph 61 of the Complaint.

62. Defendants deny the allegations contained in Paragraph 62 of the Complaint.

63. Defendants deny the allegations contained in Paragraph 63 of the Complaint.

64. Defendants deny the allegations contained in Paragraph 64 of the Complaint.

65. Defendants deny the allegations contained in Paragraph 65 of the Complaint.

66. Defendants state that the allegations contained in Paragraph 66 of the Complaint make no sense, but to the extent a response is required, Defendants deny the allegations included therein.

67. Defendants admit that the email excerpt referenced and re-printed in Paragraph 67 of the Complaint was sent on March 19, 2012, and state that the document speaks for itself.

68. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68 of the Complaint.

69. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth set forth in Paragraph 69 of the Complaint.

70. Defendants deny the allegations contained in Paragraph 70 of the Complaint to the extent they allege that any of the Defendants threatened AI, but admit that Defendants requested that AI complete the work AI had contracted to perform or, in the alternative, return the funds paid by Adorama.

71. Defendants admit that the email referenced and re-printed in italics in Paragraph 71 of the Complaint was sent on August 27, 2012, and state that the document speaks for itself.  Defendants deny the remaining allegations contained in Paragraph 71 of the Complaint.

72. Defendants admit that the letter referenced and re-printed in Paragraph 72 of the Complaint was sent on or around August 28, 2012, and state that the document speaks for itself, except deny that any of the Defendants engaged in "bullying," "tag-teaming" or "threats" as alleged in the referenced letter.

73. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 of the Complaint to the extent it alleges that AI discovered a blog on or about September 6, 2012.  As for the remaining allegations in Paragraph 73, Defendants state that they refer to a website which Plaintiffs have reprinted in the Complaint as a screenshot and state that the text in the screenshot speaks for itself.

74. Defendants state that the allegations in Paragraph 74 of the Complaint refer to a press release dated September 10, 2012, which Plaintiffs have reprinted in the Complaint as a screenshot and state that the text in the press release speaks for itself.

75. Defendants state that the allegations in Paragraph 75 of the Complaint refer to a Wordpress website and entry dated September 5, 2012, which Plaintiffs have reprinted in the Complaint as a screenshot and state that the text in the screenshot speaks for itself.

76. Defendants state that the allegations in Paragraph 76 of the Complaint describe a contact for a website, which Plaintiffs have reprinted in the Complaint and state that the text in the screenshot speaks for itself.

77. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 77 and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 77 of the Complaint require a response they are denied.

78. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 78 and respectfully refer all questions of law to the Court. To the extent the allegations contained in Paragraph 78 of the Complaint require a response they are denied.

79. Defendants deny the allegations contained in Paragraph 79 of the Complaint.

80. Defendants deny the allegations contained in Paragraph 80 of the Complaint.

81. Defendants deny the allegations contained in Paragraph 81 of the Complaint.

82. Defendants deny the allegations contained in Paragraph 82 of the Complaint.

83. Defendants deny the allegations contained in Paragraph 83 of the Complaint.

84. Defendants deny the allegations contained in Paragraph 84 of the Complaint.

85. Defendants deny the allegations contained in Paragraph 85 of the Complaint.

86. Defendants deny the allegations contained in Paragraph 86 of the Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Infringement, Injunction and Impoundment—Copyrighted Software)

87. Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

88. Defendants deny the allegations contained in Paragraph 88 of the Complaint.

89. Defendants deny the allegations contained in Paragraph 89 of the Complaint, but admit that AI attempted to terminate the MSA.

90. Defendants deny the allegations contained in Paragraph 90 of the Complaint to the extent it alleges that AI did not authorize Adorama to use the Deliverables, but are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 90 of the Complaint.

91. Defendants deny the allegations contained in Paragraph 91 of the Complaint.

92. Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93. Defendants deny the allegations contained in Paragraph 93 of the Complaint and respectfully refer all questions of law to the Court.

94. Defendants deny the allegations contained in Paragraph 94 of the Complaint and respectfully refer all questions of law to the Court.

95. Defendants deny the allegations contained in Paragraph 95 of the Complaint and respectfully refer all questions of law to the Court.

96. Defendants deny the allegations contained in Paragraph 96 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Injunction—Infringement/Use of Software
### Licenses and Misappropriation of Trade Secrets)

97. Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

98. Defendants deny the allegations contained in Paragraph 98 of the Complaint and respectfully refer all questions of law to the Court.

99. Defendants deny the allegations contained in Paragraph 99 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Injunction—Solicitation)

100.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

101.    Defendants deny the allegations contained in Paragraph 101 of the Complaint and respectfully refer all questions of law to the Court.

102.    Defendants deny the allegations contained in Paragraph 102 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Injunction—Confidentiality)

103.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

104.    Defendants deny the allegations contained in Paragraph 104 of the Complaint and respectfully refer all questions of law to the Court.

105.    Defendants deny the allegations contained in Paragraph 105 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Contract)

106.   Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

107.   Defendants deny the allegations contained in Paragraph 107 of the Complaint and respectfully refer all questions of law to the Court.

108.   Defendants deny the allegations contained in Paragraph 108 of the Complaint and respectfully refer all questions of law to the Court.

109.   Defendants deny the allegations contained in Paragraph 109 of the Complaint and respectfully refer all questions of law to the Court.

110.   Defendants deny the allegations contained in Paragraph 110 of the Complaint and respectfully refer all questions of law to the Court.

111.   Defendants deny the allegations contained in Paragraph 111 of the Complaint and respectfully refer all questions of law to the Court.

112.   Defendants deny the allegations contained in Paragraph 112 of the Complaint and respectfully refer all questions of law to the Court.

113.   Defendants deny the allegations contained in Paragraph 113 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Piercing the Corporate Veil Arising from
### Tortious Actions and Copyright/License Infringement)

114.   Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

115.   Defendants deny the allegations contained in Paragraph 115 of the Complaint and respectfully refer all questions of law to the Court.

116.     Defendants deny the allegations contained in Paragraph 116 of the Complaint and respectfully refer all questions of law to the Court.

117.     Defendants deny the allegations contained in Paragraph 117 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Software License Infringement)

118.     Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

119.     Defendants deny the allegations contained in Paragraph 119 of the Complaint and respectfully refer all questions of law to the Court.

