UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDER INTERACTIVE, INC., ALEXANDER SCHMELKIN, and JOSH LEVINE,

Plaintiffs,

- against -

ADORAMA, INC., ADORAMA ENTERPRISES LLC, EUGENE MENDLOWITS, and MENDEL MENDLOWITS,

Defendants.

MENDEL MENDLOWITS, ADORAMA ENTERPRISES LLC, ADORAMA, INC., and EUGENE MENDLOWITS,

Counter Claimants,

- against -

ALEXANDER INTERACTIVE, INC, JOSH LEVINE, and ALEXANDER SCHMELKIN,

Counter Defendants.

12 Civ. 6608 (PKC) (JCF)

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiffs in this action -- Alexander Interactive, Inc., Alexander Schmelkin, and Josh Levine (collectively, “Alexander Interactive”) -- move for sanctions related to spoliation and other discovery misconduct, as well as an order that work product privilege has been waived in regard to a third-party witness and that all associated documents be produced. For the reasons that

follow, the plaintiffs' motions are granted in part and denied in part.

Background

The background of this case is described in previous decisions resolving discovery disputes. Alexander Interactive, Inc. v. Adorama, Inc., No. 12 Civ. 6608, 2013 WL 6283511, at *1-2 (S.D.N.Y. Dec. 4, 2013); Alexander Interactive, Inc. v. Adorama, Inc., 2014 WL 61472, at *1-2 (S.D.N.Y. Jan. 6, 2014). In brief, Adorama, an electronics retailer, hired Alexander Interactive in 2010 to develop a new website. Pursuant to a Master Services Agreement, Alexander Interactive created the source code for different components of the new website (the "deliverables"). These deliverables would first be tested by Alexander Interactive, and then transferred to a site managed by Adorama, where the deliverables would undergo full review and testing. (Declaration of Alexander Schmelkin dated May 2, 2014 ("Schmelkin 5/2/14 Decl."), attached as Exh. 4 to Plaintiffs' Reply in Response to Defendants' Objection and In Further Support of Plaintiffs' Omnibus Motion Seeking Sanctions Against Defendants Arising From Discovery Misconduct and Destruction of Evidence ("Omnibus Reply"), ¶¶ 5-6). This staging site was known as the "Manage" site. (Declaration of Alexander Schmelkin dated March 22, 2014 ("Schmelkin 3/22/14 Decl."), attached as Exh. Y to Plaintiffs' Memorandum of Law in

Support of Plaintiffs' Omnibus Motion Seeking Sanctions Against Defendants Arising From Discovery Misconduct and Destruction of Evidence ("Pl. Omnibus Memo."), at 1-2, ¶¶ 5-6). Initially, this staging ground was stored on Rackspace servers, although it was subsequently transferred to servers hosted by Amazon Web Services ("AWS") when the contract was terminated. (Letter of Matthew Sheppe dated May 9, 2014 ("Sur-Reply") at 2; Schmelkin 5/2/14 Decl., ¶ 5).

The website was also designed to interface with a number of peripheral systems and integration feeds. (Schmelkin 3/22/14 Decl. at 3, ¶ 3; Pl. Omnibus Memo. at 14-15). Peripherals are external systems that interact with the designed website through coded integration points to provide full functionality. For instance, a website's search results or the ads it displays at any given moment might be powered through interactions between the website's own source code and an external system (the "peripherals"). The integration points between the website's source code and the peripherals also require their own coding in order to ensure proper integration. The website Alexander Interactive was to design for Adorama was intended to function with several peripherals, including the AS400 system, the Endeca server, the Advertising Server ("AdServer"), and the Enterprise Business Server ("EBS"). (Schmelkin 3/22/14 Decl. at 3, ¶ 3; Declaration of Glen Holman

dated April 25, 2014 ("Holman Decl."), ¶ 3). The parties dispute some aspects of control over the peripherals, but it is undisputed that the AS400 and the Endeca server were controlled by Adorama. (Pl. Omnibus Memo. at 17; Holman Decl., ¶¶ 10, 12 (describing Endeca as a third party search platform, which Adorama "set[] [] up" to run with the source code provided by Alexander Interactive). As part of the code development process, Adorama provided Alexander Interactive with a feed from the AS400. (Holman Decl., ¶ 11). Initial development and testing was done using that discrete feed; once the code was uploaded to the Manage site, the deliverables would interact with the actual AS400 system. (Schmelkin 5/2/14 Decl., ¶ 7).

After a series of delays and disagreements over the code deliverables, the contract was terminated in March 2012. Several months later, Alexander Interactive sued Adorama, alleging that the defendants breached the contract and that Adorama's re-engineered website illegally incorporated code developed by Alexander Interactive. (2d Am. Compl., ¶¶ 44-57, 61-65). Alexander Interactive subsequently discovered that Adorama had created a blog on WordPress (www.aiexposed.com) purporting to provide an "open forum for dissatisfied and frustrated clients" of Alexander Interactive, which prompted the plaintiffs to add claims of defamation to the action. (2d Am. Compl., ¶¶ 73, 75, 79-86). In

turn, Adorama asserted a variety of counterclaims, alleging that Alexander Interactive wrongfully terminated the contract, failed to meet deadlines, misrepresented its capabilities, and delivered shoddy work that had not been quality-tested. (Answer, Affirmative Defenses and Counterclaims, ¶¶ 213, 215, 217–20, 228, 230–34, 253–58).

The discovery process in this action mirrors the fractious business relationship between the parties. Although initially scheduled to be completed by February 15, 2013, the parties have sought and received no less than seven extensions of discovery deadlines. Particularly relevant is a memorandum and order of January 6, 2014 resolving the then-outstanding discovery disputes between Alexander Interactive and Adorama. Part of that order dealt with the defendants' requested extension of the discovery schedule, in order to conduct a review of a hard drive produced by the plaintiffs on October 31, 2013, the last day of discovery, containing a copy of the deliverables that Alexander Interactive contended it had provided to Adorama. In recognition of the fact that "the actual work that Alexander Interactive delivered to Adorama is at the heart of this lawsuit," and noting that "it is not unreasonable to think there may be differences between what Adorama contends it received and what Alexander Interactive contends it delivered," I extended the discovery deadline to

February 7, 2014, for purposes of a full review of the contents of the external hard drive. Alexander Interactive, 2014 WL 61472, at *7. More specifically, I allowed "discovery [into] . . . any discrepancies that may be found between the data on the drive and the data already in defendants' possession," in addition to a forensic inspection of Alexander Interactive's computer system. Id. This deadline was subsequently extended to April 25, 2014, due to difficulties scheduling depositions and the parties' inability to agree on inspection parameters. (Order dated Feb. 12, 2014; Order dated March 24, 2014; Letter of Daniel J. Brown dated March 13, 2014 ("Brown 3/13/14 Letter")). The defendants were largely concerned that the data on the hard drive could not be authenticated, and that Alexander Interactive had engaged in "tampering or backdating the contents of the external drive." (Brown 3/13/14 Letter at 3).