120.     Defendants deny the allegations contained in Paragraph 120 of the Complaint and respectfully refer all questions of law to the Court.

121.     Defendants deny the allegations contained in Paragraph 121 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

122.     Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

123.     Defendants deny the allegations contained in Paragraph 123 of the Complaint and respectfully refer all questions of law to the Court.

124.     Defendants deny the allegations contained in Paragraph 124 of the Complaint and respectfully refer all questions of law to the Court.

125.     Defendants deny the allegations contained in Paragraph 125 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Unjust Enrichment)

126.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

127.    Defendants deny the allegations contained in Paragraph 127 of the Complaint and respectfully refer all questions of law to the Court.

128.    Defendants deny the allegations contained in Paragraph 128 of the Complaint and respectfully refer all questions of law to the Court.

129.    Defendants deny the allegations contained in Paragraph 129 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Recovery and Turnover)

130.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

131.    Defendants deny the allegations contained in Paragraph 131 of the Complaint and respectfully refer all questions of law to the Court.

132.    Defendants deny the allegations contained in Paragraph 132 of the Complaint and respectfully refer all questions of law to the Court.

133.    Defendants deny the allegations contained in Paragraph 133 of the Complaint and respectfully refer all questions of law to the Court.

134.    Defendants deny the allegations contained in Paragraph 134 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Damages—17 U.S.C. §  504 & 505)

135.     Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

136.     Defendants deny the allegations contained in Paragraph 136 of the Complaint and respectfully refer all questions of law to the Court.

137.     Defendants deny the allegations contained in Paragraph 137 of the Complaint and respectfully refer all questions of law to the Court.

138.     Defendants deny the allegations contained in Paragraph 138 of the Complaint and respectfully refer all questions of law to the Court.

139.     Defendants deny the allegations contained in Paragraph 139 of the Complaint and respectfully refer all questions of law to the Court.

140.     Defendants deny the allegations contained in Paragraph 140 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Damages—Breach of Contract)

141.     Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

142.     Defendants deny the allegations contained in Paragraph 142 of the Complaint and respectfully refer all questions of law to the Court.

143.     Defendants deny the allegations contained in Paragraph 143 of the Complaint and respectfully refer all questions of law to the Court.

144.     Defendants deny the allegations contained in Paragraph 144 of the Complaint and respectfully refer all questions of law to the Court.

145.    Defendants deny the allegations contained in Paragraph 145 of the Complaint and respectfully refer all questions of law to the Court.

146.    Defendants deny the allegations contained in Paragraph 146 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Damages—License Infringement)

147.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

148.    Defendants deny the allegations contained in Paragraph 148 of the Complaint and respectfully refer all questions of law to the Court.

149.    Defendants deny the allegations contained in Paragraph 149 of the Complaint and respectfully refer all questions of law to the Court.

150.    Defendants deny the allegations contained in Paragraph 150 of the Complaint and respectfully refer all questions of law to the Court.

151.    Defendants deny the allegations contained in Paragraph 151 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### (Damages—Theft of Trade Secrets)

152.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

153.    Defendants deny the allegations contained in Paragraph 153 of the Complaint and respectfully refer all questions of law to the Court.

154.    Defendants deny the allegations contained in Paragraph 154 of the Complaint and respectfully refer all questions of law to the Court.

155.    Defendants deny the allegations contained in Paragraph 155 of the Complaint and respectfully refer all questions of law to the Court.

156.    Defendants deny the allegations contained in Paragraph 156 of the Complaint and respectfully refer all questions of law to the Court.

157.    Defendants deny the allegations contained in Paragraph 157 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### (Damages—Interest)

158.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

159.    Defendants deny the allegations contained in Paragraph 159 of the Complaint and respectfully refer all questions of law to the Court.

160.    Defendants deny the allegations contained in Paragraph 160 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### (Defamation)

161.    Defendants repeat and reallege each of their responses to the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

162.    Defendants deny the allegations contained in Paragraph 162 of the Complaint and respectfully refer all questions of law to the Court.

163.    Defendants deny the allegations contained in Paragraph 163 of the Complaint and respectfully refer all questions of law to the Court.

164.    Defendants deny the allegations contained in Paragraph 164 of the Complaint and respectfully refer all questions of law to the Court.

165.     Defendants deny the allegations contained in Paragraph 165 of the Complaint and respectfully refer all questions of law to the Court.

166.     Defendants deny the allegations contained in Paragraph 166 of the Complaint and respectfully refer all questions of law to the Court.

167.     Defendants deny the allegations contained in Paragraph 167 of the Complaint to the extent they allege the publication constitutes actionable defamation and respectfully refer all questions of law to the Court.

168.     Defendants deny the allegations contained in Paragraph 168 of the Complaint and respectfully refer all questions of law to the Court.

## AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

169.   The Complaint fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

170.   Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' damages, if any, were caused by Plaintiffs' and/or its agents' conduct as Plaintiffs, among other things, failed to perform their obligations under the parties' agreement.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

171.     Plaintiffs' claims are barred, in whole or in part, on the grounds of lack of consideration as Defendants received no benefit for any work allegedly done by Plaintiffs.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

172.     Plaintiffs' claims are barred, in whole or in part, by virtue of Plaintiffs' failure to allege or prove any specific losses or damages caused by Defendants' alleged breach of contract.

## AS AND FOR AN FIFTH AFFIRMATIVE DEFENSE

173.   Defendants allege that any duty or obligation, contractual or otherwise, which Plaintiffs claim Defendants owed them has been fully performed, satisfied and/or discharged.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

174.   Plaintiffs' claims are barred, in whole or in part, on the grounds that Plaintiffs have breached the implied covenant of good faith and fair dealing in the MSA.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

175.   Plaintiffs' claims are barred in whole or in part by the doctrines of laches, waiver, estoppel and unclean hands.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

176.   Plaintiffs are not entitled to the relief sought to the extent Plaintiffs have acted with bad faith, willful misconduct and/or gross negligence.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

177.   Plaintiffs are not entitled to the relief sought with respect to their defamation claims because Defendants' statements were true, substantially true and/or non-actionable opinion.

## AS AND FOR AN TENTH AFFIRMATIVE DEFENSE

178.   Plaintiffs' copyright infringement and misappropriation claims are barred because Defendants purchased a license to use Plaintiffs' website design concept.