## Discussion

### A. Legal Standard

The plaintiffs seek sanctions against the defendants for discovery misconduct, including spoliation of evidence, under Rules 26 and 37 of the Federal Rules of Civil Procedure, and sanctions against defendants' counsel under 28 U.S.C. § 1927 based on alleged unethical conduct. (Pl. Omnibus Memo.). The plaintiffs also move for an order ruling that defendants' counsel waived work product

protection as to documents regarding a third-party witness in the case, and sanctions under Rules 37 and 45. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion Seeking an Order (I) Ruling that Defendants' Counsel Waived Work Product Privilege and (II) Imposing Sanctions Arising From Defendants' Violation of the November 20, 2013 Order Entered By the Honorable P. Kevin Castel and Federal Rule [of] Civil Procedure 45 ("Pl. Work Product Memo.")).

The authority to sanction litigants for abuses of the discovery process arises under both the Federal Rules of Civil Procedure and the court's inherent powers. Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). Rule 37 allows for the imposition of sanctions where a party has failed to meet its disclosure obligations under Rule 26; this failure to disclose includes evidence that rightfully would have been produced but for its destruction. See In re September 11th Liability Insurance Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("A failure to disclose under Rule 37 encompasses both the destruction of evidence, or spoliation, and untimely production of documents and information required to be produced."). "Sanctions are appropriate even where a party's spoliation occurred before the issuance of the discovery order -- thus rendering compliance impossible -- because the inability to comply with the order was self-inflicted." Orbit

One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (internal quotation marks omitted). Indeed, the proposition that "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs" is well established in this Circuit. Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 106-07 (2d Cir. 2002); see also, e.g., Kronisch v. United States, 150 F.3d 122, 126–27 (2d Cir. 1998); Mastr Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc., 295 F.R.D. 77, 82 (S.D.N.Y. 2013), aff'd, No. 12 Civ. 7322, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013); Zimmerman v. Poly Prep Country Day School, No. 09 CV 4586, 2011 WL 1429221, at *12 (E.D.N.Y. April 13, 2011).

Imposing sanctions solely under a court's inherent power, however, generally requires a finding of bad faith. See DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998) (affirming sanctions levied pursuant to inherent power where party acted in "conscious disregard of [its] discovery obligations"). Bad faith must be shown by "(1) clear evidence or (2) harassment or delay or . . . other improper purposes." Id. (alteration in original) (internal quotation marks omitted).

B. Spoliation of Electronic Evidence

Spoliation is "'the destruction or significant alteration of

evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation.'" Orbit One Communications, Inc., 271 F.R.D. at 435 (quoting Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 107 (2d Cir. 2001)); accord Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), abrogated on other grounds by Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2d Cir. 2011); Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 288 (S.D.N.Y. 2009). A party seeking sanctions for spoliation must show: (1) the party with control over the evidence had an obligation to preserve such evidence, (2) the party that destroyed or failed to produce evidence in timely manner had a culpable state of mind, and (3) the missing evidence is relevant to the moving party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Residential Funding Corp., 306 F.3d at 107; Valentini v. Citigroup, Inc., No. 11 Civ. 1355, 2013 WL 4407065, at *2 (S.D.N.Y. Aug. 16, 2013).

A party has an obligation to preserve evidence when the party is on notice "that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citing Kronisch v. United States, 150

F.3d 112, 126). "Thus, the preservation requirement arises when a party 'reasonably anticipates litigation.'" Orbit One, 271 F.R.D. at 436 (quoting Pension Committee, 685 F. Supp. 2d at 466); accord Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008). "'This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation.'" Apple Inc. v. Samsung Electronics Co., 888 F. Supp. 2d 976, 990-91 (N.D. Cal. 2012) (quoting Micron Technology, Inc. v. Rambus, Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011)). The obligation to preserve exists whether or not the documents have been specifically requested in a demand for discovery or whether there has been an explicit discovery order issued. Zimmerman, 2011 WL 1429221, at *13.

"Failures to preserve and produce relevant evidence occur 'along a continuum of fault -- ranging from innocence through the degrees of negligence to intentionally.'" Curcio v. Roosevelt Union Free School District, 283 F.R.D. 102, 107 (E.D.N.Y. 2012) (quoting Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267 (2d Cir. 1999)). Therefore, the "culpable state of mind" element may be satisfied by a showing of ordinary negligence, as well as gross negligence or bad faith. See Residential Funding Corp., 306 F.3d at 113; Valentini, 2013 WL 4407065, at *3 (culpable state of

mind established where party was "at least negligent in failing to properly search for and produce responsive documents in a timely and thorough manner"); R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 23 ("In the Second Circuit, negligence is sufficient to establish culpability."), opinion adopted, 271 F.R.D. 55 (S.D.N.Y. 2010). This is necessary to "protect[] the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense." Orbit One, 271 F.R.D. at 438.[1]

A party moving for sanctions based on spoliation is charged with showing two types of relevance. First, the party must show, in accordance with the standard of Rule 26(b)(1) of the Federal Rules of Civil Procedure, that the destroyed information could reasonably have led to the discovery of admissible evidence. Id. at 440-41. Second, the moving party must demonstrate that a reasonable trier of fact could find that the missing evidence would have supported its claims. Id. at 438 (citing Residential Funding Corp., 306 F.3d at 108-09, and Zubulake v. UBS Warburg LLC, 229

[1] A proposed amendment to Rule 37(e) would limit the types of remedial orders that a court could issue absent a finding that the spoliator intended to deprive its adversary of the use of the evidence that was destroyed. See Report of the Advisory Committee on Civil Rules (May 2, 2014) at 35. However, until that amendment is enacted, it remains the law in this Circuit that the full range of remedies is available for even negligent spoliation.