## AS AND FOR A ELEVENTH AFFIRMATIVE DEFENSE

179.   Plaintiffs' copyright infringement and misappropriation claims are barred because Plaintiffs expressly acquiesced to Defendants' use of Plaintiffs' website design concept.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

180.    Plaintiffs' claims are, in whole or in part, subject to arbitration.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

181.    Plaintiffs' claims are barred, in whole or in part, to the extent they are duplicative.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

182.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of federal preemption.

## RESERVATION OF RIGHTS

183.    Defendants expressly reserve the right to amend and/or supplement their answer and affirmative defenses as appropriate as discovery proceeds.

## DEFENDANT-COUNTERCLAIM PLAINTIFF'S COUNTERCLAIMS

## THE PARTIES

184.    Defendant-Counterclaim Plaintiff Adorama, Inc. ("Adorama") is a corporation duly formed and operating under the laws of the State of New York with its principal place of business located at 42 West 18th Street, New York, New York.

185.    Plaintiff-Counterclaim Defendant Alexander Interactive, Inc. ("AI") is a corporation duly formed and operating under the laws of the State of New York with its principal place of business located at 149 Fifth Avenue, 8th Floor, New York, New York.

186.    Plaintiff-Counterclaim Defendant Alexander Schmelkin ("Schmelkin") is a resident of New York, New York and a principal and senior officer of AI.

187.    Plaintiff-Counterclaim Defendant Josh Levine ("Levine") is a resident of New York, New York and a principal and senior officer of AI.

## JURISDICTION AND VENUE

188.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367.

189.   Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

190.   In or around March 2010, Adorama began preliminary discussions with AI with respect to Adorama's plan to develop and launch a completely new company website.

191.   AI, through Schmelkin, represented to Adorama that AI possessed unique and specialized expertise in working with companies like Adorama to not only create tailored commercial website design solutions, but also to draft the requisite source code and oversee the installation and launch of the new website.  Specifically, AI's website proclaimed that AI is a "full-service digital agency that creates exceptional ecommerce solutions.  The result is a site with higher traffic, increased conversion rates, and a flawless customer experience."

192.   Schmelkin further represented to Adorama that AI had recent in-house technical experience in both designing and implementing customized e-commerce website platforms utilizing Magento e-commerce software products which Adorama had selected for its new website.  Specifically, Schmelkin provided Adorama with three customer references and referred Adorama to online articles published by AI in-house technical experts reflecting their purported expertise utilizing the Magento e-commerce software products.  Additionally, Schmelkin assured Adorama that AI was capable of handling specific technical complexities known to occur during a website platform customization using Magento e-commerce software solutions.

**The Master Services Agreement**

193.    Thereafter, AI and Adorama executed a Master Services Agreement dated

as of June 2, 2010 (the "MSA").  The MSA contemplated, among other things, that the

parties would execute schedule agreements, delineating the specific services to be

performed by AI (the "Deliverables") together with the rates and timetables for

completion and public launch of Adorama's new website.

194.    Section 1.4 of the MSA provided, in relevant part, that:

> In the event that [AI] is unable to meet such estimated
> completion dates despite its commercially reasonable
> efforts to do so, [Adorama] agrees that it shall in good
> faith, renegotiate the fees set forth in such Schedule, taking
> into the account the additional time necessary to complete
> the applicable Deliverable.  In the event the parties cannot
> agree on revised fees, the parties agree to submit the matter
> to binding arbitration, conducted in accordance with the
> rules and procedures of the American Arbitration
> Association.

195.    Section 1.5 of the MSA provided that "[t]o the extent that there is a

conflict between the provisions of this Master Services Agreement and a Schedule, the

terms of the Schedule shall control, with respect to such Schedule only."

**Schedule A:  The Requirements Phase**

196.    On or around June 2, 2010, Adorama and AI executed Schedule A of the

MSA, whereby AI received $50,000 and agreed to provide Adorama with a

comprehensive plan for how AI intended to create, develop, deliver and price the myriad

technical features and components required for construction and public launch of

Adorama's proposed new website (collectively, the "Requirements Phase").  (A true and

correct copy of Schedule A is annexed as Exhibit A to Plaintiffs' Complaint).

197.    For Adorama, the work contemplated by the Requirements Phase represented an important investment in the long-term success of the project because Adorama wanted to ensure that AI would fully understand each of the various tasks AI would need to accomplish to deliver a quality finished product to Adorama.

198.    In addition to educating AI about Adorama's specific business and technical requirements, the Requirements Phase also was intended to eliminate price uncertainty and delivery delays because it would allow AI to carefully assess the scope of work required to complete the website construction such that AI could then provide Adorama with a fixed cost for AI's work and a firm deadline for a public launch of the new website.

199.    From June 2010-December 2010, Adorama allocated various personnel to assist AI in familiarizing itself with Adorama's business and technical needs to complete the Requirements Phase.  During this period, Schmelkin and other AI representatives worked side by side together with Adorama on an almost daily basis.

200.    During this diligence period, Adorama also considered other digital commerce service providers, including Optaro's, Inc. ("Optaros"), which is headquartered in Boston, Massachusetts.  Ultimately, Adorama opted to proceed with AI because of its expertise at website development which included, without limitation, AI's express agreement to consult with Magento experts during the customization process, AI's web design concept capabilities, and AI's local presence.

**AI Executes Consulting Agreements with Two Magento Expert Consultants**

201.    In addition to investing money upfront with AI to confirm it fully understood the parameters of the proposed website construction, Adorama encouraged and AI agreed to enter into a consulting agreement with Magento, Inc. ("Magento"). Adorama believed that AI would benefit from accessing Magento's expertise as an independent consultant.

202.    AI consented and entered into Customer Services Agreement with Magento as of November 10, 2010 (the "CSA").  Prior to executing the CSA, Schmelkin advised Adorama that he had "secured two of the most qualified Magento scalability experts to work alongside AI on the Adorama project."

203.    On or around December 1, 2010, AI also entered into a consulting agreement with a second Magento expert, Magento Academy, based in France.

204.    Under both consulting agreements, AI was required to bear the expenses incurred in connection with either of the Magento consultants.

205.    As described *infra*, AI deliberately failed to properly or sufficiently utilize either of the above-referenced Magento consulting relationships because AI wanted to reduce its costs and thereby increase its profit margin on the Adorama project.  Upon information and belief, AI's failure to properly utilize the Magento consultants contributed to project delays and other AI performance deficiencies.