F.R.D. 422, 431 (S.D.N.Y. 2004)). Although this second inquiry presents a higher threshold, the burden is not an onerous one, "'lest the spoliator be permitted to profit from its destruction.'" Mastr Adjustable Rate Mortgages Trust 2006-OA2, 295 F.R.D. at 86 (quoting Orbit One, 271 F.R.D. at 440). If a party's failure to preserve evidence rises to the level of willfulness or gross negligence, the moving party is entitled to the rebuttable presumption that any missing evidence would be favorable to that party. GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 358 (S.D.N.Y. 2012), aff'd, No. 11 Civ. 1299, 2012 WL 1849101 (S.D.N.Y. May 21, 2012). Where the breach of discovery obligations is merely negligent, relevance "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." Residential Funding Corp., 306 F.3d at 108 (footnote omitted).

1. Manage/Manage1 site

On April 2, 2013, AWS, which hosted the Manage and Manage1 sites, informed the defendants by e-mail that the servers on which the sites were stored were set to be retired in ten days' time due to hardware deterioration. (E-mail from Amazon Web Service dated April 2, 2013 ("AWS E-mail"), attached as Exh. I to Pl. Omnibus Memo.). The e-mail, which was sent to Benzion Mandelbaum, the manager of Adorama's IT department, recommended launching

replacement servers and migrating all necessary data. (AWS E-mail). Mr. Mandelbaum does not recollect receiving the e-mail, which was sent while Adorama's offices were closed for the Passover Holiday. (Declaration of Benzion Mandelbaum dated April 25, 2014 ("Mandelbaum Decl."), ¶ 4). When Mr. Mandelbaum returned to work the following day, he states that he very likely either did not open the AWS e-mail or did not appreciate its import due to the high number of e-mails in his inbox after a roughly two week absence. (Mandelbaum Decl., ¶ 4). Nonetheless, Mr. Mandelbaum was informed at that time by other Adorama employees that Manage was inaccessible. (Mandelbaum Decl., ¶ 7). He then tried to access Manage himself but could not, as the AWS server had already "degraded beyond repair." (Mandelbaum Decl., ¶ 7). According to Mr. Mandelbaum, it is an unfortunate but common occurrence for AWS servers to degrade before the retirement date provided by AWS. (Mandelbaum Decl., ¶¶ 6-7).

On December 11, 2013, as part of another discovery dispute, the defendants submitted a letter to the court stating that the server hosting the Manage site had "crashed" and Adorama no longer had access, but that they could provide an "older non-working version of the site." (Letter of Matthew Sheppe dated Dec. 11, 2013 ("Sheppe 12/11/13 Court Letter"), attached as part of Exh. M to Pl. Omnibus Memo., at 7). They also stated that information

relating to the crash had been included in their May 2013 document production, and therefore the plaintiffs should have been aware of the issue. (Sheppe 12/11/13 Court Letter at 7). On that same day, the defendants told the plaintiffs that they would provide access to the "Manage 1 database." (Letter of Matthew Sheppe dated Dec. 11, 2013 ("Sheppe 12/11/13 Letter"), attached as Exh. N to Pl. Omnibus Memo., at 3). The defendants again committed to providing "login access to Manage1 and documents concerning its creation" as late as January 6, 2014. (E-mail of Matt Sheppe dated Jan. 6, 2014 ("Sheppe 1/6/14 E-mail"), attached as Exh. P to Pl. Omnibus Memo.). On January 22, 2014, the defendants stated they would produce documents "concerning" Manage1. (E-mail of Daniel J. Brown dated Jan. 22, 2014, attached as part of Exh. T to Pl. Omnibus Memo.). Yet, as the plaintiffs' forensic expert was informed on January 29, 2014, neither of the Manage sites was accessible and only a non-working form of Manage survived. (Declaration of Nicholas A. Zatkovich dated March 13, 2014 ("Zatkovich Decl."), attached as Exh. R to Pl. Omnibus Memo., ¶ 57; E-mail of Daniel J. Brown dated Jan. 29, 2014, attached as part of Exh. T to Pl. Omnibus Memo.)).

It is undisputed that the last version of the website created under the Master Services Agreement was contained on the manage.adorama.com server, which was under Adorama's control. The duty to preserve the Manage sites attached, at the latest, with the

filing of the complaint in August 2012.[2] The subsequent loss of information was, at minimum, negligent. See Zubulake, 220 F.R.D. at 220. And the lost evidence -- the final source code contained on the staging site maintained by Adorama -- is critical to claims

---

[2] The duty to preserve arguably may have arisen prior to that date, given the contentious manner in which the contract was terminated. See, e.g., GenOn Mid-Atlantic, LLC, 282 F.R.D. at 356 (S.D.N.Y. 2012) (duty to preserve "unquestionably" arose when party "began to anticipate elements" of the litigation); Treppel, 249 F.R.D. at 118 (duty to preserve attaches "when a party should have known that the evidence may be relevant to future litigation" (internal quotation marks omitted)). This is relevant only insofar as the defendants have seized upon an assertion by the plaintiffs' expert, Thomas A. Tinsley, that Alexander Interactive is prejudiced because it is unable to access the site "as it originally sat and operated on the Rackspace server." (Declaration of Thomas A. Tinsley dated April 1, 2014, attached as Exh. 1 to Omnibus Reply, ¶¶ 20, 28; Sur-Reply at 2). The defendants contend that -- as the data transfer from Rackspace to AWS occurred in April 2012, five months before the suit was filed -- any alleged spoliation can be traced to a time before the obligation to preserve existed. (Sur-Reply at 2). The plaintiffs respond that Adorama referenced potential litigation on several occasions as the parties' working relationship deteriorated, and thus the duty to preserve relevant information attached well before the suit was filed. (Plaintiffs' Sur-Sur-Reply Filed In Further Support of Plaintiffs' Omnibus Motion ("Sur-sur-reply") at 3-5). Despite the arguments presented by the parties as to when the duty to preserve attached, the essence of Alexander Interactive's allegations remains that it can no longer access the Manage sites maintained by the defendants. Any potential prejudice as a result of the transfer from Rackspace server to the AWS server is now unknowable, as the information on the AWS server has been destroyed. (Sur-sur-reply at 6). As Alexander Interactive still would have had access to the Manage sites after they were transferred to the AWS server from the Rackspace server, it is not necessary for the purposes of the instant motion to determine exactly when the duty to preserve arose.

in this case, especially given Adorama's distrust of the copy of the source code provided by the plaintiffs.