**AI and Adorama Execute a Fixed Bid Agreement for
Schedule B:  The Development Phase**

206.    After working closely alongside Adorama's representatives for more than six months, AI and Adorama executed a second schedule dated as of December 21, 2010

("Schedule B") providing, among other things, the various specific design and technical development milestones (the "Appendix C Deliverables") to enable Adorama to launch its new website by May 15, 2011. (A true and correct copy of Schedule B and the Appendix C Deliverables is attached as Exhibit C to the Complaint).

207.    Schedule B provided that AI's fees for providing the Appendix C Deliverables would be a "fixed bid cost of $1,325,000." Plaintiffs' Compl., Ex. C (emphasis in original).

208.    Section 6 of Schedule B further provided for eight cash payments to AI for a total cash payment of $825,000, all of which Adorama paid to AI.

**The Escrow Agreement**

209.    Section 6 of Schedule B also contemplated that two additional AI payments would be held by a third party pursuant to the terms of a escrow agreement dated December 21, 2010 (the "Escrow Agreement"). (A true and correct copy of the Escrow Agreement is annexed as Exhibit D to the Complaint). Specifically, the Escrow Agreement required deposits by Adorama in the amounts of $50,000 no later than December 21, 2010 and $450,000 no later than April 1, 2011. The Escrow Agreement further provided specific triggering events based upon completion of specific Appendix C Deliverables upon which AI could seek the release of the escrow funds.

210.    On or about December 21, 2010, Adorama deposited the $50,000 payment as required. As described *infra*, in or around April 2011, AI was not even close to completing the specific Appendix C Deliverables required to trigger release of the $450,000 payment under the Escrow Agreement. On or around April 15, 2011, Schmelkin agreed that AI would defer Adorama's $450,000 deposit requirement under

the Escrow Agreement until AI produced the relevant Appendix C Deliverables.

211.    Because AI never completed or delivered the Appendix C Deliverables, AI agreed to waive Adorama's deposit of the $450,000 and, upon information and belief, AI never applied for release of the $50,000 deposited by Adorama because AI had not completed any of the triggering events required by the terms of the Escrow Agreement.

212.    As with the Requirements Phase, AI's work associated with the Appendix C Deliverables required close interaction and collaboration with Adorama.  Specifically, Schmelkin attended dozens of weekly face-to-face meetings at Adorama's headquarters to discuss project updates and upcoming milestones.  In addition to in-person meetings, AI and Adorama created and utilized a confidential electronic communications platform, referred to among the parties as "Basecamp," which permitted the parties to maintain real time project status updates as well as post comments and recommendations concerning the ongoing website construction.

213.    After receiving payments from Adorama totaling almost $900,000 and after almost 15 months of work, AI failed to deliver a usable website.

214.    By way of example only, AI and Schmelkin repeatedly assured Adorama throughout the parties' business relationship that AI would construct the new Adorama website in a manner that would leave the Magento software core intact and just build Adorama's customizations around the Magento core.  This was a basic global design feature because it would allow Adorama to easily add regular Magento upgrades and/or additional system modifications without affecting the website.

215.    As described *infra*, in or about August 2012, Adorama discovered that AI had improperly modified Magento core files, making regular system upgrades and

prospective modifications either impossible or extremely expensive.

216.    Upon information and belief, Schmelkin and AI either knew or should have known at the time they advised Adorama about the Magento core installation that AI either had no intention or technical ability to deliver the Magento core files as promised.

217.    In addition, AI specifically failed to deliver, among other things, the following Appendix C Deliverables: (i) HTML, CSS and Javascript interfaces pursuant to Section 4.1 of the Appendix C Deliverables; (ii) Multivariate Testing Platform pursuant to Section 4.2 of the Appendix C Deliverables; (iii) Magento Enterprise pursuant to Section 5.1.  AI also failed to comply with various aspects of its Quality Assurance obligations pursuant to Section 6 of the Appendix C Deliverables.

**Schmelkin and AI Knowingly Misrepresent**
**the Quality of AI's Deliverables and the Timeline for a Public Launch Date**

218.    From Spring 2011 through February 2012, AI, through Schmelkin and other AI representatives, repeatedly submitted deficient Appendix C Deliverables to Adorama for user acceptance testing, notwithstanding that both Schmelkin and AI knew or had reason to believe that the Appendix C Deliverables contained glaring technical impairments.

219.    Upon information and belief, Schmelkin knowingly and intentionally misrepresented the quality of AI's Deliverables during dozens of weekly face-to-face meetings at Adorama's New York offices attended by Eugene Mendlowits.

220.    Upon information and belief, Schmelkin specifically represented the following false information to Eugene Mendlowits and Glen Holman of Adorama: (i) AI had completed various Appendix C Deliverables; (ii) the Appendix C Deliverables were

clear of technical deficiencies and ready for user acceptance testing pursuant to the MSA; and (iii) the Appendix C Deliverables had undergone thorough internal AI quality assurance testing prior to submission to Adorama.

221.   In each instance, Schmelkin was aware that the information was being provided for a serious purpose and would be relied upon by Adorama.

222.   Upon information and belief, following most of these meetings a representative from Adorama accompanied Schmelkin back to AI's Manhattan offices whereupon AI's quality assurance representative corroborated the technical deficiencies cited by Adorama.

223.   Schmelkin and AI understood that the information being provided to Adorama was for a serious purpose and Adorama reasonably relied upon the representations being made.

224.   By way of example only, on or about August 22, 2011, Schmelkin and AI presented Adorama with a proposed Appendix C Deliverable related to the "product page" function of the website.  The product page allows Adorama customers to obtain detailed product information, including but not limited to pricing, product specifications and other information during the online shopping experience and, thus, represents an important component of Adorama's website.

225.   Upon information and belief, Schmelkin represented to Eugene Mendlowits and Adorama's Chief Information Officer, Glen Holman ("Holman"), that the product page deliverable had undergone internal AI Quality Assurance department review prior to submission to Adorama for user acceptance testing and did not contain any technical deficiencies.  In an email dated August 23, 2011, Holman provided

Schmelkin with no fewer than fifteen examples of major deficiencies he had discovered. By email dated August 24, 2011, Schmelkin acknowledged the deficiencies, stating "[t]he site is complicated and there are a lot of details to get through to ready it for launch."