Further, even assuming that the defendants inadvertently lost access to the Manage sites, they offer no explanation for defendants' counsel's subsequent, repeated assertions that the plaintiffs would still be given access to the Manage1 site. (Sheppe 12/11/13 Letter at 3; Sheppe 1/6/14 E-mail). The plaintiffs' expert describes the Manage and Manage1 sites as working in tandem, with Manage primarily serving as a load balancer and redirecting visitors to the Manage1 site. (Zatkovich Decl., ¶ 55). While the defendants characterize the sites somewhat differently, they do not contend that the Manage1 site is the "older, non-working copy" referenced in the December 11, 2013 communications, nor that it is currently available. (Mandelbaum Decl., ¶ 3 (acknowledging that "Adorama's copy of the Manage Server was no longer accessible to Adorama as of April 2013")). Under these circumstances, it is appropriate to consider the spoliation grossly negligent, and the rebuttable presumption that the missing information would have been favorable to the plaintiffs applies.

2. Peripheral Systems

The plaintiffs contend that Adorama employee Glen Holman admitted in July 2013 that Adorama dismantled the peripherals necessary to enable the website to perform. (Pl. Omnibus Memo. at

16-18). Without access to the specified peripherals, Alexander Interactive claims that it is unable to demonstrate a working site to the jury and therefore is irreparably prejudiced. (Pl. Omnibus Memo. at 16-18). The four required peripherals, according to Alexander Interactive, are the AS400 system, the Endeca server, AdServer, and Adorama's side of the EBS. (Pl. Omnibus Memo. at 17-18). Adorama flatly denies destroying the peripherals and views Alexander Interactive's allegations as an attempt to require Adorama to underwrite Alexander Interactive's trial expenses by providing access to information never requested during discovery. (Holman Decl., ¶ 3). According to the defendants, the decision to disconnect the peripherals was motivated by cost considerations when the contract between Alexander Interactive and Adorama was terminated. (Holman Decl., ¶ 5). The defendants also assert that the AdServer was programmed and controlled by a third party and not Adorama, and that Alexander Interactive programmed and controlled the entire ESB. (Holman Decl., ¶ 3).

To the extent that the peripherals in Adorama's control have been disconnected but still exist -- in particular, the AS400 and the Endeca server -- this defeats any charges of intentional spoliation. (Holman Decl., ¶¶ 4, 7 (noting that "Adorama retained the peripheral systems and source code integration data/feeds such that they could be produced if needed")). Although the plaintiffs

allege that they are still prejudiced because the peripherals are designed to work with the Manage site and will not work optimally with the data on the hard drive (Schmelkin 5/2/14 Decl., ¶ 10), this is prejudice that is properly attributed to the Manage site spoliation rather than any peripheral dismantling. Adorama argues that the AdServer is provided by a third party and that the plaintiffs may pay for access to the peripheral if required for jury demonstrations. (Def. Memo. at 11; Holman Decl., ¶ 18). They similarly argue that the plaintiffs may pay a licensing fee for access to the Endeca server, and that the discrete AS400 feed provided for development should suffice for purposes of demonstrating the website. (Def. Memo. at 11; Holman Decl., ¶¶ 11, 12).

In a previous discovery dispute, Alexander Interactive sought to compel the production of the configuration files of the AS400 and the Endeca server. I denied that request because the plaintiffs did not establish the relevance of that information at that time. Alexander Interactive, Inc., 2013 WL 6283511, at *5. The plaintiffs have now demonstrated the relevance of the peripherals, and, as stated above, any prejudice stemming from their disconnection is due to the loss of the Manage sites. Therefore, despite my prior order, I will nonetheless consider the relevance of the peripherals in relation to the spoliation of the

Manage sites in assessing any sanctions.

3. Deletion of www.aiexposed.com

The plaintiffs discovered www.aiexposed.com on or about September 6, 2012, and added claims of defamation shortly thereafter. The site has remained online throughout most of the litigation, and the plaintiffs served document requests seeking any documents relating to site optimization, site visits, and comment moderation. (Plaintiffs' Amended First Request for Production of Documents, attached as Exh. E to Pl. Omnibus Memo. ("Pl. Doc. Request"), Request No. 50). In May 2013, Adorama produced a chart showing site visits from January through March 2014. (Def. Memo. at 12; Site Visits, attached as Exh. C to Mandelbaum Decl.). The defendants intentionally took down the site in late December 2013. (Pl. Omnibus Memo. at 15; Def. Memo. at 13).

The plaintiffs contend that deleting the site has made it impossible for them to adequately demonstrate the site to the jury and deprived them of necessary access to the workings and infrastructure of the site. (Pl. Omnibus Memo. at 15, 18). The defendants respond that they merely complied with the plaintiffs' repeated requests to take down the site and that it can be reconstituted as necessary for jury demonstrations. (Def. Memo. at 12-13; Declaration of Daniel J. Brown dated April 25, 2014 ("Brown Decl."), ¶ 32). Adorama also asserts that the workings and

infrastructure of the site are irrelevant to any issues of liability or damages relating to the plaintiffs' defamation claim. (Def. Memo. at 12).

The request for optimization data was already considered in a previous discovery motion, Alexander Interactive, 2014 WL 61472, at *6, and the defendants allege that they have turned over all responsive documents. (Def. Memo. at 12; Sheppe 12/11/13 Court Letter at 4-5). "Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist . . . should resolve the issue of failure of production . . . ." Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 152 (S.D.N.Y. 1997) (second alteration in original) (internal quotation marks omitted). Here, the plaintiffs have not made any showing that would cast doubt on the defendants' prior representations that they have no optimization data to produce. There can be no spoliation where the requested evidence does not exist. See Mastr Adjustable Rate Mortgages Trust 2006-OA2, 295 F.R.D. at 87; Orbit One, 271 F.R.D. at 441; Farella v. City of New York, Nos. 05 Civ. 5711, 05 Civ. 8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007). The defendants have also supplemented their production of information on site visits, in conjunction with their opposition to the pending motion. (Def. Memo. at 12).