226.   Upon information and belief, AI's quality assurance representatives repeatedly advised Schmelkin that adequate internal quality assurance either had not been done on various Appendix C Deliverables and/or that AI had failed to correct the deficiencies prior to their submission to Adorama for user acceptance testing.

227.   Upon information and belief, Schmelkin knowingly ignored any such internal admonishment and instructed AI's quality assurance representatives to submit the deficient Deliverables to AI for user acceptance testing.  In each instance, Schmelkin was aware that the information was being provided for a serious purpose and would be relied upon by Adorama.

228.   The deficient Appendix C Deliverables which AI repeatedly attempted to pass off to Adorama as functioning Deliverables that had been checked by AI's quality assurance department represented important features of Adorama's proposed new website.  Notwithstanding repeated assurances that AI's Deliverables were ready for user acceptance testing, Adorama discovered obvious technical errors, including inconsistent performance of critical features and, in several instances, a complete failure to produce the Appendix C Deliverables in accordance with required performance metrics specified in Schedule B.

229.   Upon information and belief, in addition to misrepresenting the quality of AI's work product, Schmelkin and AI repeatedly and knowingly misrepresented the public launch date for Adorama's new website.

230.    By way of example only, on or around July 20, 2011, and in response to urgent and repeated inquiries from Adorama executives for a project update and realistic completion deadline, Schmelkin informed Holman and other Adorama executives by email that the completion of the website was on schedule, and that "nothing I am seeing today says we won't be live as of September 2011."

231.    Upon information and belief, Schmelkin knew or had reason to believe in July 2011 that AI was nowhere near completing the website construction in accordance with the Schedule B specifications and that the information he was providing Adorama was for a serious purpose and would be relied upon by Adorama.

232.    As described *infra*, after failing to meet the September 2011 public launch, Schmelkin and other AI representatives continued making similar promises to Adorama through the fall of 2011.  By way of further example, on or around October 4, 2011, AI's Director of Technology, Philip Cotty, advised Adorama that "we are very nearly" at a launch ready position and that Adorama would "hear some continued good news over the next few days."

233.    Upon information and belief, Cotty knew or had reason to believe in October 2011 that AI was nowhere near completing the website construction in accordance with the Schedule B specifications and that the information he was providing Adorama was for a serious purpose and would be relied upon by Adorama.

234.    In late December 2011, AI finally conceded to Adorama that AI would not be able to deliver a completed website for public launch until at least June 2012.

**Schmelkin's Misrepresentations Caused Protracted Delays
and Adorama to Incur Needless Licensing Fees and Vendor Expenses**

235.    In or around May 2011, Schmelkin pressured Adorama to enter into a licensing agreement with Magento which Schmelkin advised was necessary for Adorama's full production site.  Schmelkin repeatedly assured Adorama that the license was necessary and that the website would soon be available for public launch.

236.    As a result of Schmelkin's assurances, Adorama entered into a multi-year licensing fee arrangement with Magento, and incurred fees in excess of $212,000.

237.    Upon information and belief, Schmelkin either knew or should have known at the time he pressured Adorama to purchase a license from Magento that AI was nowhere near completion of the Adorama website.

238.    Given Schmelkin's professed expertise and close first-hand working knowledge regarding the project status, Adorama reasonably relied upon Schmelkin's repeated assurances to Adorama's detriment.

239.    From the beginning of the project, Schmelkin began pressuring Adorama that it needed to contract with Rackspace, Inc. ("Rackspace") or some other outsource provider to begin providing Adorama with outsourcing services to host Adorama's servers, operating systems, database platform and other infrastructure for the proposed new website.  Rackspace thereafter provided Adorama with a contract, which provided an annual service fee in excess of $200,000 for the above-referenced services.

240.    Because AI had not yet provided Adorama with a functioning new website, Adorama questioned Schmelkin regarding the wisdom of entering into an expensive annual contract with Rackspace to service a product that AI had not yet

delivered.

241.   In response, Schmelkin repeatedly assured Adorama that the website would be delivered in a timely manner and insisted that Adorama needed to have Rackspace ready to go with hosting services beforehand.

242.   Upon information and belief, Schmelkin either knew or should have known at the time he demanded that Adorama contract with Rackspace that AI was nowhere near completion of the Adorama website.

243.   Given Schmelkin's professed expertise and close first-hand working knowledge regarding the project status, Adorama reasonably relied upon Schmelkin's repeated assurances and executed the Rackspace contract on June 6, 2011.  To date, Adorama has paid Rackspace approximately $150,000 for useless outsourcing services.

244.   Because AI never delivered a completed website and, as described *infra*, wrongfully terminated the MSA, Adorama received nothing in return for its payments to Rackspace.

245.   Also since the beginning of the project, Schmelkin insisted that it was necessary for and pressured Adorama to engage Gomez, Inc. ("Gomez") and Zend Server, Inc. ("Zend") to provide web page monitoring services and web deficiency reporting services, respectively.  As a result of these engagements, Adorama incurred additional contract fees of $16,800 and $9,600, respectively.

246.   Upon information and belief, AI never utilized the services offered by Gomez or Zend.

247.   As with Rackspace, Schmelkin knew or had reason to believe at the time that he persuaded Adorama to contract with Gomez and Zend that their respective

services were not necessary given the actual status of the project.

248.   Adorama reasonably relied upon Schmelkin's assurances and contracted with Gomez and Zend to its detriment.

**AI Consents to Adorama's Use of its Web Design Concept**

249.   In or around late October 2011—almost 6 months past the contemplated May 2011 launch date—it became apparent that AI's repeated delays and deficiencies would potentially impact Adorama's ability to present an attractive commercial website to its customers in advance of the 2011 holiday gift season.

250.   As a result, Adorama decided that it would attempt to utilize its in-house programmers to modify and launch an interim website platform by using Adorama's existing website together with AI's web design concepts.  Although Adorama's cash payments to AI represented payment in full for AI's website design concepts, Adorama nevertheless requested advance permission from AI prior to using the design concepts, which AI granted.  Indeed, by email dated November 1, 2011, Schmelkin stated that Adorama's decision to utilize AI's design concept to create a website for Adorama's customers in advance of the 2011 holiday season was "terrific news."