However, insofar as the live site itself is a piece of

evidence that once existed and no longer does, based on the intentional conduct of the defendants, the plaintiffs have met their burden of establishing spoliation. As the website was the basis for the plaintiffs' defamation claim, the defendants unquestionably knew that it was relevant evidence that they were required to preserve, yet chose to dismantle it. And although the defendants assert that the plaintiffs' previous requests that the site be "take[n] down" should be considered a waiver of any subsequent charges of spoliation (Def. Memo. at 13 (citing International Business Machines Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775373, at *2-3 (S.D.N.Y. April 25, 2013) (declining to impose sanctions for spoliation where moving party previously requested destruction of that very evidence)), the circumstances here do not amount to a waiver. The defendants provide no specific examples of the plaintiffs' "repeated[] complaint[s]" about the website (Brown Decl., ¶ 32), the plaintiffs contend that the site could have been hidden from the public instead of permanently deleted (Pl. Omnibus Memo. at 18), and the decision to delete the site came over a year after the Amended Complaint was filed.

4. Sanctions

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and

is assessed on a case-by-case basis." Fujitsu Ltd., 247 F.3d at 436 (internal citations omitted). Moreover, "a court must determine the appropriate sanction based on the relative fault of the party against whom sanctions are sought and the prejudice suffered by the party seeking sanctions." Richard Green (Fine Paintings), 262 F.R.D. at 292 (internal quotation marks ommitted). In crafting an appropriate sanction, therefore, the court should attempt both to "restore the parties to the position they would have occupied but for the breach of discovery obligations and [to] deter future misconduct." In re September 11th Liability Insurance Coverage Cases, 243 F.R.D. at 131–32. With a variety of available sanctions ranging from further discovery to monetary sanctions to terminating the action, the court should impose the mildest sanction capable of remedying the harm. Passlogix, Inc. v. 2FA Technology, LLC, 708 F. Supp. 2d 378, 420 (S.D.N.Y. 2010). Terminating sanctions, such as entry of default judgment or dismissal of claims, are generally ordered only in "egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence." R.F.M.A.S., Inc., 271 F.R.D. at 25 (internal quotation marks omitted); Arista Records, LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) ("Terminating sanctions are used only in extreme circumstances, usually after consideration of alternative, less

drastic sanctions." (internal quotation marks omitted)).

While the spoliation of the Manage sites has not been shown to be either willful or intentional, defendants' counsel, as detailed above, repeatedly assured Alexander Interactive they would have access to the Manage1 system, despite Adorama's knowledge that that was impossible after the degradation of the AWS server. The end result is that Adorama delayed revealing the full extent of the spoliation through the end of discovery.

Given this delay, the misrepresentations made to the plaintiffs, and the highly relevant nature of the lost information, it is appropriate that the defendants be precluded from offering any argument at trial that the version of the website contained on the hard drive provided by Alexander Interactive is not the final website that Alexander Interactive delivered to Adorama. This is an imperfect solution, as Alexander Interactive contends that it is still prejudiced because the hard drive version will not be able to integrate fully with the peripheral systems. (Declaration of Nicolas A. Zatkovich dated May 2, 2014, attached as Exh. 2 to Omnibus Reply, ¶¶ 15-16; Schmelkin 5/2/14 Decl., ¶ 7). The defendants, for their part, seemingly doubt the authenticity of the hard drive contents (Brown 3/13/14 Letter at 3-4), even as they argue that the plaintiffs are not prejudiced by the disappearance of the Manage sites because they have the "identical" data on the

hard drive (Def. Memo. at 10). The hard drive was turned over to the defendants on October 31, 2013, ostensibly for comparison with the Manage sites, and before Alexander Interactive knew the Manage sites were inaccessible. It therefore seems unlikely that Alexander Interactive would have produced a drastically different version of the site. Furthermore, the party responsible for spoliation is the one that should bear the attendant risks. See Residential Funding Corp., 306 F.3d at 108; Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D.N.Y. 1991).

As a result, the defendants' pending expert forensic inspection of the hard drive is moot. The forensic review is focused on "ascertaining whether or not [Alexander Interactive] engaged in any data tampering or backdating [of] the contents of the external drive." (Brown 3/13/14 Letter at 3). To conduct this analysis, the defendants have required access to and information regarding Alexander's computer systems, servers, backup systems, and logging files. (Brown 3/13/14 Letter at 3). The primary means of verifying the authenticity of the hard drive data is through comparison with the Manage sites, which is now impossible. As the defendants are precluded from offering any argument that the contents of the hard drive are different from the website stored on the Manage sites, there is no further basis for inquiry into its authenticity.

There has been no spoliation of the peripheral systems associated with the website, as they still exist. However, the plaintiffs claim that the remaining hard drive copy of the website cannot be fully integrated with the peripherals. In light of this potential prejudice, the defendants are ordered to provide access to the AS400 and Endeca server, free of charge, to the extent it is possible to integrate those peripherals with the hard drive copy of the website. The defendants must also bear the costs of providing access to the AdServer.

As for the deletion of www.aiexposed.com, it is clear that this was an intentional and bizarrely-timed decision. However, given the representations of defendants' counsel that all responsive documents relating to www.aiexposed.com have been produced, the supplementation of documents showing site visits through the present, and the questionable relevance of comment moderation as grounds for demonstrating malice in conjunction with claims of defamation, there is not a sufficient showing of prejudice to warrant sanctions. As the defendants represent that the site can be reconstituted, they should consult with the plaintiffs to determine whether this is the course the plaintiffs wish to pursue. If so, the defendants are ordered to reconstitute www.aiexposed.com.

C. Untimely or Unproduced Discovery

1. Financial Documents

The plaintiffs contend that the defendants have not produced, as promised, all the financial documents specifically requested in the plaintiffs' first document request. (Pl. Omnibus Memo. at 26; Letter of Daniel J. Brown dated May 7, 2013 ("Brown 5/7/13 Letter"), attached as Exh. J to Pl. Omnibus Memo., at 9-10). Without this financial data, the plaintiffs allege, their expert is unable to conduct an analysis in support of the plaintiffs' claims of unjust enrichment. (Pl. Omnibus Memo. at 26). The plaintiffs point in particular to two requests served as part of the plaintiffs' first amended request for document production, Request Nos. 44 and 45. Request No. 44 seeks "sales/revenue/profit comparisons" of Adorama's old website and its re-engineered website. (Pl. Doc. Request, Request No. 44). The defendants agreed to produce such documents, but for a more compressed time period than requested by the plaintiffs. (Brown 5/7/13 Letter at 9). Request No. 45 seeks documents relating to the eCommerce conversion rate and average order value of Adorama's old and new websites. (Pl. Doc. Request, Request No. 45). The defendants also agreed to produce these documents. (Brown 5/7/13 Letter at 10).