251.   In a December 29, 2011 email from Holman to Schmelkin, Holman again specifically referenced the parties' agreement to allow Adorama to use AI's design concept for Adorama's website.  Prior to bringing this action, at no time did Schmelkin or anyone from AI raise any objection to Adorama's use of AI's design concepts.

252.   Adorama was thus expressly authorized by AI to use its design concept to launch a temporary website in 2011.

**The December 12, 2011 Meeting**

253.     In or around December 2011, Adorama requested an in-person meeting with Schmelkin to discuss the status of the website project and demanded that AI's new technology director, Philip Cotty ("Cotty"), attend the meeting so that Adorama could obtain a first-hand report regarding the current project status and a firm deadline when Adorama could expect completion and public launch of its new website.

254.     In the weeks preceding a face-to-face meeting with Cotty, Schmelkin repeatedly assured Adorama that the website public launch date was on target and would occur in early 2012.

255.     Schmelkin initially refused to produce Cotty for a face-to-face meeting with Adorama, but ultimately relented.  On or about December 12, 2011, the meeting was held at Adorama's offices and attended by Schmelkin and Cotty for AI and Eugene Mendlowits for Adorama.  During the meeting, Cotty acknowledged that a realistic public launch date for the completed website would be sometime in June 2012, more than one year after the May 2011 date contemplated in both the MSA and Schedule B.

**AI Acknowledges Major Performance Failures**

256.     Following the December 2011 in-person meeting at Adorama's offices, Cotty acknowledged by e-mail dated December 14, 2011, that Adorama had highlighted aspects of AI's business and Deliverables which were "broken" and, more specifically, conceded that AI needed to allocate additional resources to its quality assurance department.

257.     By email dated January 21, 2012, Schmelkin provided Adorama with a more fulsome explanation concerning AI's failure to perform under the MSA and

Schedule B.

258.   Specifically, Schmelkin acknowledged that:

- AI was focused on rushing Deliverables out the door to Adorama for user acceptance testing without a consistent and thorough in-house quality assurance check that the Deliverables actually worked properly as required by the MSA and Schedule B.

- Despite AI's professed technical expertise and completion of the Requirements Phase, AI still failed to grasp the technical complexities and scope of work required to complete the Appendix C Deliverables.

- AI assigned inadequate and inexperienced personnel who were incapable of providing accurate and reliable deadlines for completing the Appendix C Deliverables.

- AI assumed incorrectly and without any basis that Adorama would be "flexible" regarding the production of previously agreed-upon Appendix C Deliverables and thereby excuse AI from producing what AI specifically agreed to provide under Schedule B.

- AI's "pricing scenarios" were somehow inaccurate due to the "complexity of the pricing scenarios," notwithstanding that AI's "original pricing specifications were comprehensive."

**AI Demands an Open-Ended Price Increase of**
**of $110,000 Per Month to Complete the Fixed Bid Project**

259.   Notwithstanding Schmelkin's candid admissions concerning AI's systemic performance deficiencies, in or around February 2012, Schmelkin nevertheless demanded that Adorama begin paying AI $110,000 per month going forward in exchange for AI's completion of new proposed intermediate project milestones with AI's final payment to be held in escrow pending a full public launch of the website which Schmelkin projected would not occur until August 2012.

260.   Given AI now projected needing at least an additional six months to complete the project, AI's demand was essentially a minimum price increase of 45% on

top of Schedule B's existing fixed price cost. Because Schedule B expressly provided that the Appendix C Deliverables would be provided to Adorama for a fixed cost bid, and given AI's protracted delays, misrepresentations and performance deficiencies, Adorama rejected AI's attempt to re-negotiate Schedule B, and requested that AI honor the parties' original contract.

261.    Although Adorama never consented to AI's proposed monthly price increases, AI nevertheless failed to deliver on the proposed intermediate milestones. By email dated February 27, 2012, Holman directed AI to several technical deficiencies he discovered after performing only a cursory review of the new deliverables AI attempted to pass off to Adorama as completed work product that was, according to AI, ready for Adorama user acceptance testing.

### AI's Wrongful Termination of the Master Services Agreement

262.    Unable to extract additional money from Adorama or produce Appendix C Deliverables for user acceptance testing, on March 5, 2012, AI informed Adorama that the entire project would be put on an indefinite "hold."

263.    By letter dated March 13, 2012, AI attempted to terminate the MSA (the "Termination Notice"). (A true and correct copy of the Termination Notice is annexed as Exhibit G of the Complaint).

264.    Pursuant to the Termination Notice, AI claimed Adorama had "materially breached the [MSA]" because, among other things, Adorama refused to pay AI invoices for January and February 2012, representing AI's new unilateral monthly fee demands, and because, according to AI, Adorama refused to "negotiate in good faith."

265.     The Termination Notice thus was predicated on AI's failure to persuade

Adorama to pay AI additional fees on top of the parties' agreed-upon fixed bid cost set

forth in Schedule B.  Nevertheless, AI ignored the clear terms of the MSA, which

expressly required AI to arbitrate any such dispute.

**Magento Audits AI's Performance**

266.     Notwithstanding AI's wrongful attempted termination of the MSA,

Adorama nevertheless made a final attempt to salvage its substantial investment to date

and its relationship with AI.  In or around late March 2012, Adorama contacted AI to

discuss a method by which the parties could move forward in a productive manner

whereby AI could finish the website construction.  Specifically, Adorama suggested that

the parties engage Magento as an expert independent auditor to assess AI's work

performed to date, provide the parties with a reliable timeline for project completion and

an approximate price for completion.

267.     Schmelkin's initial response was that AI stood by its work product, but

nevertheless attempted to condition AI's cooperation with the proposed audit on, among

other things, Adorama's agreement that any unfavorable audit findings would be kept

confidential and that any unfavorable audit findings would not be admissible in any

subsequent court proceedings.  Adorama refused to consent to any such conditions.  By

email dated April 18, 2012, AI agreed to participate in the audit without any conditions.

268.     In or around August 2012, Magento completed the audit which, among

other problematic findings, concluded:

> a. A substantial amount of the Appendix C Deliverables provided by
> AI either could not be used or required substantial technical
> repairs.  Specifically, Magento cited the following as examples

only: (i) the main controller had performance and architecture deficiencies; (ii) AI improperly modified the core Magento software, which meant that regular system upgrades would either be impossible to add or extremely onerous and expensive; (iii) the website data is loaded and handled improperly; and (iv) the templates contained price calculation logic which is duplicated in many areas.

b. Completion of the website pursuant to the Schedule B specifications would require an additional eight months of work.

c. The estimated cost for completing Adorama's website would require an additional investment of approximately $1,500,000.