The plaintiffs have submitted a declaration by their financial expert stating that the provided documents "did not include

sufficient useful or relevant information" but rather were a "hodge-podge of emails regarding conversion rate discussions, articles of conversion rates on the web, bits and pieces of financial data, without context, reference or summary, and text messages." (Declaration of Mark Reid dated March 10, 2014 ("Reid Decl."), attached as Exh. X to Pl. Omnibus Memo., at 2-3). He then lists the data required in order to conduct a proper analysis, including audited financial statements, tax returns, market share information, information from online merchant transaction facilitators such as PayPal and Google, data distinguishing online sales from in-store sales, identification of Adorama's accountant, and the data underlying the previously produced documents. (Reid Decl. at 3).

This is information that may indeed be relevant to Alexander Interactive's claims and necessary for a thorough financial analysis of Adorama. However, the majority of it was not sought in previous discovery requests, nor is it reasonably encompassed by Request Nos. 44 and 45. To the extent that Adorama has not disclosed the underlying data supporting its current production concerning eCommerce conversion rates and a comparison of profits and sales between the new and the old websites, this should be produced. The balance was not specifically requested during the lengthy discovery period in this action, and the defendants cannot

be compelled either to produce it or sanctioned for its non-production.[3]

2. Discovery in Waves

The plaintiffs also contend that the general pattern of Adorama's discovery production was prejudicial and provides grounds for sanctions. (Pl. Omnibus Memo. at 27). In support, they cite Lava Trading, Inc. v. Harford Fire Insurance Co., No. 03 Civ. 7037, 2005 WL 459267 (S.D.N.Y. Feb. 24, 2005), where the court chose to sanction a party for "excruciatingly slow and disjointed disclosure" with a demonstrated pattern of large-scale production shortly before court conferences and key depositions. Id. at *9-10.

The discovery process has certainly been disjointed, although delays can be attributed to both sides. The defendants also allege that 90% of their document production was provided by April 2013,

[3] Request No. 47, which seeks all documents relating to any brand enhancement experienced by Adorama as a result of its business relationship with Samsung, including documents reflecting sales data before and after such business relationship began, is also referenced in the attachments appended to the motion, although not in the motion itself. (Pl. Omnibus Memo. at 26; Brown 5/7/13 Letter at 10; Reid Decl. at 2). This request was expressly objected to by the defendants on grounds of relevance (Brown 5/7/13 Letter at 10), and was not subject to any previous motion to compel. Therefore, as discovery has now ended, the plaintiffs have waived any argument that the non-production of such evidence constitutes misconduct on the part of the defendants. Arguments as to the relevant time period for Request Nos. 44 and 45 are similarly waived. (Reid Decl. at 4).

in advance of depositions and well before the close of discovery. Although "[t]he harm caused by delay in production is a relevant factor in determining sanctions" Pure Power Boot Camp v. Warrior Fitness Boot Camp, 587 F. Supp. 2d 548, 567 (S.D.N.Y. 2008), the plaintiffs must still demonstrate that sanctions are warranted. Even the identified pattern of grossly negligent production in Lava Trading was insufficient to merit dismissal of the suit. 2005 WL 459267 at *16. Here, apart from the spoliation claims described above, the plaintiffs have not carried their burden of showing specifically how production in "waves" has prejudiced their cause.

E. The Bouhatous Deposition

While developing the website for Adorama, Alexander Interactive hired Magento, an outside consultant, to provide code audit and consulting services. (Pl. Work Product Memo. at 2). After the contract between Alexander Interactive and Adorama was terminated, Adorama solicited Magento to perform certain services that were included in the terminated contract. (2d Am. Compl., ¶¶ 48, 60). The parties sought to depose Magento's principal, Gabrielle Bouhatous, as a third-party witness. Because Mr. Bouhatous resides in France, the parties asked him to waive service under the Hague Convention. (Pl. Work Product Memo. at 2). After a series of e-mail communications between plaintiffs' counsel, defendants' counsel, and Mr. Bouhatous' counsel, on which all

parties were copied, Mr. Bouhatous agreed to waive such service providing that Alexander Interactive waived the confidentiality provisions contained within the agreement between Alexander Interactive and Magento. (Pl. Work Product Memo. at 2). Mr. Bouhatous also asked to be provided with deposition topics and questions in advance, as he would be entitled to under the Hague Convention. (Brown Decl., ¶¶ 10-12; E-mail of Frederic Jeangirard dated Oct. 8, 2014, attached as Exh. E to Brown Decl.). Alexander Interactive agreed to waive the confidentiality provision. (E-mail of Denise Savage dated Oct. 2, 2013 ("Savage E-mail"), attached as part of Exh. N to Brown Decl.). During this negotiation, the defendants provided a brief description of the deposition's subject-matter (E-mail of Daniel J. Brown dated Sept. 20, 2013, attached as part of Exh. N to Brown Decl.); plaintiffs' counsel objected to the scope of the deposition as described by defendants' counsel, but did not respond to Mr. Bouhatous' request to receive deposition questions in advance. (Savage E-mail). Mr. Bouhatous arrived in New York and was deposed on November 25, 2013.

Plaintiffs' counsel recounts that, "[a]fter ruminating about Mr. Bouhatous' testimony," she "suspected that Mr. Bouhatous had been coached by defendants' counsel." (Pl. Work Product Memo. at 3). She then sought all correspondence between the defendants, defendants' counsel, Mr. Bouhatous, and Mr. Bouhatous' counsel.