269.     Adorama shared Magento conclusions with Schmelkin.  In response, Schmelkin did not object to the accuracy of Magento's conclusions and advised Adorama that AI would not assist in completing the project.

### Adorama's Current Website

270.     In spite of using its own internal resources to build its own website, and the passage of approximately 18 months since AI's improper termination, Adorama has yet to be able to build a website that includes all of the features and capabilities of the website AI was to build for Adorama.

271.     Adorama is not able to find another vendor who can build the site that AI was to build, with all of the same features and capabilities and that would not require Adorama to start the entire process over from scratch.

272.     Adorama is willing to continue to perform its contractual obligations under its agreement with AI.

### AS AND FOR A FIRST COUNTERCLAIM
### (Breach of Contract as Against Alexander Interactive, Inc.)

273.     Adorama reasserts and realleges Paragraphs 184-272 of the Counterclaims as if set forth herein.

274.    On or about June 2, 2010, Adorama and AI entered into the MSA, which included Schedules A and B.

275.    Adorama performed all of its obligations under the MSA, Schedule A and Schedule B, including making all required payments to AI.

276.    AI materially breached the MSA and Schedule B by failing to provide AI with various Appendix C Deliverables.

277.    As a result of AI's breach, Adorama suffered monetary damages in an amount to be determined at trial.

278.    In the alternative to monetary damages, Adorama seeks specific performance to require AI to perform its obligations under the MSA and related contracts.

## AS AND FOR A SECOND COUNTERCLAIM
### (Wrongful Termination of Contract as Against Alexander Interactive, Inc.)

279.    Adorama reasserts and realleges Paragraphs 184-278 of the Counterclaims as if set forth herein.

280.    Adorama performed all of its obligations under the MSA, Schedule A and Schedule B, including making all required payments to AI.

281.    Section 1.4 of the Agreement provided that any dispute regarding fees associated with a Deliverable that could not be resolved by the parties would be subject to binding arbitration before the American Arbitration Association.

282.    In or around January 2012, Adorama and AI became embroiled in a contractual dispute arising out of AI's demand for increased monthly fees before AI would complete work on the Appendix C Deliverables.

283.   The parties were unable to negotiate new fees.

284.   Instead of commencing an arbitration as required by Section 1.4 of the MSA, AI abruptly ceased all work on the project and wrongfully terminated the MSA by letter dated March 13, 2012.

285.   As a result of AI's wrongful termination of the MSA, Adorama incurred various damages in an amount to be determined at trial, including but not limited to any and all payments made to AI, and to third party vendors such as Magento, Rackspace, Gomez and Zend Server.

### AS AND FOR A THIRD COUNTERCLAIM
(Breach of Contract as Against Alexander Interactive, Inc. For
Failure to Engage Magento's Expertise Pursuant to Schedule B)

286.   Adorama reasserts and realleges Paragraphs 184-285 of the Counterclaims as if set forth herein.

287.   On or about June 2, 2010, Adorama and AI entered into the MSA, which included Schedules A and B.

288.   Adorama performed all of its obligations under the MSA, Schedule A and Schedule B, including making all required payments to AI.

289.   Pursuant to Section 10 of Schedule B, AI was required to engage and utilize the services of a Magento software expert to assist AI with customizing the Magento software to Adorama's website.

290.   As described *supra*, Adorama believed that the Magento customization process represented a critical hurdle to AI's successful completion of Adorama's website and therefore regarded Section 10 as a material provision under Schedule B.  In that regard, Adorama insisted that Section 10 require AI to provide Adorama with a copy of

40

an executed agreement between AI and the Magento consultant within 30 days of the execution of Schedule B and that AI bear the expenses incurred in connection with any Magento consulting.

291.    In or around December 1, 2010, AI advised Adorama that AI had entered into consulting agreements with Magento and with Magento Academy.

292.    In or around September 2010, Schmelkin advised Adorama that he had selected "two of the best Magento consultants to work alongside AI" in connection with the Adorama project.

293.    Notwithstanding these representations, upon information and belief, AI deliberately, and in breach of its contractual obligations, under-utilized Magento's consulting services and expertise because AI wanted to avoid incurring consulting costs and thereby increase its profit margin on the Adorama website project.

294.    In or around January 2011, AI's second Magento consultant, Magento Academy, provided AI with a list of specific proposals designed to help AI tackle various technical issues with respect to implementing the Magento software onto the Adorama website.  Upon information and belief, AI limited its use of Magento Academy to demonstrations of ancillary technical issues and thereafter failed to maintain regular contact with Magento Academy.

295.    Upon information and belief, in or around March 2011, Magento Academy again contacted AI to offer project assistance, and suggested AI consent to three audits during the development phase of the project.  In response, AI advised Magento Academy that AI would keep Magento Academy informed regarding the timing for an audit, but never did so.

296.    AI deliberately, and in breach of its contractual obligations to engage Magento expertise, ignored Magento Academy's audit recommendation proposal and follow-up inquiries because AI wanted to avoid incurring consulting costs and thereby increase its profit margin on the Adorama website project.

297.    As a result of AI's breaches, AI failed to provide Adorama with a completed website, which caused Adorama to suffer monetary damages in an amount to be determined at trial.

## AS AND FOR A FOURTH COUNTERCLAIM
### (Negligent Misrepresentation as Against Alexander Schmelkin)

298.    Adorama reasserts and realleges Paragraphs 184-297 of the Counterclaims as if set forth herein.

299.    In light of Schmelkin's professed specialized expertise with respect to customizing e-commerce website platforms utilizing Magento software solutions coupled with the parties' almost daily working relationship from June 2010 through March 2012, Schmelkin developed a special relationship with Adorama.

300.    As detailed *supra*, Adorama reasonably relied upon Schmelkin's representations regarding AI's specialized expertise in both designing website concepts and in customizing e-commerce website platforms utilizing Magento software solutions.