(Pl. Work Product Memo. at 3). The defendants produced such correspondence on December 27, 2013, which showed that defendants' counsel and Mr. Bouhatous' counsel had indeed exchanged e-mails prior to the deposition. (Pl. Work Product Memo. at 3; Correspondence between Daniel J. Brown and Frederic Jeangirard, dated from Nov. 18, 2013 to Nov. 24, 2013 ("Bouhatous Correspondence"), attached as part of Exh. A to Pl. Work Product Memo.). In the e-mails, defendants' counsel asks whether Mr. Bouhatous can provide "any emails/narratives in his possession at eCommerce Academy showing the audits and reports sent back to [Alexander Interactive]," and also attaches a draft outline of the topics to be addressed in the deposition, including exhibits, intended questions, and questions he anticipated plaintiff's counsel would ask. (Bouhatous Correspondence). Defendants' counsel also relayed that plaintiffs' counsel was likely to inquire about how Mr. Bouhatous had prepared for the deposition, and that under the U.S. Federal Rules of Civil Procedure, his attorney could direct Mr. Bouhatous "not to answer any such questions as they would result in a waiver of [] attorney client privilege." (E-mail of Daniel J. Brown dated Nov. 21, 2013 ("Brown 11/21/13 E-mail"), included as part of Bouhatous Correspondence). Although Mr. Bouhatous' counsel sent an e-mail on November 21, 2013, indicating that Mr. Bouhatous was "gathering the documents" and that they

would be sent the following day (E-mail of Frederic Jeangirard dated Nov. 21, 2013, included as part of Bouhatous Correspondence), defendants' counsel now states that Mr. Bouhatous never produced any documents. (Brown Decl., ¶ 15; E-mail of Daniel J. Brown dated Nov. 23, 2013, attached as Exh. K to Brown Decl.).

The plaintiffs contend that by sending Mr. Bouhatous' counsel the deposition topics and proposed questions, a purportedly confidential document, the defendants have waived work product protection for all documents relating to Mr. Bouhatous. (Pl. Work Product Memo. at 5-6). As a sanction for defense counsel's ex parte communications with Mr. Bouhatous' counsel, the plaintiffs also seek to exclude all use of Mr. Bouhatous' deposition testimony, or, in the alternative, an adverse instruction, as well as costs and fees of the motion. (Pl. Omnibus Memo. at 25). The defendants respond that obtaining documents informally after court-ordered discovery deadlines is "perfectly permissible." (Def. Memo. at 15). They also argue that the plaintiffs cannot show any prejudice, as plaintiffs' counsel knew that Mr. Bouhatous required deposition questions in advance, the defendants turned over the documents Adorama sent to Mr. Bouhatous' counsel, Mr. Bouhatous ultimately produced no documents to the defendants, and plaintiffs' counsel did not ask any questions at the deposition concerning how Mr. Bouhatous prepared for the deposition. (Def. Memo. at 15-17,

21-23; Brown Decl., ¶¶ 10-12, 15-17, 22).

1. Work Product Waiver

Work product privilege is waived there is "'deliberate, affirmative, and selective use of privileged work-product materials by a party.'" SEC v. Gupta, 281 F.R.D. 169, 171 (S.D.N.Y. 2012) (quoting In re Grand Jury Proceedings, 219 F.3d 175, 191 (2d Cir. 2000)). This privilege is not automatically waived by disclosure to a third party, but rather when disclosure is "inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information." In re Terrorist Attacks on September 11, 2001, 293 F.R.D. 539, 544 (S.D.N.Y. 2013) (internal quotation marks omitted); see Costabile v. Westchester, 254 F.R.D. 160, 164 (S.D.N.Y. 2008); Fullerton v. Prudential Insurance Co., 194 F.R.D. 100, 103 (S.D.N.Y. 2000). District courts in this Circuit have held that disclosure to a third-party witness in the action waives privilege where the witness does not share a common interest with the disclosing party. Gupta, 281 F.R.D. at 172; In re Refco Inc. Securities Litigation, Nos. 07 MDL 1902, et al., 2012 WL 678139, at *3 (S.D.N.Y. Feb. 28, 2012); Ricoh Co. v. Aeroflex Inc., 219 F.R.D. 66, 70 (S.D.N.Y. 2003). Otherwise, "the ability of a party to meet with a non-party witness, show him documents and ask him questions, and then mask the entire preparation session in the cloak of work

product protection would serve to facilitate even the most blatant coaching of a witness." Gupta, 281 F.R.D. at 173.

Here, defendants' counsel chose to send Mr. Bouhatous' counsel a document that was prepared in anticipation of litigation. That defendants' counsel also asked Mr. Bouhatous' counsel to discuss the draft deposition topics and questions with his client rather than actually providing the documents themselves to Mr. Bouhatous, ostensibly in an attempt to preserve work product confidentiality (Brown 11/21/13 E-mail), does not alter the underlying disclosure. Work product protection was therefore waived with respect to that document.

However, the plaintiffs have been provided with the entire e-mail exchange between defendants' counsel and Mr. Bouhatous' counsel, as well as the attached deposition topics and questions. The plaintiffs now request all work product connected to Mr. Bouhatous, separate and apart from the deposition, as well as all underlying factual material explicitly referenced within the documents provided to Mr. Bouhatous' counsel. (Pl. Work Product Memo. at 6). Although a party may be required to produce underlying factual material explicitly referenced in disclosed communications, these materials must be "explicitly identified, cited, or quoted in [the documents] disclosed." See In re Weatherford Interntional Securities Litigation, No. 11 Civ. 1646,

2013 WL 6628964, at *3 (S.D.N.Y. Dec. 16, 2013). The plaintiffs have not specified what particular factual material they seek, nor is any apparent from a review of the deposition questions provided to Mr. Bouhatous. Furthermore, plaintiffs' counsel was present at the deposition, had access to the exhibits, and could have, at the time, requested any specifically referenced factual material. No further disclosure is warranted here.

2. Sanctions

The plaintiffs also seek to have Mr. Bouhatous' deposition testimony precluded, contending that defendants' counsel's ex parte communications with Mr. Bouhatous' attorney and request for documents after the period for document requests had expired violated both Rule 45 of the Federal Rules of Civil Procedure and Judge Castel's scheduling order. (Pl. Work Product Memo. at 6; Pl. Omnibus Memo. at 25). Preclusion is a harsh sanction reserved for exceptional cases. See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147 (S.D.N.Y. 2012) (noting the "importance of imposing such a sanction sparingly"); Passlogix, Inc., 708 F. Supp. 2d at 421; Kunstler v. City of New York, 242 F.R.D. 261, 265 (S.D.N.Y. 2007) (describing preclusion as "disfavored").