301.    In addition, the phased and highly collaborative nature of the parties' business relationship necessitated a close working relationship among AI's representatives and Adorama, including dozens of face-to-face status meetings attended by Schmelkin at Adorama's headquarters, and the Basecamp communication platform. During this process, Schmelkin was entrusted with virtually every aspect of Adorama's business.

302.    Schmelkin also was keenly aware that Adorama had allocated significant time, resources and capital to ensure the successful and timely launch of the new website and that the website development represented an integral component of Adorama's business plan to drive the company's success into the future.

303.    Given all of these circumstances, Schmelkin held a special relationship with Adorama and, therefore, had a duty to use reasonable care to ensure that he imparted correct information to Adorama.

304.    As detailed *supra*, Schmelkin repeatedly and knowingly produced false information to Adorama regarding the manner in which AI would produce the Magento core such that Adorama would be able to easily install Magento upgrades and other modifications.

305.    As detailed *supra*, Schmelkin repeatedly and knowingly provided Adorama with false information regarding the quality of AI's Deliverables, which Schmelkin knew or had reason to know was false at the time he conveyed the information.

306.    As detailed *supra*, Schmelkin repeatedly and knowingly provided Adorama with false information regarding an accurate timeline for the completion of the Appendix C Deliverables and launch of the Adorama website, which Schmelkin knew or had reason to know was false at the time he conveyed the information.

307.    Schmelkin knew that the information he provided to Adorama was for a serious purpose and that it would be relied upon by Adorama.

308.    Adorama reasonably relied on the above-referenced false representations by Schmelkin, and suffered monetary damages in an amount to be determined at trial.

43

## AS AND FOR A FIFTH COUNTERCLAIM
### (Negligent Misrepresentation as Against Josh Levine)

309.    Adorama reasserts and realleges Paragraphs 184-308 of the Counterclaims as if set forth herein.

310.    Upon information and belief, Levine is a senior officer and/or principal at AI.

311.    Upon information and belief, Levine was aware that Adorama had allocated significant time, resources and capital to ensure the successful and timely launch of the new website and that the website development represented an integral component of Adorama's business plan to drive the company's success into the future.

312.    Upon information and belief, Levine was aware that Schmelkin had developed a special relationship with Adorama, which imposed a duty to use reasonable care in conveying information to Adorama.

313.    Upon information and belief, Levine either knew or participated together with Schmelkin in providing Adorama with false information regarding the quality of AI's Deliverables.

314.    Upon information and belief, Levine either knew or participated together with Schmelkin in providing Adorama with false information regarding an accurate timeline for the completion of the Appendix C Deliverables and launch of the Adorama website.

315.    Upon information and belief, Levine knew that the information being provided to Adorama was for a serious purpose and that it would be relied upon by Adorama, causing monetary damages in an amount to be determined at trial.

**AS AND FOR A SIXTH COUNTERCLAIM**
**(Negligent Misrepresentation as Against Alexander Interactive, Inc.)**

316.    Adorama reasserts and realleges Paragraphs 184-315 of the Counterclaims as if set forth herein.

317.    In light of AI's professed specialized expertise with respect to customizing e-commerce website platforms utilizing Magento software solution coupled with the parties' almost daily working relationship from June 2010 through March 2012, AI developed a special relationship with Adorama.

318.    As detailed *supra*, Adorama reasonably relied upon AI's representations regarding its specialized expertise in both designing website concepts and in customizing e-commerce website platforms utilizing Magento software solution.

319.    In addition, the phased and highly collaborative nature of the parties' business relationship necessitated a close working relationship among AI's representatives and Adorama, including dozens of face-to-face status meetings attended by Schmelkin and other AI representatives at Adorama's headquarters, and the Basecamp communication platform.  During this process, AI was entrusted with virtually every aspect of Adorama's business.

320.    AI also was keenly aware that Adorama had allocated significant time, resources and capital to ensure the successful and timely launch of the new website and that the website development represented an integral component of Adorama's business plan to drive the company's success into the future.

321.    Given all of these circumstances, AI held a special relationship with Adorama and, therefore, had a duty to use reasonable care to ensure that he imparted

correct information to Adorama.

322.   As detailed *supra*, AI repeatedly and knowingly provided Adorama with false information regarding an accurate timeline for the completion of the Appendix C Deliverables and launch of the Adorama website, which AI knew or had reason to know was false at the time AI conveyed the information.

323.   As detailed *supra*, AI repeatedly and knowingly produced false information to Adorama regarding the manner in which AI would produce the Magento core such that Adorama would be able to easily install Magento upgrades and other modifications.

324.   As detailed *supra*, AI repeatedly and knowingly produced false information to Adorama regarding the quality of the Appendix C Deliverables.

325.   AI knew that the information being provided to Adorama was for a serious purpose and that it would be relied upon by Adorama.

326.   Adorama reasonably relied on the above-referenced false representations by AI, and suffered monetary damages in an amount to be determined at trial.

## AS AND FOR A SEVENTH COUNTERCLAIM
### (Unjust Enrichment as Against Alexander Interactive, Inc.)

327.   Adorama reasserts and realleges Paragraphs 184-326 of the Counterclaim as if set forth herein.

328.   AI received and retained various payments made by Adorama from June 2010 through 2011 in excess of $875,000.

329.   As detailed *supra*, AI's retention of these payments is unjust because Adorama received nothing of value in exchange for payments made to AI.

330.   Given these circumstances, AI has been unjustly enriched and Adorama

has been damaged in an amount to be determined at trial.

331.   Defendants/Counterclaim Plaintiff demand a trial by jury of all of Plaintiffs' claims and Counterclaim Plaintiff's counterclaims that are so triable.

WHEREFORE, Defendants demand that Plaintiffs' Complaint be dismissed in its entirety and that judgment be entered in favor of the Defendant-Counterclaim Plaintiff Adorama, Inc. on each of the Counterclaims with damages to be determined in an amount at trial, and/or in the alternative for specific performance to require AI to perform its obligations under its agreements with Adorama and that Defendants be awarded their costs in this action, together with such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         January 27, 2014

REISS SHEPPE LLP

By: _____
        Matthew Sheppe (MS-9406)
        Daniel J. Brown (DB-7458)
     425 Madison Avenue, 11th Floor
     New York, New York 10017-1110
     (212) 753-2424

     Attorneys for Defendants and Defendant-
     Counterclaim Plaintiff Adorama, Inc.