On Oct. 31, 2013, I ordered the deadline for discovery be extended to November 29, 2013, solely in connection to the

depositions of three non-party witnesses, including Mr. Bouhatous. (Order dated Oct. 31, 2013). The actions taken by defendants' counsel were all in connection with Mr. Bouhatous' deposition and therefore do not violate the prior scheduling order of Judge Castel.

Rule 45 governs the service of subpoenas on non-parties, and expressly requires that all parties be given prior notice and a copy of any subpoena that "commands the production of documents, electronically stored information, or tangible things." See Fed. R. Civ. P. 45(a)(4). Its purpose "is to discourage parties from engaging in secretive behavior." Lumbermens Mutual Casualty v. United States, 70 Fed. Cl. 94, 99 (Fed. Cl. 2006). Here, the deposition was arranged with the knowledge and consent of all counsel; no subpoena was ever served. Only the request for documents took place without the plaintiffs' knowledge.

Even if Mr. Bouhatous' deposition were taking place under the auspices of Rule 45, that rule provides no authority for imposing sanctions. See Shell v. J.J.B. Hilliard, No. 305-CV-245, 2007 WL 509263, *5 (E.D. Tenn. 2007) ("Neither Rule 37 nor Rule 45 of the Federal Rules of Civil Procedure authorize the imposition of sanctions for failure to provide prior notice on a subpoena duces tecum."); accord Lobato v. Ford, No. 05-CV-01437, 2007 WL 3342598 (D. Colo. Nov. 9, 2007). Sanctions would only be appropriate under

the court's inherent powers, which requires some showing of bad faith or other misconduct.

Determining the appropriate sanction for a party who has wrongfully obtained evidence requires balancing the severity of the wrongdoing and the prejudice to the adversary. Fayemi v. Hambrecht and Quist, Inc., 174 F.R.D. 319, 325 (S.D.N.Y. 1997). Here, however, no documents were ever produced by Mr. Bouhatous to the defendants. In addition, plaintiffs' counsel was present during the deposition but declined to ask any questions regarding Mr. Bouhatous' preparation for the deposition. Had she asked questions regarding the deposition preparation and been met with an objection based on attorney-client privilege, as suggested by defendants' counsel in his e-mails, there might be grounds for re-opening the deposition. The particular circumstances here, however, do not justify the imposition of sanctions. See, e.g., Carrion v. City of New York, No. 01 Civ. 2255, 2002 WL 31093620, at *4 (S.D.N.Y. Sept. 18, 2002) (where party obtained information improperly, excluding only privileged information and not information that could be acquired through normal course of discovery); Matter of Beiny, 129 A.D.2d 126, 129-33, 517 N.Y.S.2d 474, 476-79 (1st Dep't 1987) (precluding documents and disqualifying counsel who acquired documents through subpoena without providing notice and then refused to produce documents).

F. Conduct of Defense Counsel

Under 28 U.S.C. § 1927, the court may order an attorney to "satisfy personally the excess costs, expenses, and attorneys' fees" resulting from misconduct that "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Imposing sanctions under § 1927 requires a similar showing of bad faith as that necessary to invoke the court's inherent power. Enmon v. Prospect Capital Corp., 675 F.3d 138, 143–44 (2d Cir. 2012) (quoting Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986)). Indeed, "the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." Oliveri, 803 F.2d at 1273. "Bad faith may be inferred only if the [attorney's] actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999) (internal quotation marks omitted); accord McCune v. Rugged Entertainment, LLC, No. 08 CV 2677, 2010 WL 1189390, at *2 (E.D.N.Y. March 29, 2010). Sanctionable behavior under § 1927 includes bringing claims for an improper purpose, pursuing abusive

litigation practices, and "continually engaging in obfuscation of the issues." See, e.g., Keller v. Mobil Corp., 55 F.3d 94, 99 (2d Cir. 1995) (internal quotation marks omitted) (overturning § 1927 sanctions where no evidence of improper purpose, despite attorney's "excruciating attention to detail" and "at times exasperating conduct"); Dahiya v. Kramer, No. 13-CV-3079, 2014 WL 1278131, at *8 (E.D.N.Y. March 27, 2014) (affirming § 1927 sanctions where counsel pursued meritless claims for personal reasons at expense of client's interests); KGK Jewelry LLC v. ESDNetwork, No. 11 Civ. 9236, 2014 WL 1199326, at *6 (S.D.N.Y. March 21, 2014) (sanctions under § 1927 warranted where counsel issued subpoenas for purposes of harassment); Hopson v. Riverbay Corp., 190 F.R.D. 114, 123 (S.D.N.Y. 1999) (sanctions not warranted where counsel's misrepresentations may have been result of negligent preparation rather than for purpose of delay or harassment).

None of the conduct outlined above rises to a level warranting sanctions under § 1927. While defendants' counsel continued to represent that the plaintiffs would be given access to the Manage1 site long after acknowledging that the Manage site itself had been lost, on the facts presented this delay cannot be attributed to clear bad faith on part of defendants' counsel. Similarly, defendants' counsel's conduct in respect to the Bouhatous deposition, while not reflecting the utmost transparency, can be

excused given plaintiffs' counsel's knowledge that advance notification of deposition topics and questions was a prerequisite to the deposition.

Conclusion

The plaintiffs' motion for sanctions arising from discovery misconduct (Docket No. 115) is granted in part and denied in part. The defendants are precluded from offering evidence that the source code contained on the hard drive previously provided by the plaintiffs does not represent the final work product produced by Alexander Interactive under the contract. The plaintiffs' motion for an order that the defendants waived work product privilege as to documents concerning Mr. Bouhatous, and for sanctions in connection with defendants' counsel's conduct (Docket No. 121) is denied. No costs or attorneys' fees are assessed to either party.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
June 17, 2014

Copies mailed this date:

Denise L. Savage, Esq.
Savage & Associates, P.C.
400 Blinn Road
Suite 1010
Croton-on-Hudson, NY 10520

Kenneth P. Norwick, Esq.
Norwick, Schad & Goering
110 East 59th Street, 29th Flr
New York, NY 10022

Matthew H. Sheppe, Esq.
Eric J. Vardi, Esq.
Reiss Sheppe LLP
425 Madison Ave.
New York, NY 10017

Patrick J. Sweeney, Esq.
Holland & Knight LLP
31 West 52nd St.
New York, New York 10019